ORIGINAL

FILED
CLERK, U.S. DISTRICT COURT

FEB 16 2005

CENTRAL DISTRICT OF CALIFORNIA
BY                            DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

October 2004 Grand Jury

SA CR 05-    **SA05-0036**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) |
|  | ) |
| KENNETH KETNER, and | ) |
| ALLEN JOHNSON, | ) |
|  | ) |
| Defendants. | ) |
|  | ) |
|  | ) |
|  | ) |

I N D I C T M E N T

[18 U.S.C. § 1344: Bank Fraud;
18 U.S.C. §§ 1343 and 1346: Honest
Services Wire Fraud;
18 U.S.C. § 1343: Wire Fraud;
18 U.S.C. § 1956(h): Money
Laundering Conspiracy;
18 U.S.C. § 1957: Engaging in
Monetary Transactions in Property
Derived from Specified Unlawful
Activities; and
18 U.S.C. § 2: Aiding and
Abetting]

The Grand Jury charges:

INTRODUCTORY ALLEGATIONS

At all times relevant to this Indictment:

A.  Defendants

1.  Defendant KENNETH KETNER, through various titles,
controlled Mortgage Capital Resource Corporation, a California
Corporation ("MCR").

2.  Defendant ALLEN JOHNSON, a recent law school graduate,

ADS:ads



ENTER ON ICMS

FEB 17 2005

(1)

was an attorney duly licensed to practice law in the State of California.  Defendant JOHNSON was a longtime friend of defendant KETNER.  Defendant JOHNSON also was a partner in law firms which had offices in Atlanta, Georgia and in MCR's offices in Orange County, California.  JOHNSON, through his law firms, acted as the closing agent for loans originated by MCR's Atlanta, Georgia office.

B.   MCR's Creditors

3.   Household Commercial Financial Services ("Household") was a warehouse lender based in the State of Illinois.

4.   Republic Bank was a bank the deposits of which were insured by the Federal Deposit Insurance Corporation ("FDIC").

C.   MCR and the Warehouse Lines of Credit

5.   MCR was in the business of originating and funding home loans.  MCR originated two types of loans: (1) first mortgages the proceeds of which were to be used by borrowers to purchase a home; and (2) home equity loans, the proceeds of which were to be used by borrowers for a variety of reasons, including debt consolidation.

6.   The loans MCR originated were funded by warehouse lenders who provided lines of revolving credit ("warehouse lines") arranged by defendant KETNER.  The warehouse lenders permitted MCR to make loans to borrowers on their behalf so long as the loans met certain requirements.  Among those requirements was that the loans drawn on the warehouse line could only remain on a warehouse line for a set period of time and then needed to be repaid.  Typically, a loan would be repaid by selling the loan to a lender who would service it on a long-term basis.

2

COUNT ONE

[18 U.S.C. §§ 1344 and 2]

A.    THE SCHEME TO DEFRAUD

7.    The Grand Jury hereby incorporates and re-alleges by reference Paragraphs 1 through 6.

8.    Beginning in or about 1996 and continuing until at least in or about 2001, in Orange County, within the Central District of California and elsewhere, defendant KENNETH KETNER knowingly and with intent to defraud devised, executed, and participated in a scheme to defraud Republic Bank and other FDIC insured warehouse lenders, and a scheme to obtain moneys or other property owned by and in the custody and control of Republic Bank and other FDIC warehouse lenders, by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts.

9.    Defendant KETNER committed, caused the commission of, and aided, counseled, commanded, induced, and procured others to commit fraud against Republic Bank and other FDIC insured warehouse lenders by the following means and methods, among others:

        a.    Defendant KETNER would arrange for loans on properties funded by MCR's warehouse lines of credit;

        b.    The money owed to warehouse lenders would come due;

        c.    Rather than sell off the loan or take a loss on the loan, defendant KETNER would ask, or cause others to ask, a

3

friend or employee to be a straw buyer of the property.
Defendant KETNER would then assure the straw buyer/borrower that
MCR, and not the straw, was the party truly liable for the loan;

d.   Defendant KETNER would then cause a warehouse
lender to fund the loan under the false pretense that the loan
was being made to the straw buyer/borrower, when, in fact, it was
not.

e.   Defendant KETNER would cause the loan files
relating to straw buyers/borrowers to be segregated at MCR to
assure that they were not sold to a lender.  Specifically,
defendant KETNER would cause these loans to be put into purple
files, and these straw loans became known in the company as the
"purple file properties."

B.   EXECUTION OF THE SCHEME TO DEFRAUD

10.   On or about the following dates, in Orange County,
within the Central District of California an elsewhere, defendant
KETNER committed and knowingly caused others commit the following
acts, each of which constituted an execution of the fraudulent
scheme:

a.   Defendant KETNER caused 1916 South Date Avenue,
Alhambra, California, to be bought and sold by straw
buyers/borrowers at least 10 times.  The straw buyers/borrowers
for this property included defendant JOHNSON and other associates
of defendant KETNER.  On August 23, 1999, Household funded
$155,749.39 toward the purchase of this property under the false

pretense that defendant KETNER's property manager was purchasing the property when, in fact, defendant KETNER had assured the property manager that MCR would be liable for the loan;

b.   Defendant KETNER caused 36662 Rose Street, Palmdale, California, to be bought and sold by straw buyers/borrowers at least 10 times.  The straw buyers/borrowers for this property included defendant JOHNSON and other associates of defendant KETNER.  On November 24, 1999, Household funded $86,458.03 toward the purchase of this property under the false pretense that one of defendant KETNER's straw buyer/borrowers was, in fact, purchasing the property;

c.   Defendant KETNER caused 16416 Kittridge Street, Van Nuys, California, to be bought and sold by straw buyers/borrowers at least 8 times.  The straw buyers/borrowers for this property included defendant JOHNSON and other associates of defendant KETNER.  On December 17, 1999, Republic Bank funded $127,559.45 toward the purchase of this property under the false pretense that one of defendant KETNER's straw buyer/borrowers was, in fact, purchasing the property;

d.   Defendant KETNER caused 5859 Madrid Court, Palmdale, California, to be bought and sold by straw buyers at least 10 times.  The straw buyers/borrowers for this property included Defendant JOHNSON and other associates of defendant KETNER.  On December 29, 1999, Household funded $95,267.91 toward the purchase of this property under the false pretense that one

of defendant KETNER's straw buyer/borrowers was, in fact, purchasing the property;

e.   Defendant KETNER caused 2809 Tracy Street, San Bernardino, California, to be bought and sold by straw buyers at least 8 times.  The straw buyers/borrowers for this property included associates of defendant KETNER, including his property manager.  On January 12, 2000, Household funded $65,226.80 toward the purchase of this property under the false pretense that one of defendant KETNER's straw buyer/borrowers was, in fact, purchasing the property;

f.   Defendant KETNER caused 2856 Sepulveda Avenue, San Bernardino, California, to be bought and sold by straw buyers at least 9 times.  The straw buyers for this property included defendant JOHNSON, defendant KETNER's property manager, and other associates of defendant KETNER.  On January 19, 2000, Household funded $59,187.72 toward the purchase of this property under the false pretense that one of defendant KETNER's straw buyer/borrowers was, in fact, purchasing the property;

g.   Defendant KETNER caused 42957 Willow West Court, Lancaster, California, to be bought and sold by straw buyers at least 10 times.  The straw buyers for this property included defendant JOHNSON, defendant KETNER's property manager and other associates of defendant KETNER.  On October 22, 1999, Republic Bank funded $57,868.90 toward the purchase of this property under

6

the false pretense that one of defendant KETNER's straw

buyer/borrowers was, in fact, purchasing the property;

   h. Defendant KETNER caused 31206 Delwood Street,

Castaic, California, to be bought and sold by straw buyers at

least 10 times.  The straw buyers for this property included

defendant JOHNSON, defendant KETNER's property manager, defendant

KETNER's assistant, and other associates of defendant KETNER.  On

October 29, 1999, Republic Bank funded $99,939.52 toward the

purchase of this property under the false pretense that one of

defendant KETNER's straw buyer/borrowers was, in fact, purchasing

the property;

   i. Defendant KETNER caused 29810 Via Viento, Menifee,

California, to be bought and sold by straw buyers at least 10

times.  The straw buyers for this property included defendant

JOHNSON, defendant KETNER's assistant, and other associates of

defendant KETNER.  On January 9, 1999, Republic Bank funded

$98,982.73 toward the purchase of this property under the false

pretense that one of defendant KETNER's straw buyer/borrowers

was, in fact, purchasing the property;

   j. Beginning in or about 1996 and continuing until at

least in or about 2001, in furtherance of the fraudulent scheme,

defendant KETNER fraudulently obtained home loans on no less than

twenty properties using 14 straw buyers and sellers in hundreds

of transactions; and

k.   Beginning in or about 1996 and continuing until at least in or about 2001 defendant KETNER directed his employees to keep the files associated with the properties he was buying and selling through straws separate from the other warehouse files to make certain they were not inadvertently sold off.  These properties were put into special purple file folders and were known at MCR as the "purple file properties."

COUNTS TWO THROUGH SEVEN

[18 U.S.C. §§ 1343, 1346 and 2]

A.   DUTY OF THE CLOSING AGENT TO PROVIDE HONEST SERVICES

11.  Paragraphs 1 through 6 are incorporated herein by reference.

12.  At all times relevant to this Indictment, the warehouse lenders required that home loans be funded through a closing agent.  In some jurisdictions, an escrow or title company served as the closing agent; in others, including Georgia, an attorney was used as a closing agent.

13.  At all times relevant to this Indictment, the closing agent's responsibility was to receive money from warehouse lenders and then fund loans by distributing the money to the borrower or the borrower's designee.  The closing agent was required to assure that money received from the warehouse lenders would be transferred directly to the borrower and that the warehouse lender was receive a secured interest in the borrower's home as collateral.  In exchange for fulfilling these obligations, the closing agent received a fee for each transaction completed.

14.  At all times relevant to this Indictment, closing agents placed themselves in a position of trust with respect to both the warehouse lender and the borrower.  They possessed a fiduciary obligation to the lenders and borrowers to make funding decisions based on whether a transaction conformed with the

9

requirements established by the borrower and the lender.  This duty included an obligation on the part of the closing agent to conduct his duties in an honest, faithful and disinterested manner, free from self-dealing.

B.    THE SCHEME TO DEFRAUD

15.    Beginning in or about at least February 2000, and continuing until at least in or about August 2000, in Orange County, in the Central District of California and elsewhere, defendants KETNER and JOHNSON, knowingly and with intent to defraud, devised, participated in, and executed a scheme to defraud warehouse lenders, including Household, of their right to the honest services of defendant JOHNSON.

16.    Defendants KETNER and JOHNSON committed, caused the commission of, and aided, counseled, commanded, induced, and procured others to commit fraud against warehouse lenders by the following means and methods, among others:

a.    Defendant KETNER, through MCR, would enter into warehouse lending agreements.  These lending agreements would permit KETNER to borrow money to fund mortgages MCR originated;

b.    At defendant KETNER's direction, defendant JOHNSON would act as the closing agent for MCR in connection with the home loans;

c.    Defendant KETNER would then request, or cause others to request, funds from the warehouse lines of credit for

home equity loans.   Each request from a warehouse lender was for a loan collateralized by a specific property;

     d.   These funds would be wired to a bank account belonging to defendant JOHNSON;

     e.   As part of his duties as closing agent, defendant JOHNSON was required to confirm that the lender's money was going to the borrower in exchange for the lender receiving, among other things, a security interest in the borrower's home.   In exchange for completing this service, defendant JOHNSON was to receive a fee of $450 for each loan closed;

     f.   Instead of defendant JOHNSON honestly fulfilling his duty as closing agent to disburse home loan proceeds directly to the borrowers, defendants JOHNSON and KETNER would divert the warehouse lenders' money into MCR's bank accounts;

     g.   Once MCR received these loan proceeds, defendant KETNER would not use the money to fund the loans as required by the warehouse lender who was furnishing the money;

     h.   In exchange for defendant KETNER using defendant JOHNSON's law firm as the closing agent, defendant JOHNSON would provide a portion of the closing fee to defendant KETNER as a kickback; and

     i.   Defendants KETNER and JOHNSON would set up a series of bank transactions to conceal the fact that defendant JOHNSON was the source of the kickbacks.

11

B.   EXECUTION OF THE SCHEME TO DEFRAUD

17.   In or about December 1998, defendant KETNER, through MCR, entered into a warehouse lending agreement with Household.

18.   In or about late 1998, defendant KETNER offered defendant JOHNSON the position of MCR's closing agent for loans originated by MCR's Atlanta office.

19.   In or about 1999, when defendant JOHNSON first became the closing agent for MCR, the closing procedures MCR used were as follows:

        a.   Borrowers would apply for a loan from MCR;

        b.   MCR would request loan funds from one of its warehouse lenders;

        c.   A warehouse lender would transfer the requested funds to defendant's JOHNSON's client trust account; and

        d.   Defendant JOHNSON would confirm that the transaction met certain requirements and disburse the funds directly to the borrower or designees.

20.   A short time after defendant JOHNSON became the closing agent, he and defendant KETNER changed the closing procedure such that defendant JOHNSON, upon receiving money from a warehouse lender, would wire it to MCR for it to conduct the closing.

21. In exchange for defendant KETNER's selecting defendant JOHNSON as the closing agent, defendant JOHNSON agreed to share the $450 per loan fee he received for each loan closing. Defendant JOHNSON and defendant KETNER further agreed to conceal

12

the payments to defendant KETNER as payments for advertising.   To conceal such payments defendants KETNER and JOHNSON did the following:

        a.   In May or June of 1999, defendants KETNER and JOHNSON set up a shell company called "Ainsley Marketing Associates Ltd.";

        b.   In May or June of 1999, defendants KETNER and JOHNSON opened a bank account in the name of Ainsley Marketing Associates Ltd. at Bank of Nevis International Ltd.   Defendants also opened an account at Banque Internationale A Luxembourg (collectively "Offshore Accounts");

        c.   On June 15, 1999, defendants KETNER and JOHNSON incorporated the "Good Corporation," a Nevada Corporation.   On June 28, 1999, defendants KETNER and JOHNSON incorporated "Joc Monet.com", also a Nevada Corporation (collectively "Shell Corporations");

        d.   In July 1999, defendants KETNER and JOHNSON opened bank accounts in the names of Good Corporation and Joc Monet.com at Heritage Bank of Nevada (the "Heritage Accounts");

        e.   In or about June or July of 1999, to further conceal the source of such payments, defendant KETNER obtained a false identification in the name of "Paul Hernandez" from one of defendant KETNER's associates and used this fictitious person as the signatory on the Heritage Accounts;

        f.   In June 1999, defendants JOHNSON and KETNER

conducted a test transaction in which they caused a $5,000 check made out to "Ainsley Marketing Associates Ltd." to be deposited in Ainsley's Nevis bank account.  Defendants KETNER and JOHNSON then caused this money to be wired from this account to the account they set up at Banque Internationale A Luxembourg.  On August 23, 1999, defendants KETNER and JOHNSON further caused $2,465 to be wired from Banque Internationale A Luxembourg to each of the Heritage Accounts; and

g.  Over the next ten months, defendants KETNER and JOHNSON wrote 11 checks, totaling $705,000, to Ainsley Marketing Associates Ltd.  Defendants KETNER and JOHNSON caused $526,430 of that money to be wired to the Heritage Accounts.

22.  By February of 2000 the checks that defendant KETNER directed MCR to write to borrowers and to defendant JOHNSON were being returned for insufficient funds.

23.  On February 18, 2000, defendant KETNER caused $25,000 of fraudulently obtained loan proceeds to be wired from defendant JOHNSON's attorney trust account to Ferrari of Orange County to complete the down-payment for the purchase of a "corsa red" 2000 Ferrari 550 Maranello.  The total price for this car, including tax and license, was $244,932.97.

24.  Despite repeatedly bouncing checks to borrowers, defendant KETNER continued to direct defendant JOHNSON to forward money received from the warehouse lenders directly to MCR.

14

25.   On May 22, 2000, Household wired $346,500 to defendant JOHNSON, in his capacity as closing agent, to fund at least 11 borrower's loans.  That same day, defendants KETNER and JOHNSON diverted $335,000 of that money to MCR's bank account and deprived the intended borrowers of their loan proceeds.

26.   On May 24, 2000, Household wired $762,807 to defendant JOHNSON, in his capacity as closing agent, to fund at least 12 borrowers' loans.  That same day, defendants KETNER and JOHNSON diverted $700,807 of that money to MCR's bank account and deprived the intended borrowers of their loan proceeds.

27.   On June 2, 2000, Household wired $848,800 to defendant JOHNSON, in his capacity as closing agent, to fund at least 14 borrowers' loans.  That same day, defendants KETNER and JOHNSON diverted all $848,800 to MCR's bank account and deprived the intended borrowers of their loan proceeds.

28.   From at least April 2000, to at least June 2000, defendants KETNER and JOHNSON misused and misappropriated and caused the misuse and misappropriation of at least $9 million in loan proceeds belonging to Household.

///

//

/

15

C.   WIRINGS

29.  On or about the dates set forth below, in Orange County, within the Central District of California and elsewhere, defendants KETNER and JOHNSON, for the purpose of executing and attempting to execute the above described scheme to defraud, caused and aided and abetted the transmission of, the following by means of wire communication in interstate commerce:

| Count | Date | Contents of Wire Communication |
|---|---|---|
| TWO | 5/3/2000 | At least $35,000 wired from Household Bank in Illinois to Sanwa Bank in Orange County, California to fund a home equity loan for David Dubay |
| THREE | 5/12/2000 | $368,850 wired from Household Bank in Illinois to Sanwa Bank in Orange County, California to fund various residential loans |
| FOUR | 5/17/2000 | $264,225 wired from Household Bank in Illinois to Sanwa Bank in Orange County, California to fund various residential loans |
| FIVE | 5/24/2000 | $762,807 wired from Household Bank in Illinois to Sanwa Bank in Orange County, California to fund various residential loans |

16

| | | |
|---|---|---|
| SIX | 6/1/2000 | $875,178 wired from Household Bank in Illinois to Sanwa Bank in Orange County, California to fund various residential loans |
| SEVEN | 6/19/2000 | $209,500 wired from Household Bank in Illinois to Sanwa Bank in Orange County, California to fund various residential loans |

///

//

/

17

COUNTS EIGHT THROUGH FOURTEEN

[18 U.S.C. §§ 1343 and 2]

A.    THE SCHEME TO DEFRAUD

30.    The Grand Jury hereby incorporates and re-alleges by reference Paragraphs 1 through 6.

31.    Beginning in or about January 2000, and continuing to in or about July 2000, in Orange County, withing the Central District of California and elsewhere, defendant KETNER knowingly and with intent to defraud, devised, participated in, and executed a scheme to defraud warehouse lenders, including Household, and to obtain money or property from warehouse lenders, including Household, by means of false and fraudulent pretenses, representations, and promises, and the concealment of material facts.

32.    Defendant KETNER committed, caused the commission of, and aided, counseled, commanded, induced, and procured others to commit fraud against warehouse lenders as described below by the following means and methods, among others:

a.    Defendant KETNER, through MCR, would enter into warehouse lending agreements with various warehouse lenders. These agreements permitted defendant KETNER, through MCR, to borrow money to fund home loans;

b.    Defendant KETNER, through MCR, would request money from warehouse lenders to fund residential loans for borrowers;

18

c.   Warehouse lenders would send the loan proceeds as requested; and

d.   Defendant KETNER would fraudulently divert the loan proceeds such that the intended borrowers never received their money.

B.   EXECUTION OF THE SCHEME TO DEFRAUD

33.   Beginning in at least February 2000, and continuing to in or about August 2000, defendant KETNER misused and misappropriated loan proceeds from warehouse lenders intended to fund specific loans.

34.   The Grand Jury hereby incorporates and re-alleges by reference Paragraphs 22-23 and 25-28.

C.   WIRINGS

35.   On or about the dates set forth below, in Orange County, within the Central District of California and elsewhere, defendants KETNER and JOHNSON, for the purpose of executing and attempting to execute the above described scheme to defraud, caused and aided and abetted the transmission of, the following by means of wire communication in interstate commerce:

| Count | Date | Contents of Wire Communication |
|---|---|---|
| EIGHT | 4/2000 | Telephone call between Scott Miller in Washington and defendant KETNER in Orange County, California regarding the bouncing of checks to borrowers |

| NINE | 5/22/2000 | $346,500 wired from Household Bank in Illinois to Sanwa Bank in Orange County, California |
| TEN | 5/26/2000 | $260,250 wired from Household Bank in Illinois to Sanwa Bank in Orange County, California to fund loans |
| ELEVEN | 6/2000 | Telephone call between Scott Miller in Washington and MCR in Orange County, California regarding the closing of the Washington office |
| TWELVE | 6/2/2000 | $848,800 funds wired from Household Bank in Illinois to Sanwa Bank in Orange County, California to fund loans |
| THIRTEEN | 6/15/2000 | At least $35,000 in funds wired from Household Bank in Illinois to Sanwa Bank in Orange County, California to fund a home equity loan for Nancy and Allan Mink |
| FOURTEEN | 6/30/2000 | $408,400 funds wired from Household Bank in Illinois to Sanwa Bank in Orange County, California to fund loans |

COUNT FIFTEEN

[18 U.S.C. § 1956(h)]

A.   OBJECTS OF THE CONSPIRACY

36.   Paragraphs 1 through 6 and are paragraph 21(b)-(d) are incorporated herein by reference.

37.   Beginning in or about June 1999, and continuing until in or about January 2001, in Orange County, within the Central District of California, and elsewhere, defendants KETNER and JOHNSON knowingly and willfully conspired and agreed with each other to commit offenses against the United States, namely:

a.   Conducting and attempting to conduct monetary transactions in criminally derived property of a value of greater than $10,000, which property was derived from a specified unlawful activity, namely, wire fraud, knowing said funds represented the proceeds of a some form of unlawful activity; and

b.   Conducting and attempting to conduct financial transactions affecting interstate commerce involving the proceeds of a specified unlawful activity, namely, wire fraud, knowing that the transactions were designed, in whole or in part, to conceal and disguise the nature, location, source, ownership, and control of the proceeds of such specified unlawful activity.

B.   MEANS BY WHICH THE OBJECT OF THE CONSPIRACY WAS TO BE ACCOMPLISHED

38.   The object of the conspiracy was to be accomplished, and was accomplished as follows:

21

a.   Defendants KETNER and JOHNSON would open the Offshore Accounts;

b.   Defendants KETNER and JOHNSON would then write checks on defendant JOHNSON's account payable to Ainsely Marketing Assocaites Ltd. and cause the checks to be deposited into the Nevis bank account;

c.   Defendants KETNER and JOHNSON would then cause the money in the account in Nevis to be wired to a bank in Luxembourg;

d.   Defendants KETNER and JOHNSON would set up the Shell Corporations;

e.   Using a fake identification provided by a friend of defendant KETNER, defendants KETNER and JOHNSON would open the Heritage Accounts;

f.   Defendants KETNER and JOHNSON would have the proceeds of the wire fraud sent to the Offshore Accounts, and then to the Heritage Accounts, from which defendants KETNER and JOHNSON would withdraw the money.

C.   OVERT ACTS

39.   In or about May or June of 1999, defendants KETNER and JOHNSON set up a shell company called "Ainsley Marketing Associates Ltd."

40.   In or about May or June of 1999, defendants KETNER and JOHNSON opened the Offshore Accounts.

41.   On or about June 15, 1999, defendants KETNER and

22

JOHNSON incorporated the Shell Corporations.

42.   In or about July 1999, defendants KETNER and JOHNSON opened the Heritage Accounts in the names of the Shell Corporations.

43.   In or about June or July of 1999, to further conceal the source of such payments, defendant KETNER obtained a false identification in the name of "Paul Hernandez" from one of defendant KETNER's associates and used this fictitious person as the signatory on the Heritage Accounts.

44.   In or about June 1999, defendant JOHNSON and KETNER did a test transaction causing a $5,000 check made out to "Ainsley Marketing Associates Ltd." to be deposited in the Nevis bank account.  Defendants KETNER and JOHNSON then caused this money to be wired from this account to their account at Banque Internationale A Luxembourg.  On August 23, 1999, defendants KETNER and JOHNSON further caused $2,465 to be wired from Banque Internationale A Luxembourg to each of the Heritage Accounts.

45.   Over the next ten months defendants KETNER and JOHNSON wrote 11 checks, totaling $705,000, to Ainsley Marketing Associates Ltd.  Defendants KETNER and JOHNSON caused $526,430 of that money to be wired to the Heritage Accounts.

COUNTS SIXTEEN THROUGH EIGHTEEN

[18 U.S.C. §§ 1957 and 2]

46.   On or about the dates set forth below, in the Orange County, within the Central District of California and elsewhere, defendant KETNER, knowing that the funds involved in the transactions represented the proceeds of some form of unlawful activity, conducted and caused others to conduct the following monetary transactions in criminally derived property of a value

///

//

/

24

greater than $10,000, which property was derived from specified

unlawful activity, namely wire fraud.

| COUNT | DATE | TRANSACTION |
|-------|------|-------------|
| SIXTEEN | 5/22/2000 | $335,000 wire transfer from Johnson & Payne's Sanwa bank account to MCR's La Salle Bank Account Number 2800089095 |
| SEVENTEEN | 5/24/2000 | $700,807 wire transfer from Johnson & Payne's Sanwa bank account to MCR's La Salle Bank Account Number 2800089095 |
| EIGHTEEN | 6/02/2000 | $847,800 wire transfer from Johnson & Payne's Sanwa bank account to MCR's La Salle Bank Account Number 2800089095 |

A TRUE BILL

*Joseph Churchin*

Foreperson

DEBRA W. YANG
United States Attorney

STEVEN D. CLYMER
Special Assistant United States Attorney
Chief, Criminal Division

*Wayne Gross*

WAYNE R. GROSS
Assistant United States Attorney
Chief, Southern Division

25