Terry W. Bird - State Bar No. 49038
    twb@birdmarella.com
Jason D. Kogan - State Bar No. 107707
    jdk@birdmarella.com
Benjamin N. Gluck - State Bar No. 203997
    bng@birdmarella.com
BIRD, MARELLA, BOXER, WOLPERT,
    NESSIM, DROOKS & LINCENBERG, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

Attorneys for Defendant Kenneth Ketner

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. SA CR-05-36JVS |
| Plaintiff, | **NOTICE OF OBJECTIONS AND OBJECTIONS OF DEFENDANT KEN KETNER TO PRESENTENCE INVESTIGATION REPORT** |
| vs. | |
| KENNETH KETNER, | Trial Date:          May 30, 2006 |
| Defendant. | |

Pursuant to Rule 32(f) of the Federal Rules of Criminal Procedure, defendant Ken Ketner hereby gives notice that he objects to the December 4, 2006 Presentence Probation Report in this action on the grounds more fully set forth in Attachment A

1  hereto.  Attachment A has previously been provided to the Probation Office and to

2  counsel for the United States.

3

4  DATED: April 20, 2007          Terry W. Bird

5                                 Jason D. Kogan
                                   Benjamin N. Gluck

6                                 BIRD, MARELLA, BOXER, WOLPERT,
                                       NESSIM, DROOKS & LINCENBERG, P.C.

7

8                                 By: _____

9                                           Terry W. Bird

10                                 Attorneys for Defendant Kenneth Ketner

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

# BIRD | MARELLA

### BIRD • MARELLA • BOXER • WOLPERT • NESSIM • DROOKS & LINCENBERG

A PROFESSIONAL CORPORATION

**Terry W. Bird**
twb@birdmarella.com

1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone (310) 201-2100
Facsimile (310) 201-2110
www.BirdMarella.com

File 2646.3

April 11, 2007

***VIA HAND DELIVERY***

Nancy O'Connor
U.S. Probation Office
21041 Burbank Blvd., Suite 200
Woodland Hills, CA 91367

Re:   **U.S.A. v. Kenneth Ketner – Case No. SA-CR-05-36JVS**

Dear Nancy:

We have attempted on two previous occasions to meet with you in order to carefully talk through the mountain of evidence which has been gathered by the government and defense in this case. Unfortunately, each of our efforts has proved unsuccessful. On April 3, 2007 you instructed us to resubmit the information set forth in our February 16, 2007 letter in the form of formal objections, before they would be considered. This letter respectfully presents our many objections to the Revised Pre-Sentence Report (PSR) submitted to the Court on December 4, 2006.

A.   Defendant's Statement of the Case.

The critical and inalterable fact here is that Mr. Ketner has committed a crime. He has admitted this and he recognizes that he should and will be punished for what he has done. This response to the PSR is in no way intended to evade responsibility for what Mr. Ketner did or to minimize his offenses. Mr. Ketner signed the plea agreement and admitted his guilt in open court because he is in fact guilty. Mr. Ketner does not expect to and certainly is not attempting to avoid the consequences of that fact.

Nevertheless, just as the facts should not be unfairly construed to minimize Mr. Ketner's culpability, neither should they be unfairly construed to misstate it. While we realize that reasonable people may legitimately differ in their conclusions , we are not asking you to simply take our word for it. Instead, we ask you to consider certain demonstrable and incontrovertible facts that illuminate exactly what happened here.

3

BIRD | MARELLA

BIRD • MARELLA • BOXER • WOLPERT • NESSIM • DROOKS & LINCENBERG

Nancy O'Connor
April 11, 2007
Page 2

These demonstrable facts are set out below and in the report and exhibits prepared by
Martin G. Laffer, which is attached hereto as Exhibit 1 (Laffer Report).[1]

B.   Objections Concerning Guideline Range and Sentencing Calculations

Our initial objections are to (1) the Probation Department's letter to Judge Selna of
December 4, 2006 ("Probation Letter") at pages 1, 5, (2) the PSR, page 3, (Guideline
Summary), and (3) the PSR at paragraphs 62-68. In each instance the Probation
Department inaccurately calculates the advisory guildeline range in that it misapplies the
provisions of the November 1, 1998 edition of the Guidelines manual. More specifically
we believe that the sentencing calculations set forth in the Plea Agreement are justified
and appropriate. The PSR incorrectly assesses key facts and applies guideline sections
which are inapposite, including the following:

1.   Contrary to the Government's Stipulation, the PSR Improperly
Applies a Four-Level Increase Under 2F1.1(b)(7)(B) (Offense
Affecting Financial Institution And Defendant Individually Received
$1 Million),

The PSR argues that Mr. Ketner derived more than $1 million in gross receipts
from an offense affecting a financial institution and therefore imposes a four level
enhancement under § 2F1.1(b)(7)(B). PSR ¶ 64. In reaching this conclusion, the PSR
relies on the receipt of $1.8 million into *MCR's account* ("Ketner received at least $1.8
million into MCR's account from Johnson, funds Johnson acquired from Household. In
addition, Ketner received at least $266,215 in laundered funds (half of the $526,430
deposited into the Heritage accounts.)" PSR ¶ 64).

The government disagrees with this adjustment. And this is for good reason. The
Guidelines forbid attributing *MCR* funds to Mr. Ketner for purposes of Section 2F1.1.
"The defendant derived more than $1,000,000 in gross receipts from the offense" means
that the gross receipts "*to the defendant individually, rather than to all participants*,
exceeded $1,000,000." U.S.S.G. § 2F1.1(b)(7)(B), Appl. Note 18 (emphasis supplied).

---

[1]   All references to the Laffer Report are noted as "Exhibit 2, Laffer Report." All
references to the Laffer Report Exhibits are noted as "Laffer Exhibit(s)."

BIRD | MARELLA

BIRD • MARELLA • BOXER • WOLPERT • NESSIM • DROOKS & LINCENBERG

Nancy O'Connor
April 11, 2007
Page 3

In other words, only money *Mr. Ketner* actually received is counted towards the $1 million.

Case law similarly forbids applying this adjustment to an individual defendant when the funds were received by a corporation rather than the individual defendant. *See United States v. Colton*, 231 F. 3d 890 (4th Cir. 2000); *United States v. Castellano*, 349 F. 3d 483 (7th Cir. 2003); *United States v. Bortnick*, 2006 WL 680544 (E.D. Pa. 2006); *cf. United States v. Millar*, 79 F. 3d 338 (2d Cir. 1996) (funds held by one individual co-defendant do not count against other individual co-defendant).

In *Colton*, for example, the defendant and his partner used their corporate entity to unlawfully obtain over $2 million. Thereafter the defendant and his partner each received $300,000 from the corporation out of these funds, but the remainder was used to satisfy the corporation's obligations along with corporate obligations incurred by other entities run by the defendant and his partner. The district court ruled that this adjustment did not apply because the defendant himself received only $300,000. On appeal, the government argued this was error because Section 2F1.1 defines "gross receipts" as those received "directly or indirectly." Seizing on this terminology, the government maintained that the defendant *indirectly* received half of the $2 million. The Court of Appeals for the Fourth Circuit rejected this argument and affirmed the lower court because there was no indirect receipt through the corporation. *See Colton*, 231 F. 3d at 910-12; *see also Castellano*, 349 F. 3d at 486-87 (holding that founder and principal manager of corporation does not individually receive money entering corporate coffers); *Bortnick*, 2006 WL 680544 at *3-4 (holding that president and part owner of corporations does not individually receive money deposited into corporations' accounts).

The plain language of Section 2F1.1 and Application Note 18, as well as the relevant case law, mandate that the $1.8 million that *MCR* received into its account does not factor into the calculation of Mr. Ketner's *individual* "gross receipts" under Section 2F1.1. The government recognized this when it stipulated that this adjustment does not apply here and the PSR should recognize this as well. This adjustment does not apply here.

In addition, the PSR does take into account the bank records which clearly reflect that Mr. Ketner did not benefit from the $266,215 received from Johnson. In fact, $135,000 of that was returned to the MCR operating account and, therefore, Mr. Ketner

BIRD | MARELLA

| BIRD • MARELLA • BOXER • WOLPERT • NESSIM • DROOKS & LINCENBERG

Nancy O'Connor
April 11, 2007
Page 4

only benefited from $131,819.58 from the "sharing" arrangement with Johnson. (Exh. 2, Laffer Report, pp. 40-41; Laffer Exhibit 74.)

2.  Contrary to the Government's Stipulation, the PSR Improperly Applies a Four-Level Increase Under § 3B1.1(a) (Organizer/Leader).

After investigating this matter for several years, after interviewing witnesses and taking testimony, the government concluded that Mr. Ketner deserves a three-level upward adjustment for role in the offense. The government also agreed that Mr. Ketner *does not deserve* a four-level upward adjustment.

Though the PSR makes clear that its conclusions are not based on any information other than that provided by the government, the PSR comes to a conclusion the government disputes, namely that Mr. Ketner deserves a four-level adjustment. (PSR, ¶¶ 68-68.) The PSR bases its conclusion on a rhetorical question, "if Ketner is not the leader, than who is[?]" (PSR, ¶ 66.) But not every scheme has a single leader. As discussed above, the underlying losses resulted from the deceitful actions and supervision of several people and were simply not the end result of the long term, preconceived scheme as envisioned by the PSR.

The PSR also considers the factors set out in the application notes regarding role in the offense. But these do not support the PSR's conclusion either. For example, while exercise of decision-making authority is a factor, it is clear that others, such as Mr. Benincosa, had at least as much authority as Mr. Ketner when it came to MCR's finances. Indeed, Mr. Ketner did not even sign any of MCR's checks and he had no wire authority. Instead, Mr. Benincosa controlled these things. Likewise, the nature of Mr. Ketner's participation in the commission of the offense was not different from Mr. Bristol's, for example. There is no evidence that Mr. Ketner claimed or received a larger share of the proceeds than Mr. Bristol; indeed, Bristol received more than Ketner.

In short, while the PSR lists a number of factors to be considered, it does not actually determine whether any of these factors should apply here. Instead, it simply states that Mr. Ketner was in charge of MCR and was involved in the offenses. Of course, no one disputes this. But this is the wrong question. The proper question is whether Mr. Ketner was significantly more involved than the others and whether he "led" them in the offense. Even the PSR indicates that he did not, noting as it does that Mr. Ketner "along with Bristol and Johnson" defrauded the warehouse lenders.

BIRD | MARELLA

BIRD • MARELLA • BOXER • WOLPERT • NESSIM • DROOKS & LINCENBERG

Nancy O'Connor
April 11, 2007
Page 5

In short, when the PSR gave Mr. Ketner a four-level adjustment, the PSR assumed its own conclusion. The government's agreement that this is wrong should carry heavy weight here. As the government agrees, a proper understanding of the facts reveals that Mr. Ketner should not receive this four-level adjustment.

3.   The PSR's Calculation Of The Amount Of Loss Is Without Sufficient Basis, Is Contrary To Government's Position And Is Wrong.

The PSR's conclusion on loss (PSR, ¶¶ 35-39, 62; Letter to Judge Selna, p. 1) is significantly different from the government's. Moreover, the PSR's conclusion is not well-founded. For example, the PSR states that the General Counsel of Republic Bank "indicated to the SA that Ketner had a $15 million line of credit with Republic Bank, approximately half of which had been recovered. Republic Bank then estimated an expected loss of several million dollars." PSR ¶ 36. Apart from the third-hand nature of this representation, what this means is entirely unclear: If Republic recovered half of a $15 million credit line, why would the loss be only "several million dollars?" And why would the then AUSA indicate, contrary to the stipulation he signed, that the loss was $1.5 million? Id. ¶ 37.

The point here is not to debate the precise number. It is more fundamental than that. Whatever the number is, it needs to have some basis. And none of the numbers in the PSR has any basis that can be used to test its validity. Indeed the numbers provided don't even agree with each other.

4.   Contrary to the Government's Stipulation, the PSR Improperly Applies a Two-Level Increase Under § 3B1.3 (Abuse of Trust).

The PSR argues that Mr. Ketner deserves a two level adjustment for abusing a position of trust with the warehouse lenders. PSR ¶ 68. But this contradicts even the government's understanding of events and, moreover, is inconsistent with the Guidelines.

The PSR says that "it was [the] abuse of [Mr. Ketner's] position with the warehouse lenders that allowed for the commission of the offense." But whether Mr. Ketner's position enabled him to commit the offense is the wrong inquiry under § 3B1.3. As the Application Notes to § 3B1.3 make clear, "position of trust" for purposes of this adjustment does not mean a position that made the crime possible. It does not mean

7

BIRD | MARELLA

BIRD • MARELLA • BOXER • WOLPERT • NESSIM • DROOKS & LINCENBERG

Nancy O'Connor
April 11, 2007
Page 6

access. Instead, it means a position that entails a high level of discretion on the part of the defendant.

Specifically, Application Note 1 states:

"Public or private trust" refers to a position of public or private trust characterized by professional or managerial *discretion* (i.e., substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature. For this adjustment to apply, the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense (*e.g.*, by making the detection of the offense or the defendant's responsibility for the offense more difficult). This adjustment, for example, applies in the case of an embezzlement of a client's funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination. This adjustment does not apply in the case of an embezzlement or theft by an ordinary bank teller or hotel clerk because such positions are not characterized by the above-described factors."

Even on its face, this makes clear that the government was right when it concluded that abuse of trust does not apply. Indeed, as alleged in the PSR itself, the loan money at issue was supposed to have been distributed directly by Johnson & Payne and not MCR. If so, Mr. Ketner could not have had any position of trust in regards to that money – if he improperly took control of the money, by definition he did not enjoy a position of trust relative to the warehouse bank victims.

Moreover, even if Mr. Ketner did have authorization to distribute the funds here, he would still not be in a position of trust for purposes of this adjustment. As the application notes make clear, discretion, not access, is the hallmark of abuse of trust. The misconduct alleged here is that mortgage money from one borrower was used to pay another borrower's loan. In other words, the whole point is that Ketner *had no discretion.* He was no different from a bank teller who has access to money but no discretion about what to do with it. And as the Application Notes make clear, access does not equal a position of trust. Instead, "discretion must be entrusted to the defendant

BIRD | MARELLA

BIRD • MARELLA • BOXER • WOLPERT • NESSIM • DROOKS & LINCENBERG

Nancy O'Connor
April 11, 2007
Page 7

by the victim." *United States v. Broderson*, 67 F. 3d 452, 455-56 (2d Cir. 1995). No such discretion was entrusted to MCR or Mr. Ketner by the warehouse lenders. Even the PSR recognizes that, pursuant to the terms of their commercial transactions, the warehouse lenders carefully restricted MCR's and Mr. Ketner's discretion: (1) they permitted MCR to make loans on their behalf only if the loans met their specified requirements; and (2) they required that a closing agent, not MCR, fund the loans. In other words, Mr. Ketner did not enjoy a position of trust.

This conclusion is not undermined by the fact that MCR and Mr. Ketner managed to redirect the warehouse lenders' funds to MCR despite the warehouse lenders intentions:

> That [the defendant's] illegal activities frustrated [the victims'] oversight by corrupting various checks on his performance does not mean that he held a position that his victims intended to be immune from oversight and control; indeed it appears that he held a position with certain checks in place to confirm his compliance with the law and the contract, but that his illegal actions undermined these checks.

*United States v. Thorn*, 317 F. 3d 107, 121-22 (2d Cir. 2003).

Even according to the PSR, Mr. Ketner was never supposed to be and never was in a position "immune from oversight and control" relative to the mortgage money. If so, as the government correctly concluded, the abuse of trust adjustment does not apply.

C.    Objections Concerning "The Offense Conduct"

Our objections are to the conclusions reached in the Probation Letter at page 4 and in the PSR at paragraphs 14-34. More specifically, the PSR does not adequately or accurately address key aspects of the offense conduct. Its reliance on information obtained from various government sources (Cf PSR, ¶ 14) is critically misplaced as those sources failed in part to consider key evidence which belies the more expansive version of events erroneously adopted by the Probation Department.

We discuss below some of the more critical aspects of the factual background that the PSR did not take into account and that explain why the PSR produces a result so different from what the government ultimately deemed appropriate and from what is appropriate.

q

BIRD | MARELLA

BIRD • MARELLA • BOXER • WOLPERT • NESSIM • DROOKS & LINCENBERG

Nancy O'Connor
April 11, 2007
Page 8

1. The PSR Relies On An Incomplete Factual Record.

We understand and support the Probation Office's charge to provide the Court with an independent assessment of key facts and calculation of the advisory sentencing guidelines calculations. The PSR is necessarily limited, however, by the quality and depth of information provided by others, including the U.S. Attorney's Office, the investigating agency (*i.e.*, the FBI) and the defense. And its assessments and calculations must not simply parrot untested claims and biased versions of key circumstances.

Other than my client's initial interview I am unaware of any independent investigation of the Defendant's assessment of the underlying facts conducted by the Probation Department in this case. Of course, we fully realize that the complexity and scope of the underlying transactions, the age of the events at issue, the number and volume of transactions and witnesses and various other key factors combine to make any time-limited assessment of the facts particularly difficult at best. This is precisely why we have set out in great detail those facts and circumstances necessary to properly place all the relevant evidence in context. These areas of evidence, unexplored by the PSR and/or the government, include the following categories:

 (a) MCR's Documents.

When MCR was put into a receivership, all of the company's documents were transferred to the control of the receiver. By the time the bankruptcy proceeding concluded, the receiver had accumulated over 300 boxes of original MCR documents directly relating to the period at issue here. As noted above, the government conceded to Judge Selna that it had never reviewed these boxes. Of course, these documents are a key source necessary to understand what actually happened at MCR. We have reviewed them and they shed important light on the nature of Mr. Ketner's offense. Importantly, these documents reflect the personal involvement of various MCR employees other than Mr. Ketner in the transactions at issue here. As noted, these documents give important perspective on the scope of Mr. Ketner's involvement in the underlying offenses.[2] and importantly, they shed crucial light on the role of others who were responsible for the offenses.

---

[2] For example, as discussed above, the documents reveal that the "purple file" transactions were in fact disclosed to bank officers.

BIRD | MARELLA

BIRD • MARELLA • BOXER • WOLPERT • NESSIM • DROOKS & LINCENBERG

Nancy O'Connor
April 11, 2007
Page 9

(b)     Third Party Evidence.

Another area of evidence never developed by the government concerns the
activities of the victim banks here. As your report notes, Household was the most
significant victim. Importantly, this is not the first time that Household has lost money
on warehouse lines. Indeed, it has previously been involved in litigation over losses
arising from situations almost exactly like what occurred here. We have obtained
evidence developed during that other litigation, evidence the government did not develop.

One example of such evidence is the Reynolds Report (Laffer Exhibit 2). That
Report sets forth a critical analysis of the manner in which Household operated with
companies like MCR. The Report, as well as deposition testimony of Vice-President
Michael Hammond and Assistant Vice President Robert Carse, makes clear that at least
some Household corporate executives were fully aware of "diversions" such as those
attributed to MCR and that they deemed it in their best interest to allow these
"diversions" to occur. While we do not contend that Household's CEO was aware of
these diversions, the fact that people at the victim bank had engaged in such conduct in
the past and willingly engaged in such conduct with MCR, certainly must color any
judgment of what Mr. Ketner did. At a minimum, Household's own actions and
knowledge that MCR was disbursing borrower checks directly to borrowers calls into
serious question the PSR's notion that Ketner was singularly responsible for a massive,
pre-designed, long-term scheme to divert Household funds.

In addition, the Reynolds Report supports the conclusion that the MCR operation
was not a preconceived plan to hide diversion from Household while skimming profits at
the expense of borrowers. Rather, the Reynolds Report demonstrates that Household
officers allowed MCR to route monies through MCR's operations accounts because
MCR was making a lot of money for Household and making the local officers look good.
It was only when the mortgage market turned bad and MCR's officers allowed MCR's
overhead to explode that Household pulled the plug. The Reynolds Report does not
exonerate Mr. Ketner from his criminal acts in 2000, but it does put his actions in 1998
and 1999 into proper perspective.

(c)     Bank Records.

Key bank records and documents were never collected by or reported to the FBI.
For instance, banking records reflecting significant monies paid *to* Republic *by* Mr.
Ketner during 2000 are not reported in the PSR. These records reflect Ketner's belated

11

BIRD | MARELLA

BIRD • MARELLA • BOXER • WOLPERT • NESSIM • DROOKS & LINCENBERG

Nancy O'Connor
April 11, 2007
Page 10

and unsuccessful personal efforts to salvage MCR. While this may not excuse Mr. Ketner from responsibility, the fact that he tried to salvage MCR at his own expense speaks to his credit and should be noted in order to have a complete and accurate picture of what happened. Neither does the PSR consider records showing that a significant portion of the monies that went into the Heritage Accounts did not go to Mr. Ketner. (Cf. PSR, ¶ 64.) In fact those monies were transferred directly to MCR for its operations. These transfers and several other facts not considered by the PSR critically undermine its conclusion as to the application of U.S.S.G. § 2F1.1(b)(7)(B) as discussed below. (Cf. ¶ 64.) Mr. Ketner's bank and other income records reflecting his actual receipt of funds from MCR were never considered by the PSR.

> (d)   Evidence Showing The Significant Involvement of People
> Other Than Mr. Ketner.

There exists considerable evidence relating to key MCR employees and officers, such as Mr. Benincosa, which was never fully explored or considered by the Government and the PSR. That evidence was uncovered in the course of our trial preparation. As noted above, it demonstrates that Mr. Benincosa and others were knowingly, directly and substantially involved in the diversion of funds of which you have assumed that Mr. Ketner was the sole "leader."

Instead of directly considering the roles of Mr. Benincosa and others, the PSR asks the rhetorical question, "if Ketner is not the leader, then who is?" But this question assumes its own conclusion, namely that this was a single, premeditated scheme with a single leader. The better questions are how could a scheme of this size and intricacy be perpetrated by one man? And how could MCR have directed funds through its operations account without Household having known about it and condoning it? And how could the CFO, Mr. Benincosa, and the head of the Atlanta office, Mr. Bristol, and others, not know, manage, and supervise? We do not shrink from the import of Mr. Ketner's responsibility for his wrongdoing. We simply point out that the PSR's conclusion regarding leadership is based on a faulty assumption that this was a scheme headed by one "leader" is in error and that therefore its sentencing calculations are faulty. It is worth noting again that the government stipulated that the "organizer/leader" enhancement does *not* apply to Mr. Ketner. This is for good reason.

BIRD | MARELLA

BIRD • MARELLA • BOXER • WOLPERT • NESSIM • DROOKS & LINCENBERG

Nancy O'Connor
April 11, 2007
Page 11

        (e)    <u>Analysis and Report of Martin G. Laffer</u>.

In the attached report of Martin G. Laffer, we have set forth many other concrete examples of evidence which was not considered by the PSR. Mr. Laffer, a former IRS special agent and a prominent CPA, discusses his conclusions and analysis of the books and records of MCR and Mr. Ketner. Much, if not all, of that evidence was never presented to or considered by you. We respectfully request that you reconsider the PSR's conclusions in light of that evidence and Mr. Laffer's analysis.

        2.    <u>Documents and Testimony Prove The Banks Knew About The "Purple File Scheme."</u>

The PSR alleges that Mr. Ketner engaged in bank fraud by secretly arranging to have "straw buyers" buy certain properties. PSR ¶ 19-24. But there are several problems with the PSR's description of this issue.

First, while it is true that certain properties were sold to and by various MCR employees and others, the description of these people as straw buyers is entirely misleading. Each of these people provided his or her own credit information on which the mortgage was based, each person actually signed the note, and, as a matter of law, each of these people was the true buyer of the house. These were not straw buyers. Instead, these transactions can only be described as non-arms-length. And, critically, MCR's documents reveal that the banks were told just this.

Specifically, among the documents found in the 300 boxes the government did not review are numerous examples of documents sent from MCR to the banks enclosing the mortgage applications for these non-arms-length transactions. These documents, which were sent to the bank, accurately describe the transactions as "Corporate Flips" and indicate that they are for "Corporate-Ken Ketner." (Laffer Exhibit 63.) In other words, Mr. Ketner never hid the non-arms-length nature of these transactions from the bank.

Moreover, even without MCR's affirmative disclosure, the nature of the transactions was not hidden. Tammy Cooley, a third-party escrow officer who reviewed each of these applications, testified under oath that the face of the documents and included title reports made clear that these were non-arms-length transactions. (See Cooley Deposition excerpts attached as Exhibit 3.) Ms. Cooley further testified that she discussed this with her supervisors and they reviewed the documents and concluded that because the buyers were using their own credit and truly signing the notes, they were not

BIRD | MARELLA

BIRD • MARELLA • BOXER • WOLPERT • NESSIM • DROOKS & LINCENBERG

Nancy O'Connor
April 11, 2007
Page 12

straw buyers and there was nothing inappropriate about the transactions.  So they continued approving them.

In short, the "Purple File Scheme" did not involve "straw buyers."  And while it did involve non-arms-length transactions, that fact was never hidden from the bank.  In effect, Mr. Ketner was "parking" the properties with the bank's knowledge long enough to improve them and prepare them for resale.  The values of the properties were never misrepresented and they were not "flipped" or sold at falsely inflated prices.  (Exh. 2, Laffer Report, pp. 26-29.)

3.     The PSR Conflates Two Separate Aspects Of The Diversion Of Mortgage Money.

In paragraphs 24 through 35, the PSR discusses what it calls "The Scheme To Defraud Warehouse Lenders By Diverting Funds."  The PSR discusses the fact that Johnson sent mortgage money to MCR for distribution to borrowers and also discusses the fact that some of the earmarked mortgage money was used to cover other mortgages and some was used to cover MCR's operating expenses.

While Mr. Ketner plead guilty to the latter issue, namely the misuse of mortgage money, and while Mr. Ketner certainly admits that Mr. Johnson sent money to MCR for distribution, the PSR does not acknowledge certain critical aspects of the arrangement with Mr. Johnson.

Specifically, just as was the case with the "purple file scheme," it is proved by documents and testimony that the bank *knew* Mr. Johnson was sending the money to MCR for distribution and the bank allowed it to happen.  First, among the voluminous records that were received from, but apparently not reviewed by, the government are copies of checks MCR sent to the banks.  Those checks show that the money was issued to the borrowers *by MCR*, not the closing agent.  (Laffer Exhibit 61.)

Similarly, bank employees have testified under oath that they knew that their closing agents were sending funds to their mortgage company clients for distribution, but the bank did not care.  For instance, Household's Robert Carse testified that he knew in 2000 that some of the MCR loans that were bought by Household were not fully disbursed.  (See Exh. 2, Laffer Report, pp. 32-35.)  He also admitted that Household never used or entered into escrow agreements with Johnson & Payne.  (*Id.*, p. 33 and Laffer Exhibit 60, p. 230.)  Indeed, Mr. Carse stated that Household's closing

BIRD | MARELLA

BIRD • MARELLA • BOXER • WOLPERT • NESSIM • DROOKS & LINCENBERG

Nancy O'Connor
April 11, 2007
Page 13

transactions and communications came from MCR, not Johnson & Payne and that there was nothing hidden or concealed about those transactions with MCR.  As discussed above, there is a well documented third party expert report (*i.e.*, the Reynolds Report) concerning the victim bank which discusses the reasons for the bank's willingness to allow mortgage companies to distribute funds.  The bottom line is that Household was both a purchasing entity (*i.e.*, it bought loans from MCR) and a lender (*i.e..*, it had a warehouse lending relationship with MCR).  Apparently because it was making considerable money off the MCR deals, it chose to allow MCR to distribute the funds.

4.   The PSR Does Not Consider The Relative Roles And Responsibility Of Others, Including Val Benincosa And Randy Bristol.

Vallard "Val" Benincosa, MCR's CFO, is a perfect example of how it was that others, leaders separate and apart from Ketner, were responsible for Household's losses and how this evidence is unaddressed in the PSR.  Literally from the beginning, Mr. Benincosa engaged in misconduct at MCR.  Indeed, he lied to Mr. Ketner and the public in order to get his job, a job for which he was not qualified.  He misrepresented his credentials and education in published curriculum vitae, job applications and, sworn depositions.  Benincosa represented that he was a certified public accountant, licensed by the States of California and Utah, and that he had earned a masters degree in business administration from the University of Utah.  In truth and fact, as was learned in trial preparation, Benincosa was never licensed as a CPA by any state, nor does he have an MBA.  He lied to Mr. Ketner and to MCR's banks about his credentials.  He also lied to the FBI and through it to the Probation Department.

But worse than just lying about his credentials, Mr. Benincosa regularly lied to Mr. Ketner about MCR's condition.  As part of his duties as CFO, Mr. Benincosa issued internal financial statements reporting profit and loss as well as the financial position of MCR.  He faxed these statements to Mr. Ketner, as reflected on the copies attached to his depositions.  (Laffer Exhibit 72, 73.)  As an initial matter, Mr. Benincosa failed to make these reports on time, rendering the information stale and useless.  But worse than this, Mr. Benincosa regularly overstated MCR's profits to Mr. Ketner.  He did this because his bonus was tied to certain targets.  Thus, even while the company was in free-fall, Mr. Benincosa was telling Mr. Ketner that it was doing well.  Indeed, despite MCR's increasingly dire position, Mr. Benincosa paid himself a performance bonus into 2000. And Mr. Ketner was not aware of MCR's true position until early 2000.

\15

BIRD | MARELLA

BIRD • MARELLA • BOXER • WOLPERT • NESSIM • DROOKS & LINCENBERG

Nancy O'Connor
April 11, 2007
Page 14

Similarly the PSR does not discuss or address MCR banking and transaction records that reflect Mr. Benincosa's secret manipulation of MCR funds and, therefore, his motivation to hide diversions from Mr. Ketner. Mr. Benincosa issued at least three payments to himself after his alleged termination from MCR according to his sworn statements, but recorded the payee in the check register as a legitimate third-party vendor or left them blank. These payments came from the MCR Holding account that Benincosa personally controlled according to deposition testimony. He wrote checks from that account thru August 2000. Because Mr. Benincosa was on a profit-sharing bonus program, he falsified the records to generate a bonus to himself. Mr. Benincosa needed the bonuses because he had recently filed bankruptcy and desperately needed money. In his deposition he admits that he never disclosed his bonus income to the bankruptcy court and concealed it from the IRS.

Another example that people other than Ketner were leading the diversion of MCR funds concerns the "HomeFN" account. This was a secret account established by Mr. Benincosa and Mr. Bristol, the head of MCR's Atlanta office. They set up this secret account in order to hide from Mr. Ketner, auditors and others the fact that Mr. Benincosa had transferred mortgage funds into the MCR operating account. Mr. Benincosa created a "due-from account" named HomeFN on the books of MCR. Mr. Benincosa and Mr. Bristol were not aware that Mr. Ketner had retained the same auditors to conduct an audit for HomeFN and MCR. They hid the account's activities by setting it up through people loyal to Bristol (*i.e.*, the signature card for this account has the names of people working under Mr. Bristol in Atlanta). Mr. Ketner did not have any authority over the account. In return for Mr. Bristol's assistance, Mr. Benincosa provided Bristol with improper tax assistance and continued to pay Mr. Bristol $22,500 every two weeks through August 2000 even though Mr. Bristol supposedly quit MCR several months earlier.

In early 2000, as MCR's auditors were preparing MCR's financial statement, the auditors discovered a series of suspicious transactions to and from the HomeFN account. It was when they brought this to Mr. Ketner's attention that he pressed Mr. Benincosa and discovered MCR's precarious financial condition.

It also was then that Mr. Ketner made a serious and life altering mistake. He chose to try to "fund" and liquidate MCR out of the hole he then knew it was in. To do this, he misdirected money earmarked for certain mortgages and used it to cover other obligations. To his credit, he also took substantial personal funds to pay the lenders and attempt to resolve MCR's shortfall. But in the end, MCR collapsed anyway. Mr.

BIRD | MARELLA

BIRD • MARELLA • BOXER • WOLPERT • NESSIM • DROOKS & LINCENBERG

Nancy O'Connor
April 11, 2007
Page 15

Ketner's decision was wrong. He committed a crime, he has admitted it, and he will be punished for it. But this does not mean that Mr. Ketner was the sole wrongdoer at MCR. Neither does it mean that he was the leader of every bad act at the company. Indeed, as mentioned earlier, the government concluded that it would be inaccurate to characterize Mr. Ketner as the leader or organizer for sentencing purposes. We respectfully submit that the government's conclusion should be adopted.

The documentary evidence shows that it is beyond dispute that the banks knew the true nature of the "purple file" transactions, it is beyond dispute that the banks knew MCR was distributing mortgage money, it is beyond dispute that Mr. Benincosa misled Mr. Ketner about MCR's financial condition, and it is beyond dispute that many others at MCR were high-level participants in misconduct, both involving Mr. Ketner and other misconduct. Indeed, Randy Bristol was paid significantly more than Mr. Ketner, who was paid a salary which was commensurate with that paid by other mortgage banking operations.

None of this is to say that Mr. Ketner is innocent and didn't commit serious crimes. None of it is to say that he should not receive a serious penalty. On the other hand, these facts provide important context and perspective. The government's position after a long investigation and hard-fought litigation is quite different from the PSR's. Entirely apart from the defendant's position, the points made above, which were not considered by the PSR, explain why, at the very least, the government's position should be followed.

5.    The PSR Misstates The Circumstances Surrounding CFC Mortgage.

At paragraphs 148-151 the PSR misrepresents the circumstances surrounding Ken Ketner's actions relative to CFC Mortgage, a company operated by Ketner in the late 1980's to the mid-1990's. Contrary to the PSR's suggestion and the FBI 302 of an interview with CFC's "prior president," the HUD settlement, which Ketner readily discussed and fully addressed in his Probation Department interview, did not involve "fraudulent loans." Nor did Ketner have any direct involvement with processing the CFC loans at issue. The incident involved loans which did not meet HUD guidelines and which CFC loan processors had incorrectly processed. There was no evidence or finding that Ketner or anyone else at CFC was responsible for "fraud." The PSR's reliance on the statement attributed to Roberta Martin is misplaced and erroneously suggests there was a pattern or practice at work. Ketner settled the HUD suit against CFC as he was the

BIRD | MARELLA

| BIRD • MARELLA • BOXER • WOLPERT • NESSIM • DROOKS & LINCENBERG

Nancy O'Connor
April 11, 2007
Page 16

owner and responsible person at CFC. Settlement of such suits is almost always the prudent business decision.

Similarly, the PSR reference at paragraph 151 to Ketner taking money out of CFC and MRC (1) misrepresents the circumstances surrounding CFC and (2) relies on a statement reported by Allen Johnson which Ketner never made. In the first place the lenders dealing with CFC never lost any money. Second, the only money taken by Ketner from CFC was legitimately paid to him. Third, the CFC bankruptcy took place in 1999, years after Ketner had moved on to MCR. CFC went into bankruptcy because it lost a civil judgment which was larger than available assets, not because lenders had lost money or because borrower funds were improperly diverted. The PSR's suggestion that there was some parallel between the events at CFC and those for which Ketner pled guilty is simply wrong. Fourth, as noted, the PSR's reliance on Johnson in this matter is misguided, as he worked mightily to maximize his value to the government.

D.   Objections Concerning The PSR's Recommended Sentence, Factors To Be Considered Pursuant To 18 U.S.C. §§ 3553(a), And The Government's Plea Agreement.

The PSR purports to apply the factors spelled out in Title 18 USC Section 3553(a) in framing its recommended sentence. (Probation Letter, pp. 4-5.) It does so with no real consideration of those factors other than the bald conclusion that

"In consideration of all the factors delineated under 18 U.S.C. 3553(a), it appears that a sentence of imprisonment imposed from the lowest end of the advisory guideline sentencing range, namely 97 months, followed by the maximum term of supervised release, is a reasonable sentence. This period of incarceration will serve as a just punishment adequately reflecting the nature of the offense, and a deterrent."

(Probation Letter, p. 5.) The PSR, however, has studiously failed to consider the crucial implications and consequences of the carefully constructed plea agreement in this case. The Defendant fervently and respectfully objects to the Probation Department's failure to address these implications and considerations. The government's plea agreement evidences careful consideration of key Section 3553(a) factors by the two parties who best understand the underlying facts and circumstances. Chief among the various §3553(a) factors implicitly considered by the Government are the seriousness of the

18

BIRD | MARELLA

BIRD • MARELLA • BOXER • WOLPERT • NESSIM • DROOKS & LINCENBERG

Nancy O'Connor
April 11, 2007
Page 17

offense, promotion of respect for the law, providing just punishment for the offense, affording adequate deterrence to criminal conduct, and protecting the public and the guideline sentencing range.

Nowhere in the PSR is there any consideration of the practical and policy decisions which are the foundation for the Plea Agreement and the Defendants' plea. Indeed, the PSR manifestly ignores such facts and consequently fails to properly take account of the parties' sense that the recommended range properly reflects the seriousness of the offense, promotes respect for the law and otherwise provides just punishment. The Probation Department is charged to reach its conclusions independently. Nevertheless, its conclusions should be tested against all relevant considerations, including the administration of justice and the government's implicit determination that deterrence, protection of the public, finality and certainty, and the seriousness of the offense are reflected in the Plea Agreement. Implicit in the recommendations set forth in the Plea Agreement is the conclusion that the public is better served by the Plea Agreement's recommended range than is the range calculated and proposed by those who are two or three steps removed from the underlying facts and practical realities of the case.

One such relevant consideration is the recollections of key witnesses, which have dimmed and blurred. Several witnesses on whom the PSR relies (e.g., Mr. Benincosa, Roger Luby, Beverly Fleming, Roberta Martin, Scott Miller and Kevin Bonds) were motivated to deflect and diminish their own involvement and responsibility by attributing guilt solely to Ken Ketner. Allen Johnson's cooperation agreement and his demonstrated misrepresentations are totally ignored. The PSR does nothing to address such biases and does nothing to test the reliability of these witnesses.

We respectfully ask that you take into consideration the government's conclusions and factual stipulations, which were reached after the government investigated and litigated this case for well over five years. This is a complicated case, with a number of parties engaged in a number of types of misconduct. The government interviewed many, many witnesses and reviewed thousands of documents. And even the government admitted that it had left significant portions of the original record unreviewed.[3]

---

[3] The government admitted to Judge Selna that it had not reviewed some 300 boxes of original MCR documents reflecting the transactions at issue in this case. The government (footnote continued)

19

BIRD | MARELLA

BIRD • MARELLA • BOXER • WOLPERT • NESSIM • DROOKS & LINCENBERG

Nancy O'Connor
April 11, 2007
Page 18

Nevertheless, the government came to certain conclusions relative to Mr. Ketner, which differ from the PSR. For example, the government concluded that others in MCR participated in misconduct and that Mr. Ketner does *not* deserve a four-level "organizer/leader" adjustment. Given the complexities of this case, the conclusions embodied by the Plea Agreement should carry great weight.

The Plea Agreement was the product of an aggressive and hard fought prosecution. The government's calculations of the sentencing guidelines "are consistent with the facts of this case," (Plea Agreement, p. 9) as those facts were understood by the government's investigators. We respect the independence of the Probation Office. Nevertheless, the PSR ignores the years of work and analysis which the government put into this matter. It also purports to base its far different view of key facts on random selected pieces of evidence (mostly unsupported, incomplete or inconclusive FBI 302s).

In the final analysis this is not a case where the PSR simply comes to a different conclusion as to their import of certain agreed upon facts. Instead, this is a case where there are serious disagreements about, among other things, (1) the amount of loss, (2) the role of others in the offense, (3) the import and existence of Household's knowledge of the underlying facts, and (4) the amount of money which Ken Ketner earned from the underlying scheme. Those factual disagreements were resolved in the Plea Agreement by the only parties who had and have the necessary insight and command of the critical facts – the government and the defense. The PSR incorrectly fails to give proper deference and weight to these considerations by assuming that the complexities of this case are susceptible to resolution based on its reading of miscellaneous FBI 302's and the underlying charges in the Indictment and its one-time interview of the Defendant.

E.    Objections Concerning the History and Characteristics of the Defendant.

The PSR has reached several inaccurate and incomplete conclusions concerning Mr. Ketner's "Offender Characteristics" and his "Mental and Emotional Health." Many of these inaccuracies result from the fact that the PSR was prepared before the Probation Department had access to crucial and telling reports prepared by several highly trained

_____

also admitted the importance of these documents. Specific examples of what was found in these documents are discussed below.

BIRD | MARELLA

BIRD • MARELLA • BOXER • WOLPERT • NESSIM • DROOKS & LINCENBERG

Nancy O'Connor
April 11, 2007
Page 19

medical and psychiatric experts. A copy of Dr. Balkan's April 9, 2007 report relating to those reports is attached as Exhibit 2 ("Balkan Report").

The Defendant objects generally to the conclusions set forth in the PSR at paragraphs 124-138 and in the Probation Letter at pages 4-5 insofar as (1) they do not present a complete and accurate assessment of the Defendant's psychological and emotional problems; (2) they do not report accurately the Defendant's significant efforts to deal with his alcoholism and substance abuse; (3) they do not accurately report the full extent of the Defendant's contrition and rehabilitation; and (4) they do not accurately reveal the Defendant's character, devotion to his family, and community participation.

The Balkan Report sets forth the conclusions and observations of several trained experts who have examined and/or worked with the Defendant over the past six months. This includes Dr. Richard Romanoff, who did a psychological assessment of the Defendant; Dr. Annette Ermshar, who performed a neuropsychological assessment; and Dr. Joseph Haraszti, a psychiatrist who is treating the Defendant with medications. It also includes Robert Timmins, an addiction specialist and Dr. Jerry Brown, a psychologist, each of whom is counseling the Defendant relating to his alcoholism and substance abuse.

Dr. Balkan reports in detail about Ketner's childhood illness and traumatic relationship with his birth parents (Balkan Report, pages 2-5), as well as his early adulthood and first marriage. (*Ibid.*, pages 5-7.) Those reports put Ketner's early, formative experiences into a more complete context than does the PSR at paragraphs 103-109. For instance, the Balkan Report sets forth the details of how it was that Ketner was literally abandoned by his mother in a South Central Los Angeles hotel room, while still in a wheelchair (*Ibid.*, p. 3). Similarly, the Balkan Report gives a much keener sense of the emotional trauma of dealing with the rejection of parents and peers due to his handicap. Most importantly, the Balkan Report does what the PSR could not, it chronicles the psychological and psychiatric assessments and diagnoses which resulted from the testing and studies performed on Ketner before and after the PSR was prepared. (*Ibid.*, pages 10-13.)

The Balkan Report also details Ketner's acknowledgement of his alcohol and substance abuse problems. That acknowledgement is not hedged or qualified. The Report documents what the PSR almost glosses over – the fact that Ketner has worked hard to come to grips with the painful, dark and debilitating memories and events in his

**BIRD | MARELLA**

BIRD • MARELLA • BOXER • WOLPERT • NESSIM • DROOKS & LINCENBERG

Nancy O'Connor
April 11, 2007
Page 20

life. He has spent significant time and energy to use his guilty plea as a transformative event in his life. He has reached out to experts and his family for their support and direction. Unfortunately and incorrectly the PSR ignores or downplays these efforts and their import. While this is understandable given the fact that these reports were unavailable to the Probation Department, we respectfully urge reconsideration of the PSR's implicit judgments and explicit reports and conclusions.

Reconsideration is also merited in light of new insights as to Ketner's physical impairments, such as the organic impairment to his auditory short-term memory and attention to detail described by Dr. Romanoff. (*Ibid.*, pages 10-11.) Similarly, Dr. Ermshar also reported evidence of a specific psychological syndrome, cyclothymic disorder, which involves fluctuating mood disturbances which are common among those who abuse alcohol. (*Ibid.*, page 12.) In addition, Ketner is diagnosed by Dr. Haraszti as having severe Attention Deficit Hyperactivity Disorder (ADHD). (*Ibid.*, page 14.) The ADHD has contributed to Ketner's career "fits and starts" and helps explain his inattention to detail which was evident throughout the events at issue.

Most importantly, the PSR does not accurately report or reflect on Ketner's legitimate efforts to deal with his addictions and impairments. For instance, the PSR does not reveal that Dr. Brown has reported that Ketner "has shown steady progress in his [addictive behavior] treatment." (*Id.*, page 13.) Dr. Brown is a psychologist with a specialization in addictive behavior, who is also a former Orange County Deputy Probation Officer and a consultant with the State of California's correctional system. As Dr. Brown has reported,

> "[Ketner] is sober for the first time in his adult life. I have been impressed with his ability to talk openly about his involvement in a criminal matter and his willingness to accept responsibility. In therapy, he is learning the importance of sobriety in his life. I do not believe that with his continuing involvement in treatment and the 12-Step Program that Mr. Ketner would be at risk to reoffend."

(*Id.*, page 13.)

In addition, Ketner has been meeting with addiction specialist Robert Timmins. Timmins has worked in the field of addiction treatment for 35 years and was a chief consultant in the establishment of the national drug court system. He has managed Ketner's recovery from alcoholism since July 13, 2006. Timmins concluded in part that

BIRD | MARELLA
BIRD • MARELLA • BOXER • WOLPERT • NESSIM • DROOKS & LINCENBERG

Nancy O'Connor
April 11, 2007
Page 21

> "Based on my evaluation, I found Mr. Ketner to be amenable
> to treatment and a good candidate for Alcoholics Anonymous
> . . . . Mr. Ketner has been in compliance with all aspects of
> his treatment plan . . . I have spent time with Mr. Ketner since
> he entered recovery and found him to be genuine in his desire
> to change and stay sober."

(*Id.*, pages 14-15.)

Ken's AA sponsor since October 2006, Jim Cordwell, also has reported that

> "Ken and I talk several times a week and he is attending
> multiple AA meetings weekly. Ken understands that this
> battle is a life battle and not a short-term war...I can assure
> you that Ken takes to the AA Program with dedication and
> rigorous sincerity. Having been active in AA for such a long
> time, I feel qualified to judge Ken in this important respect.
> Ken has and will win his battle." (*Id.*, p. 15)

Finally, the PSR does not give sufficient credit to Ketner's long term devotion to his family and community. This is also reported in some detail in the various letters written by family, friends and community representatives, as reported by Sheila Balkan in her report. (*Id.*, pages 15-22.) More recently, Ketner has dedicated extraordinary energy and time to the rebuilding of a neighborhood in New Orleans, severely damages by Hurricane Katrina. His participation in the Broadmoor Improvement Association has helped local New Orleans residents salvage an area of their city earmarked for complete elimination. Reverend Jerry Kramer, deeply involved in the Broadmoor rebuilding efforts, calls Ketner "invaluable to their team and their organization's ability to move forward." (*Id.*, pages 23-24.) Kramer credits Ketner with spearheading an email and fundraising campaign necessary to support the Reverend's work.

All of this and more, as reported in the Balkan Report, should be reported to the Court in order to fairly depict Ken Ketner's considerable efforts to acknowledge his wrongdoing, "get straight," deal properly with addictions, and continue his necessary rehabilitation. Having said this, it is worth repeating that Ketner does not offer any of this as an excuse. His plea agreement and repeated statements of guilt and remorse represent his acknowledgment of wrongdoing. What is fair and right, however, is that

**BIRD | MARELLA**

BIRD • MARELLA • BOXER • WOLPERT • NESSIM • DROOKS & LINCENBERG

Nancy O'Connor
April 11, 2007
Page 22

full consideration of the Section 3553(a) factors should include much more than what is now in the PSR.

    F.    <u>Conclusion</u>.

    For all the reasons set forth above and in the attached reports and documents, we respectfully urge you to reconsider the specified conclusions in the PSR. We offer once again to clarify any issue addressed here. Please call or write at your convenience, so that we can discuss any of the questions raised by these objections.

    Sincerely,

*Terry W. Bird*

Terry W. Bird

TWB:dh
Enclosures
236715.1

24

# BIRD | MARELLA

BIRD • MARELLA • BOXER • WOLPERT • NESSIM • DROOKS & LINCENBERG

Nancy O'Connor
April 11, 2007
Page 23


bcc:   Ken Ketner
       Marty Laffer

25

# EXHIBIT 1

Expert Report of

Martin G. Laffer, CPA

In the matter of

United States v. Kenneth C. Ketner

SA CR 05-36-JVS

February 13, 2007

26

Laffer & Gottlieb

Certified Public Accountants

Expert Report of Martin G. Laffer
U. S. v. Kenneth C. Ketner
Page 2

# Contents of Report

Introduction ............................................................................................... 3

Qualifications............................................................................................. 4

Introduction to the Industry........................................................................ 5

History of the Company.............................................................................. 7

CFC Mortgage Company ........................................................................... 8

Mortgage Capital Resources..................................................................... 9

Home ZipR Corporation ........................................................................... 10

HomeFN...................................................................................................11

The Government's View............................................................................13

Vallard "Val" John Benincosa ...................................................................16

Roger Luby...............................................................................................22

"The Straw-Buyer Scheme to Defraud Warehouse Lenders".....................26

Closing Agent...........................................................................................29

"The Scheme to Defraud Warehouse Lenders by Diverting Funds"...........36

Monies Received by Ketner .......................................................................40

Household Withheld MCR's Funds .............................................................41

Conclusions..............................................................................................42

EXHIBITS..................................................................................................45

Laffer & Gottlieb
Certified Public Accountants
Expert Report of Martin G. Laffer
U. S. v. Kenneth C. Ketner
Page 3

Introduction

This firm was retained by Terry W. Bird, Esq. of Bird, Marella, Boxer, Wolpert, Nessim, Drooks & Lincenberg, approximately January 31, 2006. The purpose of retaining Laffer & Gottlieb was to assist Mr. Bird in reviewing and analyzing voluminous accounting and financial records in this instant matter. Although engaged as a consultant, and possibly to provide expert testimony at trial, the nature of the engagement morphed into assisting Mr. Ketner by addressing certain issues for sentencing.

As part of the assignment, I have been asked to address the Presentence Report (the "PSR") of Nancy O'Connor, U. S. Probation Officer, and to attempt to provide a financial framework to the crimes to which Mr. Ketner entered a plea of guilty.

Laffer & Gottlieb
Certified Public Accountants
Expert Report of Martin G. Laffer
U. S. v. Kenneth C. Ketner
Page 4

Qualifications

A *curriculum vita* is attached hereto (Exhibit 1).  A brief overview of my background training and experience is essential to this report.  I have been a principal of Laffer & Gottlieb, certified public accountants, since 1982, having previously been employed in public accounting and most notably as a special agent and group manager for the Internal Revenue Service, Criminal Investigation Division.  During my undergraduate years I was employed by the Bank of New York as a computer programmer and systems analyst/ designer, and one of my projects included designing a computer system for servicing mortgage loans.

Over the past 25 years, as a "forensic accountant" I have been involved in other matters involving mortgage banking issues.  I have testified numerous times in U. S. District Court on matters involving financial and tax related issues. My "Rule 26" list of cases is attached hereto. (Exhibit 2)

Laffer & Gottlieb

Certified Public Accountants

Expert Report of Martin G. Laffer

U. S. v. Kenneth C. Ketner

Page 5

Introduction to the Industry

The mortgage industry is diverse and complicated. A comprehensive, yet concise description of the warehouse lending business is contained in an "Expert Report of James E. Reynolds on the Island Mortgage Network Matter for State Bank of Long Island."[1] In summary, "the warehouse lending business operates within the residential mortgage industry and funded approximately $1.0 trillion dollars in private home mortgage loans in each of the calendar years for 1999 and 2000."[2] The players include the homeowner/borrower, who initiates the transaction by applying for a mortgage to either purchase a property or to refinance an existing mortgage. The application by the borrower is submitted to a mortgage lender, who receives the application for review and processing. The mortgage banker performs the credit review (underwriting function), prepares the legal documents (note, deed of trust, etc.), deals with the closing agent or escrow company responsible for transferring the funds to the beneficiary and recording the mortgage. The warehouse lender provides the funds to close the mortgage

---

[1] Exhibit 3 – Expert Report of James E. Reynolds on the Island Mortgage Network Matter for State Bank of Long Island (the "Reynolds Report") was prepared in a federal civil case involving State Bank of Long Island, a defendant in a matter brought by HAS Residential Mortgage Services of Texas, Household Commercial Financial Services, Inc. ("HCFS"), and Matrix Capital Bank, relating to losses sustained due to fraudulent actions by Island Mortgage Network, Inc. and its accountants. Interestingly, the Reynolds Report sets forth specific negligent actions by HCFS, and its subsidiary, Household Financial Services, Inc. ("HFS") in its lending operations and in purchasing closed loans from Island Mortgage Network, Inc. Many of the same Household individuals were involved with this instant MCR matter, and the conclusion by Reynolds is strikingly applicable to Household's dealings with MCR.

[2] Ibid, p. 4.

30

Laffer & Gottlieb
Certified Public Accountants
Expert Report of Martin G. Laffer
U. S. v. Kenneth C. Ketner
Page 6

transaction, generally for a short period of time, until the closed loan is sold (usually packaged with other closed loans) to an investor.

Mortgage bankers, such as MCR, establish lines of credit with warehouse lenders, and after borrowing from the credit lines, repay their lender when the loans are sold, generally within a 30 to 90 day time frame. The warehouse lender earns its revenue by charging the mortgage banker an interest rate greater than the rate they are paying for the funds,[3] plus the warehouse lender receives ancillary fees such as a transactional fees and custodial fees. The investors who purchase the closed loans earn revenue through the servicing fees paid by the borrower. The mortgage banker earns revenue from a combination of front end and back end fees (points), and interest on the balance of funds remaining from the investor's purchase funds, until remitted.

One of the problems inherent in the industry is that warehouse lenders are subject to significant and known risks.[4] The lenders are interested in generating a volume of high yield short term loans. In contrast, the investors are concerned with high quality, low risk loans to assure that the mortgages are not defaulted. There is a conflict between these two factions, since one is looking for high volume and the other for high quality.

---

[3] The difference between the two interest rates is referred to as "the spread."
[4] Ibid, p. 8.

Laffer & Gottlieb
Certified Public Accountants
Expert Report of Martin G. Laffer
U. S. v. Kenneth C. Ketner
Page 7

## History of the Company

The PSR states (p. 5, ¶15) "Ketner was one of the operators of MCR, a mortgage brokerage firm with an office [sic] in Orange County, California and Atlanta, Georgia.  Several of the witnesses interviewed by the FBI Special Agent (the SA) investigating the instant offense identified Ketner as the person in charge of MCR."  The evidence reflects that MCR was a national operation with offices as stated above, along with numerous other locations.

Mr. Ketner was in charge of the mortgage banking operation[5] for a period of time, along with Roger Luby, the president (and later the CEO), Randal Bristol, the president prior to January 2000 and the person responsible for the Atlanta, Georgia branch (which is where all of the second trust deed loans were processed, underwritten and funded).  Bristol was also involved with the credit facilities with Household and Regions.  Vallard "Val" Benincosa was the CFO and Beverly Fleming, the executive vice president of operations.

Ketner resigned as the CEO approximately March 3, 2000, to work on a new venture, "Home ZipR Corporation."[6]  (Prior to March 3rd, Luby participated in operating MCR.)  However, Ketner rejoined MCR as a consultant in an effort to right the company once he learned of its tenuous financial condition caused by the incompetence of the other executives to whom he sold and entrusted the company.  As will be discussed in detail below, at least two of the MCR senior

---

[5] MCR was not a brokerage firm.

Laffer & Gottlieb
Certified Public Accountants
Expert Report of Martin G. Laffer
U. S. v. Kenneth C. Ketner
Page 8

executives continued to take large monthly bonuses and salaries despite bouncing checks to borrowers and third parties.

CFC Mortgage Company

From 1988 through 1995 Ketner owned and operated CFC Mortgage Company. During most of that period CFC was a profitable operation with a number of warehouse lines of funding sources. The 1990 and 1991 real estate recession was very stressful to CFC, but the company operated successfully. The worst year for CFC was 1994, resulting from extremely limited real estate transactions, yet CFC was able to still generate a small profit.

By late 1994 Ketner had decided to downsize his business to focus on mortgages for residential builders and developers. This formula was expected to be a low overhead, low volume and higher profit type of model. Ketner had shared his plans with his friend Roger Luby, the former chief operating officer of Shearson American Express Mortgage who was widely known in the industry. At the time, Luby was working with Michael Barron, owner of Virtual Mortgage. They were in the midst of jointly acquiring Mortgage Bankers Acceptance Corporation ("MBA"), and they jointly approached Ketner with a proposal for them to acquire certain assets of CFC, intending to merge the two entities together. Luby had vast contacts and substantial investors, and MBA had different types of approvals than CFC. (Approvals included GNMA and FNMA service

_____

[6] Exhibit 4, Ketner deposition, September 11, 2000, 7: 19 - 8: 12.

Laffer & Gottlieb
Certified Public Accountants
Expert Report of Martin G. Laffer
U. S. v. Kenneth C. Ketner
Page 9

transactions.)  Luby agreed to purchase most of the bulk assets of CFC, along with his colleague Mike Barron.  The plan was for Luby and Barron to take over control of the retail branch operations of CFC and Ketner would retain the approvals of CFC and certain remaining assets to allow the formation of a builder based mortgage company.

Mortgage Capital Resources

As negotiations progressed, the terms were changed to reflect equal ownership between Luby, Barron and Ketner.  Barron then reneged on the transaction and Ketner agreed to merge CFC with MBA and Luby's other company, NEXUS Funding, forming Mortgage Capital Resources ("MCR") in late 1995.  MCR commenced operations on January 15, 1996.  MCR's business consisted of three operating divisions:  (1) retail branches (with loan officers and processors); (2) wholesale operations (to market MCR's services to other mortgage brokers); and, (3) builder / developer loans.  The combination of CFC's production staff, along with MBA's wholesale operations and investor relations, resulted in a synergistic entity.[7]

The ownership of MCR at the time it commenced operations was Ketner 60 percent; Roger Luby 25 percent and 15 percent owned by an investor group. Mr. Luby was the president and Ketner was the CEO. At its height, there were approximately 500 employees nationwide.

---

[7] Exhibit 5, Transcript of Beverly Fleming's, 11/19/03 2004 examination, 53: 17 – 24.

Laffer & Gottlieb
Certified Public Accountants
Expert Report of Martin G. Laffer
U. S. v. Kenneth C. Ketner
Page 10

Initially, Ketner's job was to manage the branches' production within the three operating areas.  His schedule involved two to three days of travel each week to the Western United States where MCR had operations (California, Nevada, Arizona, Idaho, Oregon and Washington).  His initial focus was the hiring of loan officers and loan processors and increasing production.  Ketner was also involved in obtaining warehouse lines of credit for MCR.

Home ZipR Corporation

On April 9, 1999 Ketner formed a new venture, Aateck Financial as a new and separate financial services and mortgage entity.  On May 3, 1999 Ketner changed the entity's name to "HomeFN," and incorporated in the State of Delaware.  On June 22, 1999 HomeFN issued shares of stock to its founders, Al Johnson (from Johnson & Payne) ("J&P"), Randy Bristol and Ken Ketner.  The formation officers were Ketner as CEO, Bristol as president, and Al Johnson, secretary.  On August 30, 1999 an independent auditors report was issued by Lesley, Thomas, Schwarz & Postma.[8]  Ketner began spending more time on launching and establishing HomeFN, and turned over management of MCR to others.

---

[8] Exhibit 6 – HomeFN Mortgage Corporation, Examination of Financial Statements, for the period October 15, 1998 to August 27, 1999.

Laffer & Gottlieb
Certified Public Accountants
Expert Report of Martin G. Laffer
U. S. v. Kenneth C. Ketner
Page 11

HomeFN

In January 2000 Ketner negotiated with Roger Luby to sell his shares of MCR to Luby to devote his entire efforts to the new HomeFN entity. In fact, the corporate resolution, executed by Beverly Fleming, on February 9, 2000 reflects Luby as president, Fleming as executive vice president and Benincosa as CFO.[9] Ketner was no longer a corporate officer. John Postma conducted a financial audit of MCR for the fiscal year ended 10/31/99, and discovered discrepancies in the cash disbursements. After a meeting between Postma, Ketner and Benincosa, in mid-February 2000, Postma resigned as the outside auditor.[10] Benincosa and Bristol opened a checking account in the name of HomeFN and transferred warehouse funds belonging to MCR into the account.[11] Bristol then instructed the employees of MCR's Atlanta branch to distribute the funds to borrowers from the HomeFN account.[12] The transfer of funds to the HomeFN account was improper, and caused a violation of MCR's warehouse agreements. The issue would have had to have been disclosed in the audit report. Postma indicated the disclosure requirement to Ketner and Benincosa, and advised that he would need to issue an "adverse auditors' opinion. Ketner

---

[9] Exhibit 7 – Corporate resolution of MCR, February 9, 2000, signed by Beverly Fleming, Corporate Secretary.
[10] Exhibit 8a - John Postma interview. Memorandum of Interview (MOI) by IRS SA Eric J. Helfand, and Exhibit 8b – Mark Murphy interview, MOI by same.
[11] Exhibit 9 – Thomas Neches & Company, LLP, Memorandum with attachment listing funds transferred by Johnson & Payne to LaSalle account XXXXX499 (HomeFN acct.) commencing 10/22/99.
[12] Exhibit 10 – HomeFN account, LaSalle National Bank statements.

Laffer & Gottlieb

Certified Public Accountants

Expert Report of Martin G. Laffer
U. S. v. Kenneth C. Ketner
Page 12

then confronted Benincosa to see if the books of HomeFN were in an auditable condition.  Benincosa informed Ketner that an audit was not feasible based on the state of the records.[13]

After these discussions, Ketner informed Luby of the problems and Luby agreed to purchase Ketner's interest in MCR because MCR was in the process of being liquidated.[14]

On March 30, 2000 Beverly Fleming advised MCR's employees that its retail branches would be merging with Nationwide Residential Capital ("NRC").[15] The transfer of the operations was delayed awaiting government approvals. Later, on August 31, 2000, Fleming sent an interoffice memorandum advising that the company was officially NRC.[16]

Beverly Fleming was the person in charge of MCR's operations, including the second mortgage operation which was housed in Atlanta (see above).[17]  She was located in Riverside where the accounting, underwriting, funding and operations were housed.  She was also in charge of all state regulatory issues. In fact, it was Ms. Fleming who dealt with the various state agencies in responding to consumer complaints regarding MCR's NSF checks and failure to pay off the

---

[13] See Postma MOI, Exhibit 8(a), ¶¶ 5 – 6.
[14] Exhibit 11 – Letter from Cory Youngberg, Lesley, Thomas, Schwarz & Postma of 12/17/99, addressing tax and economic considerations of Ketner selling certain assets of MCR.
[15] Exhibit 12 – Letter to MCR's branch managers from Beverly Fleming, dated 3/30/2000.
[16] Exhibit 13 – Interoffice Memorandum to all personnel from Beverly Fleming, dated 8/31/2000.
[17] Exhibit 14 – Beverly Fleming's *curriculum vita*.

Laffer & Gottlieb
Certified Public Accountants
Expert Report of Martin G. Laffer
U. S. v. Kenneth C. Ketner
Page 13

borrowers.[18]  A number of the initial complaints either referred to the CFO (Benincosa), Fleming or employees in Atlanta.  There is no mention of Ken Ketner, by reference or copy. One complaint was referred by Fleming to their legal advisor, Allen Johnson.[19]  It is clear that Fleming considered Allen Johnson MCR's legal counsel.  These functions did not involve Ketner.  Fleming, in her June 12, 2000 response to a complaint filed by the Board of Financial Institutions, Consumer Finance Division, for the State of South Carolina, she directed Gayle Fletcher, Examiner (for S. Carolina) to contact ". . .our president, Mr. Roger Luby."[20]  Again, no copy or reference was made to Ketner.

MCR filed for protection under the U. S.  Bankruptcy Code, Chapter 11, in January 2001.   Richard Marshack was later appointed as Trustee in liquidation when converted to a Chapter 7.

The Government's View

Ms. O'Connor's report addresses various transactions, such as "The Straw-Buyer Scheme to Defraud Warehouse Lenders," (page 6); and, "The Scheme to Defraud Warehouse Lenders by Diverting Funds," (page 7).

---

[18] Exhibit 15 – Compendium exhibit of sample correspondence from Beverly Fleming to various state regulatory agencies addressing consumer complaints on mortgage loans.
[19] It is understood that Allen Johnson testified that he did not assist MCR with any legal issues. However, Robert M. Snee, Esq., Portland, Oregon addressed a letter to MCR's legal department regarding a notice of cancellation on behalf of his clients, Jeff and Denise Ewing.  The letter was forwarded by Beverly Fleming to Al Johnson with a note, "It appears borrowers are trying to cancel the loan due to back dated right to cancel.  I'll pull the file & forward to you. Legal issue – not something I can handle. Beverly." (Exhibit 16)  In contrast, Johnson's 5/26/04 MOI (Exhibit 58) states that he never rendered legal advice to Ketner or MCR (1: ¶1).
[20] Exhibit 17 - Fleming letter of 6/12/2000 to Gayle Fletcher, Examiner, State of South Carolina.

Laffer & Gottlieb
Certified Public Accountants
Expert Report of Martin G. Laffer
U. S. v. Kenneth C. Ketner
Page 14

There is no evidence that Ketner formed MCR as a vehicle for engaging in any fraudulent activity. The company initiated business in 1996, and it wasn't until mid-1999 that the diversion began. To the contrary, the evidence reflects that several high placed executives (Benincosa and Bristol) began moving funds around in order to hide the fact that the company was losing money from operations. Upon learning of the problems, Ketner redirected his efforts to trying to work out the negative cash balances by infusing personal funds into MCR and executing a personal guarantee to Household, the largest warehouse lender. Ketner was no longer a corporate officer; he acted in the capacity of a consultant.

The "Straw-Buyer" transactions, which will be discussed in greater detail below, resulted from a number of defaulted mortgages returned to MCR by investors (because they were sold by MCR as recourse loans). However, MCR did not have sufficient funds to pay-off the mortgages. MCR then had individual borrowers, most of who were identified as MCR employees, apply for new loans. The new funds paid off the defaulted mortgages. Since the warehouse loans are short term, some of the properties had to be similarly refinanced a number of times until they were able to be sold. However, each new loan was paid on a monthly basis, the new loans were not inflated (for the purpose of "pulling out additional funds"), appraisals were not falsified or manipulated in any way, and

Laffer & Gottlieb
Certified Public Accountants
Expert Report of Martin G. Laffer
U. S. v. Kenneth C. Ketner
Page 15

for the most part, properties were eventually sold at a profit.[21]  The evidence will show that the warehouse lenders were specifically notified that the loans were "corporate / KK" or "corporate flip" as noted on funding logs, and correspondence with the lender clearly indicated that purpose of the loan.

The alleged fraud of "diversion of funds" resulted from transfers made by Val Benincosa, CFO, to cover cash deficiencies and inflate earnings.  Benincosa set up the "HomeFN" bank account at LaSalle National Bank, and transferred funds received from warehouse lenders, designated for borrowers' third-party payoffs, to this HomeFN account.  The evidence shows that Benincosa personally transferred the funds.  When Benincosa issued monthly financial statements, he included the HomeFN balances, without the offsetting liabilities, thereby inflating MCR's cash position.  During the review of approximately 300 boxes of documents received from the government, we were able to identify bank statements for periods when MCR's operating account was overdrawn, yet the financial statements reflected substantial cash balances.  (Interestingly, Benincosa paid himself a bonus check each month based upon falsified monthly profits.  This will be discussed in detail later in this report.)

In addition, the monthly financial statements reflected operating profits, yet cash was diminishing at the same time.  Although the records are incomplete, we

---

[21] In most cases, the appraisal reports used for these "internal" loans contained a disclosure that the transaction was not arms length.  Two MCR employees, Kevin Bonds (Exhibit 18 (a) – FD-302, 8/24/04) and Donald William Petty (Exhibit 18(b) – FC-302, 5/11/06) address how they took

Laffer & Gottlieb
Certified Public Accountants
Expert Report of Martin G. Laffer
U. S. v. Kenneth C. Ketner
Page 16

believe that the cash transfers by Benincosa were reflected as income to MCR, thereby inflating revenue and income.

Upon learning of MCR's financial problems, Ketner should have notified the lenders and investors of the situation. Instead, Ketner tried to "work out" the problems. In fact, Ketner infused $388,000[22] of personal funds into MCR's operating account hoping to stem the losses and turn the company around.

Vallard "Val" John Benincosa

Mr. Benincosa was probably more responsible for the demise of MCR than any other individual. As will be explained below, Benincosa misrepresented his experience, training and education. John Postma, CPA, a partner with Lesley, Thomas, Schwarz & Postma, Certified Public Accountants, Newport Beach (MCR's outside auditor) recommended Val Benincosa to Ketner for the position of chief financial officer.[23] From the very inception, Benincosa was a fraud. In addition to falsifying his resume[24] he was beyond his level of competence.

Benincosa's resume reflects that he is a licensed certified public accountant, holds a MBA degree from the University of Utah, was discharged

___

over the properties (characterized in the PSR as a Straw Buyer property) and sold them at a profit.

[22] Exhibit 19 – Kenneth Ketner's Pacific Mercantile Bank statements of 5/17/2000 and 7/15/2000 reflecting a check (no. 0101) from Ketner to Republic Bank 5/22/2000 $350,000; and, wires to MCR's LaSalle on account on 7/25/2000 and 7/26/2000 for $20,000 and $18,000 respectively.

[23] Exhibit 8 (a), 1: ¶2.

Laffer & Gottlieb
Certified Public Accountants
Expert Report of Martin G. Laffer
U. S. v. Kenneth C. Ketner
Page 17

from the U. S. Navy with a top secret security clearance and was employed by

Arthur Anderson & Co. / University of Utah from June 1977 to March 1980.

Previous experience includes "Pickle & Associates, Consultant Vice President."

Mr. Benincosa's resume is fraudulent. Specifically, neither California nor

Utah reflects that Benincosa has a CPA license. In fact, Utah's Department of

Business Regulations, Division of Professional Licensing's records contain a

formal rejection of Benincosa's CPA license application.[25]   In addition,

California's Board of Accountancy website reflects no license having ever been

issued to anyone named Benincosa.[26]

The University of Utah records reflects that on November 22, 1978

Benincosa "was not recommended for formal admission to a degree program.  A

departmental recommendation is necessary for admission to the Graduate

School."[27]

Immediately following his discharge from the U. S. Navy, Benincosa's

resume reflects that he was a "Torpedoman" [sic].  No reference to his "top

secret clearance" is listed.[28]   By grouping his Arthur Anderson experience with

---

[24] Exhibit 20 – Val J. Benincosa C.P.A., *curriculum vita*.  And earlier version of Benincosa's CV.
[25] Exhibit 21 – State of Utah, Department of Business Regulation, Division of Registration, letters of 11/23/81 and 2/4/82 rejecting Benincosa's application for a CPA license.  The entire file is attached.
[26] Exhibit 22 - California Board of Accountancy license search results from CBA website reflecting no record for any licensee named "Benincosa."
[27] Exhibit 23 – 11/22/78 letter from Normand L. Gibbons, Associate Dean of Student Affairs and Services advising Benincosa he was not admitted into the Department of Business Administration.  The entire University of Utah file is enclosed.
[28] See earlier resume, Exhibit 20, p. 2.

Laffer & Gottlieb
Certified Public Accountants
Expert Report of Martin G. Laffer
U. S. v. Kenneth C. Ketner
Page 18

his position as an internal auditor for University of Utah (from 4/18/78 to 6/20/80),

it deceptively reflects far more extensive auditing experience than he actually

had.  According to Ketner, Benincosa represented that the University of Utah

experience was actually an assignment while employed by Arthur Anderson, the

now defunct international accounting and auditing firm.  In fact, it appears that he

was employed by Arthur Anderson & Co. from June 1977 to April 1978, a period

of 10 months, not the three years (June 1977 to March 1980) reported.

Benincosa's experience at Pickle & Associates, where he was allegedly

employed as a "consultant vice president," appears suspect.  He described his

duties as "helped determine turn around problems for clients and resolved their

problems."  He then listed a number of companies he "helped."  In fact,

Benincosa's wife is Pickle Benincosa.  Westlaw's license search reflects Val

Benincosa's employer as "Pickle's Boutique," located at the same address as his

residence (18131 Brentwell Circle, Huntington Beach, CA 92647).[29]

Benincosa's resume fraud and deception continued to his sworn testimony

in a 2004 Bankruptcy Deposition[30] as follows: "I have a bachelor's in accounting

– actually it's in management with an emphasis in accounting -- from San Diego

---

[29] Exhibit 24 – Westlaw search of professional licenses for Benincosa disclosed his employer as
Pickle's Boutique, a family apparel business, at the same address as his residence.
[30] Exhibit 25 - 2004 Examination of Vallard John Benincosa, Friday, August 17, 2001.  Case No.
SA 00-19419 JB, Chapter 11.  Please note that the transcripts are not paginated.

Laffer & Gottlieb
Certified Public Accountants
Expert Report of Martin G. Laffer
U. S. v. Kenneth C. Ketner
Page 19

State. And then I have a master's from University of Utah, MBA. I also have a

CPA from the State of Utah (copy of deposition is not paginated).[31]

Benincosa was hired as the CFO on or about May 7, 1997 by MCR. His

base salary was $80,000 per annum, with a schedule of bonuses based upon

MCR's financial performances. The payment terms for the bonus states it ". . . is

to be paid out the month following the sixth month and the twelfth month of the

financial statements."[32] However, Benincosa issued $5,000 checks (and

sometimes $10,000 checks) to himself monthly for his bonus.[33] Further,

Benincosa issued three checks to himself, but either left the payee and amount

blank in the check register, or inserted a fictitious payee, as follows:[34]

| Date | Check | Payee | Amount | Register Payee | |
|------|-------|-------|--------|---------|---|
| 6/1/00[35] | 769 | Val Benincosa | $10,000 | Blank | $ 5,000 |
| 7/1/00 | 780 | Val Benincosa | 5,000 | GE Capital | $17,041 |
| 8/1/00 | 791 | Val Benincosa | 5,000 | Blank | No amt. |

Benincosa prepared a Form 1099 for his 1998 bonus of $60,000. The

payments, designated as "non-employee compensation" were subject to

---

[31] Ibid.

[32] Exhibit 26 – Benincosa employment agreement with MCR, 5/20/97. The bonuses were computed at 25% of base salary if return on investment ("ROI") was 25%; 50% bonus if ROI was 35%; and, 75% bonus if ROI was 50% or greater. Effectively, if MCR's profit was $1.2 million, then Benincosa's bonus would have been $60,000.

[33] Exhibit 27 – Compendium of MCR checks to Benincosa, including bonus checks, all signed by Benincosa.

[34] Exhibit 28 – Copies of the checks and check registers for the June, July & August bonuses.

[35] It should be noted that during the 2004 debtor examination, Benincosa testified that he had left his position at MCR in April 2000 (Exhibit 25), yet these checks (and others) were written by him

Laffer & Gottlieb

Certified Public Accountants
Expert Report of Martin G. Laffer
U. S. v. Kenneth C. Ketner
Page 20

employment taxes, but he issued himself gross checks. In addition to violations

of employment tax statutes, Benincosa never filed the Form 1099 with the

Internal Revenue Service nor California.[36] It is unknown if Benincosa reported

the income on his personal tax returns. Benincosa similarly issued a Form 1099

to Randy Bristol, manager of the Atlanta branch office for 1998 reflecting

compensation of $700,000. This Form 1099 was similarly not sent to the IRS.[37]

MCR's accounting function was located in Riverside, California. Val

Benincosa, CFO was the senior financial person for the company and was

responsible for the accounting, finance and banking functions. By Benincosa's

testimony no one other than Riverside personnel had access to the accounting

records. In fact, Benincosa identified all of the employees who had password

access to the system, and Ken Ketner was not one of the employees.[38] Wire

transfers also originated from the Riverside office, although Benincosa testified

that on occasion a wire transfer may have been initiated from the executive office

in Santa Ana. It is undisputed that Ketner did not have authority to make wire

transfers, and never signed MCR checks.

---

after that period. Also see Exhibit 32, Benincosa's FD-302, where he testified to SA John Connell
that he resigned as CFO April 1998.
[36] Exhibit 29 – 1998 Form 1099 to Benincosa from MCR, and bonus checks. During MCR's
bankruptcy proceedings, MCR employees observed that several Forms 1099 which were
prepared, did not reconcile with the forms submitted to the IRS. The two missing Forms 1099
were for Benincosa ($60,000) and for Randy Bristol, manager of the Atlanta branch office who
received $700,000 of "non-employee" compensation. This was confirmed to the undersigned in a
telephone conversation on February 9, 2007 by Elizabeth Conway, a former accounting clerk for
MCR, currently on maternity leave.
[37] Exhibit 30 – 1998 Form 1099 to Randy Bristol from MCR, and bonus checks.
[38] Exhibit 31 – 2004 examination of Benincosa, August 17, 2001, unpaginated.

Laffer & Gottlieb
Certified Public Accountants
Expert Report of Martin G. Laffer
U. S. v. Kenneth C. Ketner
Page 21

In reviewing monthly financial statements prepared by Benincosa, it was noted that the statements were issued two to three months after the period, and during the last two years, there were cash balances in the financial statements which did not correlate to MCR's bank statements from LaSalle Bank.

Benincosa explained to SA Connell how MCR funded loans. He testified that ". . . funds were diverted to the general account because Ketner needed money to run the company. Every morning Ketner checked the account balances and sent instructions to Benincosa regarding where to move money. Benincosa would then have his accountants move the money."[39] According to Dolores Mendoza,[40] who worked for MCR from April 1998 to November 2000 as a financial analyst (15: 20 – 23), the only people authorized to transfer funds in MCR's accounts were herself, Elizabeth Conway, Eliza and Val Benincosa (95: 17 – 20). Each transaction was accounted for on a separate sheet, and reflected a signature, usually Val's (97: 1 – 10). Although she recalls seeing transaction sheets with a space for Ketner's signature, she never saw Ketner's name on any of the transactions (98: 4 – 13), nor did Benincosa ever tell Mendoza that Ketner requested the transfer (99: 10 – 16). Fund transfers were generally initiated by Benincosa (128: 19 – 129: 2).

---

[39] Exhibit 32 - Benincosa FD-302 of 1/22/2000, p. 2, ¶ 4.
[40] Exhibit 33 - Deposition of Dolores Mendoza, January 30, 2001.

Laffer & Gottlieb

Certified Public Accountants

Expert Report of Martin G. Laffer

U. S. v. Kenneth C. Ketner

Page 22

Val Benincosa executed all transfer instructions.[41]  All overdraft notices were sent directly to Benincosa.[42]  Further, Benincosa issued wire transfer instructions to specifically replace MCR's NSF checks, as early as 12/15/1999.[43] Benincosa testified as follows:[44]

Q      Okay.  Was there a password necessary to send wire transfers?

A      Yes.

Q      Who had access to the passwords?

A      Passwords?

Q      Passwords.  Who had passwords?

A      Each one of us had a password.  It would be Dolores Mendoza, Eliza Au, myself, and Elizabeth Conway.

Q      Did Mr. Ketner have a password?

A      Not to my knowledge – well, no.  Because it was only on a PC.


Roger Luby

Roger Luby was the president and later the CEO of MCR.[45]  In 1996, at the start of MCR, Luby was responsible for locating investors to buy closed loans from the company and overseeing operations (supervising Beverly Fleming).

---

[41] Exhibit 34 - Compendium of wire transfers for February 29, 2000.
[42] Exhibit 35 - Compendium of overdraft notices of various dates.
[43] Exhibit 36 - Compendium of instructions signed by Val Benincosa, CFO replacing checks.
[44] Exhibit 31 - unpaginated transcript.

[45] Exhibit 37 – Roger W. Luby, *curriculum vita.*

Laffer & Gottlieb
Certified Public Accountants
Expert Report of Martin G. Laffer
U. S. v. Kenneth C. Ketner
Page 23

According to Ketner, Luby effectively worked approximately three hours per day (9 to noon) and spent the afternoon drinking.  He was paid $10,000 per month from the inception of the company until March 2000, when he increased his monthly salary to $15,000. (The additional $5,000 was paid to P. L. Miller, Luby's wife.)

On February 9, 2000 Luby executed broker agreements with Pacific Mercantile Bank as the CEO/President of MCR.[46]  A February 9, 2000 MCR corporate resolution identifies Luby as President, Beverly Fleming as EVP and secretary, and Val Benincosa as the CFO.[47]  Ketner was no longer involved with MCR.

Luby eventually resigned as the president and CEO on September 9, 2000.[48] Ketner transferred his 1000 shares of MCR to P M Miller LLC[49] on March 8, 2000.  Luby's testified to the FBI, "The sale of MCR stock to Luby's company, PL Miller, never took place."[50]  As late as January 8, 2001 Luby received a letter from the U. S. Department of Housing and Urban Development in his capacity as

---

[46] Exhibit 38 - Pacific Mercantile Bank, Mortgage Broker Agreement, dated 2/9/2000.
[47] Exhibit 39 – Corporate Resolution of MCR, dated 2/9/2000.
[48] Exhibit 40 – Resignation from MCR by Roger W. Luby, dated 9/9/2000.
[49] Exhibit 41 – MCHI (MCR's parent), 1,000 shares.  The entity should have been P L Miller, LLC, (Luby's wife's name) an entity which filed with the California Secretary of State on June 2, 2000. (See Exhibit 42 - California Business Portal record.)
[50] Exhibit 43 – Roger Luby, 3/16/2001, FD-302 from SA John Connell

Laffer & Gottlieb

Certified Public Accountants

Expert Report of Martin G. Laffer

U. S. v. Kenneth C. Ketner

Page 24

president of Mortgage Capital Resource Corporation regarding a July 16, 2000 response by Luby to the agency.[51]

Interestingly, Benincosa testified to the FBI that he resigned as CFO in 1998.[52] Luby testified, "Moreover, from January 3, 2000 through December 2000, and even before that time, I did not participate in the management of Mortgage Capital Holdings or MCR. Based on my contacts with Ketner and other MCR employees, I know that from January 3, 2000 through September 2000, Ketner served as the sole controlling managing person of MCR, acting as the de facto Chief Executive Officer, President, and Chairman of the Board of Directors. From January 3, 2000 through September 2000, Ketner controlled MCR and made management decisions. I never made any management decisions for MCR."[53] Further contradicting this representation by Luby is an August 23, 2000 letter from Ketner to Luby, wherein Ketner asked for authorization to have a settlement conference with Household. Ketner guaranteed the Household credit facility on June 26, 2000; and, since Ketner was no longer a corporate officer, he

---

[51] Exhibit 44 – U. S. Department of Housing and Urban Development, 1/8/2001 letter to Roger Luby. (The letter was actually addressed to "Mr. Roger Lube.")
[52] Exhibit 32, ¶ 3. In addition, there are voluminous documents within the prosecution's records contradicting Benincosa's testimony. (See Exhibit 46, a compendium assortment of documents wherein Luby signs as CEO or president of MCR.

[53] Exhibit 45 - Declaration of Roger W. Luby, August 13, 2001, p. 7, ¶ 19.

Laffer & Gottlieb

Certified Public Accountants
Expert Report of Martin G. Laffer
U. S. v. Kenneth C. Ketner
Page 25

was asking for Luby's authorization.[54]  The evidence clearly renders Benincosa's

and Luby's testimony false.

Luby disclosed his IRS problems,[55] and specifically discusses Ketner's

assistance in purchasing a home for Luby in Ketner's own name.  Luby failed to

mention that he was receiving compensation for his employment at MCR by

receipt of checks to a fictitious entity, McShane & Associates, Inc. controlled by

Luby, as well as payments to P L Miller, his wife.[56]  The California Secretary of

State files do not reflect a corporate entity known as McShane & Associates, Inc.

(other than two suspended entities, John McShane & Associates, Inc. (filed

8/9/1962) or McShane & Associates Tank Testing, Inc. (filed 3/20/1987)).[57]  The

Heritage Bank signature card for this fictitious entity was not located in response

to a subpoena.[58]  It was common knowledge that McShane & Associates, a

suspended Nevada Corporation was Luby's.  Luby's sons are named Marc and

Shane, hence the contraction. Payments were made by MCR, executed by Val

Benincosa to McShane & Associates in the amounts of $10,000, $7,000 and

$3,000.[59]  In addition, from March 5 ,2000 to August 2000, Benincosa issued

checks to P. L. Miller from Mortgage Capital Holdings, Inc.[60]  Luby's testimony

---

[54] Exhibit 47 - Ketner letter to Luby, 8/23/2000.  The Continuing Guarantee, dated June 26, 2000
by Ketner to Household is the subject of the negotiations. (Exhibit 48)
[55] Exhibit 49 – Luby, FD-302 of 6/18/2004, SA Paul Bonin, ¶4.
[56] See Exhibit 52 for copies of checks to P. L... Miller.
[57] Exhibit 50 - California Business Portal, Secretary of State, search for McShane.
[58] Exhibit 51 - Letter from ABN-AMRO, 3/9/2006 to Benjamin Gluck, Esq., Mr. Ketner's attorney.
[59] Exhibit 52 - MCR checks to McShane & Associates and to P. L. Miller.
[60] Ibid.

Laffer & Gottlieb

Certified Public Accountants
Expert Report of Martin G. Laffer
U. S. v. Kenneth C. Ketner
Page 26

was that "P. L. Miller never had any bank accounts, employees or office space.[61]

Some of Miller's checks were deposited to a P. L. Miller Consulting account at

Heritage Bank (see 4/1/00 check). This was the same bank as McShane &

Associates, Inc.'s account.

In an October 18, 2000 letter from Ketner to Luby,[62] Ketner refers to

extortive threats by Luby for Ketner to continue supporting him, or Luby would

"turn in Ketner" to Household. In fact, when the problems all boiled to the

surface, it was Luby who cooperated with Household Commercial Services by

providing a declaration which we believe contains numerous false statements.[63]

In exchange for his testimony, Luby was released from any liability by

Household's lawyers, Heller, Ehrman, White & McAuliffe, LLP, by dismissing

Luby from the breach of contract, fraud and civil RICO suit.[64]


"The Straw-Buyer Scheme to Defraud Warehouse Lenders"

The PSR states (¶ ¶19 - 24) "Ketner committed fraud against Republic

Bank and HCFS, a warehouse lender, as follows: Ketner would arrange for

loans on properties funded by MCR's warehouse lines. When the money owed

to warehouse lenders would become due, rather than sell off the loan or take a

---

[61] Exhibit 43.
[62] Exhibit 53 - Ketner letter of 10/18/2000 to Luby, signed by Ketner as chairman of Home ZipR.com.
[63] Exhibit 45.
[64] Exhibit 54 - Request for Dismissal, as to Luby only, transmitted September 6, 2001, executed by Carlos Solis.

Laffer & Gottlieb
Certified Public Accountants
Expert Report of Martin G. Laffer
U. S. v. Kenneth C. Ketner
Page 27

loss on it, Ketner would ask a friend or employee to be a straw buyer of the property. Ketner would assure the straw buyer that MCR, not the straw buyer, was the party truly liable for the loan. Ketner would then cause a warehouse lender to fund the loan under the false pretense that the loan was being made to the straw buyer. Ketner would cause the loan files relating to a straw buyer to be segregated at MCR to assure that they were not inadvertently sold off. Specifically, they would be put into purple files, and were known in MCR as the 'purple file properties.'"

"Between 1996 and 2001 Ketner caused at least 20 properties to be repeatedly bought and sold by straw buyers." (¶20)

"One of the straw buyers, 'RL', explained to the SA that Ketner approached him indicating the properties were sold, but the loans could not be sold by MCR because they were improperly packaged." (¶21)

The PSR's characterization of these "purple files" is incorrect. The properties securing the loans had been foreclosed upon by the third-party investors who purchased the closed loan from MCR. The properties were generally in poor condition resulting from the foreclosure process, such as the eviction proceedings. Many of the houses had to be restored to marketable condition. These were recourse loans that MCR was obligated to buy back because of the default.

Laffer & Gottlieb

Certified Public Accountants

Expert Report of Martin G. Laffer
U. S. v. Kenneth C. Ketner
Page 28

If MCR had been better capitalized, the company would have simply paid the investor the balance of the defaulted loan, foreclosed on the property and then disposed of the property.  However, MCR was unable to pay off the loan, so instead, Ketner or others had a real person complete a real loan application, and submitted a real appraisal to obtain a mortgage on the property, sufficient to pay off the existing mortgage.  In most cases, the warehouse lender was advised that the loan applicant was a MCR employee and that it was not an arms length transaction.  The funding log for the loans specifically stated "Corporate flip" and/or "Ken Ketner - KK deal."[65]  There was no profit made from these transactions.

A "straw man or party" is defined as a "front;" a third party who is put up in name only to take part in a transaction; person who purchases property or another to conceal the identity of real purchaser."[66]

It is believed that the lenders were aware of the nature of the transactions.  The loan applications reflected "NOO" (Not Owner Occupied), and the amount borrowed was generally greater than 80 percent (whereas on NOO loans, lenders look to finance less than 80 percent) of fair market value.  The title

---

[65] Exhibit 55 – Sample of daily funding logs for Republic and Household, reflecting "Corp Flip" and "Corp KK" for the branch.
[66] *Blacks Law Dictionary*, 6th Edition, West.

Laffer & Gottlieb

Certified Public Accountants
Expert Report of Martin G. Laffer
U. S. v. Kenneth C. Ketner
Page 29

policies reflected a number of earlier sales transactions, all within a short time frame.  The appraisals reflected that the transactions were "not arms length."[67]

The characterization of the transactions as being "flips" is also incorrect. Generally, a "flip transaction" is where a property is purchased at one price and then immediately (sometimes in a concurrent escrow) sold at an inflated price. We have done an extensive analysis of the "purple file" properties.[68]  It is clear that the properties were being transferred between individuals, many of whom were MCR employees.  However, the loans approximated the amount of the existing loan which needed to be paid-off because of the short term nature of the credit line.  In fact, employees Kevin Bonds and Donald Petty both testified that when MCR was unable to pay the mortgages on the "purple file properties" which were in their names, they took over the monthly payments, repaired and sold the properties at a profit.  Both knew that they had applied for the loan and in fact, owned the properties.[69]  The fact is these employees or others were bona fide owners of the properties.


Closing Agent

The PSR[70] states that "between February and August 2000, Ketner and Johnson devised and executed a scheme to defraud warehouse lenders of their

---

[67] Exhibit 56 – Sample "purple file" transactions for 3 properties.  (See title policy of 11/8/99, p. 7; 12/6/99, p. 6; and, 10/7/99, p. 5).
[68] Exhibit 57 - Detailed list of purple file properties.

Laffer & Gottlieb
Certified Public Accountants
Expert Report of Martin G. Laffer
U. S. v. Kenneth C. Ketner
Page 30

right to the honest service of Johnson and to unlawfully divert funds to MCR." (¶ 25)  "When Johnson first became the closing agent for MCR, the closing procedure MCR used was as follows: Borrowers would apply for a loan from MCR.  MCR, through Ketner or others at Ketner's direction, would request funds from one of its warehouse lenders, including Household.  A warehouse lender would transfer the requested funds to Johnson's client trust account.  Johnson would confirm, as part of this duties as a closing agent, that the transaction met certain requirements, including that the lender's money was going to the borrower in exchange for the lender receiving a security interest in the borrower's home.  Johnson would then disburse the funds directly to the borrower." (¶ 26) "A short time after Johnson became the closing agent, he and Ketner changed the closing procedure such that Johnson, upon receiving money from a warehouse lender, would wire it directly to MCR's bank account, rather than to the borrowers." (¶27)

This analysis and depiction of events is incorrect.  Allen Johnson first became involved with Ketner as a real estate developer, and borrower.  Ketner's relationship with Johnson extends back to 1985.[71]  Johnson first became employed by MCR as a law school graduate (not admitted to practice) to handle small disputes that MCR had with brokers, and [Ketner] offered Johnson an

---

[69] See their 302's, Exhibits 18 (a) and 18 (b).
[70] O'Connor Report, p. 7 ¶ 25 through p. 8 ¶ 27
[71] Exhibit 58(a) – Johnson MOI of 5/18/2004, 1: ¶1.

Laffer & Gottlieb
Certified Public Accountants
Expert Report of Martin G. Laffer
U. S. v. Kenneth C. Ketner
Page 31

office and $5,000 per month salary."[72]  Later, as Johnson related to the agents, it was Ketner who approached Johnson, at the urging of Randy Bristol, for Johnson to become a closing agent.[73]  When Johnson agreed to become a closing agent, he was not admitted to practice law in Georgia, or any state other than California. Accordingly, he actually hired a Georgia attorney, James Dooley.  They opened a business called Johnson & Dooley, which later became Johnson & Payne ("J&P").[74]  Johnson became the closing agent in early 1999 to handle loan closings for MCR's borrowers.  According to the MOI, Johnson stated that the initial procedure was for the warehouse lenders to transmit funds to J&P who then disbursed the funds to the borrower.[75]  Prior to Johnson, it was MCR's practice to distribute checks directly to borrowers from loan proceeds. Scott Miller, a Bellevue, Washington MCR employee testified that when he began working at MCR in April 1998, it was MCR's practice for the MCR Atlanta Office to forward checks to Bellevue for disbursement to the borrowers.[76]  MCR had established an equity disbursement account for this purpose.  I have reviewed the signature cards for MCR's equity disbursement account.[77]  From the date of the signature card, it appears that MCR was distributing funds to borrowers

---

[72] *Ibid*, 2: ¶6.
[73] *Ibid*, 3: ¶7.
[74] *Ibid*, 3: ¶¶8 - 10
[75] *Ibid*, 4: ¶13
[76] Exhibit 68 – Scott Miller, FD-302, dated 1/3/2000 by SA John Connell, 1: ¶3.
[77] Exhibit 59 - Signature card from LaSalle National Bank, dated July 24, 1998 for the MCR Equity Disbursement Account.

Laffer & Gottlieb
Certified Public Accountants
Expert Report of Martin G. Laffer
U. S. v. Kenneth C. Ketner
Page 32

before Johnson became involved with the company.  The signature authority on

this account was limited to MCR's Atlanta employees, including Randy Bristol.

There was no written contract between J&P and the warehouse lender

requiring J&P to process the loan proceeds.  It has been acknowledged by

Household corporate officers that J&P never had any written contractual

relationship with the warehouse lenders.[78]

The government produced documents from HFS which included copies of

MCR loan proceed distribution checks to the borrowers, and to third-parties on

behalf of the borrowers at the time loans were closed.[79]  It is evident that

Household was fully aware that MCR was disbursing funds directly.

In deposition testimony, Carse stated that Household Commercial

Financial Services ("HCFS") relied upon Household Financial Services ("HFS") to

perform due diligence of their customers when evaluating closed loans for

acquisition.[80]  Therefore, Household had to have known that MCR controlled loan

funds, since the files were replete with internal MCR documentation and copies

of checks and wires.  There was no effort to disguise MCR's handling of the

transactions, and since Household never questioned MCR, there was a

confirmation of sorts, approving MCR's procedures.

---

[78] Exhibit 60 – Robert K. Carse deposition of October 9, 2001, 230: 4 – 16.
[79] Exhibit 61 - Three loan files are enclosed as samples of the loan packages Household acquired
from MCR.  It is evident that MCR was the disbursing agent, because MCR checks were included
in the loan files.  These files were reviewed by Household as part of their due diligence
procedures.
[80] Exhibit 62 – Robert Carse deposition of 2/27/03, 84: 14 – 21.

Laffer & Gottlieb
Certified Public Accountants
Expert Report of Martin G. Laffer
U. S. v. Kenneth C. Ketner
Page 33

HCFS also used MCR as a closing agent and funded money directly to MCR. This is clearly documented. By way of example, a sample of HCFS, Warehouse Line Purchase Schedules, dated July 7, 1999 (before the date referenced above by the Probation Report) reflects that the "Closing Agent" is Mortgage Capital.[81] The related Household "Outgoing Wire Transfer Request Form" for the July 7th date reflects a $107,430.79 transfer to MCR's Republic Bank account.   Similarly, the July 8, 1998 Schedule reflects MCR as closing agent for listed loans, and the associated wire transfer to MCR's bank account is for $791,019.10; and for July 9, 1999 the MCR transfer as closing agent is for $348,977.26.[82] From these limited examples, it is very clear that the funds were not always directed to J&P, but were also transferred to MCR directly by Household.

In an October 9, 2001 civil deposition, Robert K. Carse, a HCFS employee admitted that HCFS did not use escrow closing agent agreements.[83] This was required in accordance with the written credit agreement between HCFS and MCR.[84] In addition to Carse, Michael Hammond, Household vice-president stated that the escrow agreement between J&P or any other closing agent never

---

[81] Exhibit 63 – HCFS, Warehouse Line Purchase Schedule.
[82] Ibid.
[83] Exhibit 60, 230:4-9.
[84] Exhibit 64 - Warehousing Line, Revolving Credit Agreement by and between MCR and MCFS, dated as of December 4, 1998.  P. 3 defines "'Closing Agent' means any title company or other Persons approved in writing by the Lender."

Laffer & Gottlieb
Certified Public Accountants
Expert Report of Martin G. Laffer
U. S. v. Kenneth C. Ketner
Page 34

existed.[85]  Carse also admitted that Household never had direct communications with MCR's closing agents.[86]  These statements are direct contradictions to representations made by Household personnel in their civil claims and the U S Attorney's Office.

In funding loans, HCFS issued an outgoing wire request form.  When the closing agent was J&P, no loan reference was made to a specific borrower.  However, when funding to other closing agents, loan references to individual borrowers was documented.[87]  As an example, on April 3, 2000 HCFS disbursed $687,628.30 to seven closing agents.  Each "Outgoing Wire Transfer Request Form" reflected the name of the borrower, except for the J&P disbursements.  On the J&P request forms, there is no borrower information in the "reference" portion of the form.  However, for the other six closing agents, the reference is included.  This is consistent with the 5/1/2000 and 6/23/2000 transactions.  The three examples were culled from numerous boxes received from the government.  This demonstrates that HCFS knew that J&P was not distributing the funds to the borrowers, but was instead transferring the money to MCR, because MCR had the borrower identification and information.

In addition to the direct funding mentioned above, Household, Republic and other warehouse lenders received wires from MCR directly to refund funds

---

[85] Exhibit 65 – Michael Hammond deposition dated 2/28/2003, 138:6-14).
[86] Exhibit 60 - 231:16-22.

Laffer & Gottlieb

Certified Public Accountants
Expert Report of Martin G. Laffer
U. S. v. Kenneth C. Ketner
Page 35

on cancelled loans, as well as payoffs of the "purple file loans." There are

numerous wire transfers from MCR evidencing the source of the refund.[88] It is

disingenuous for the "victims" to stake a position that they were unaware that

funds were bypassing Johnson & Payne, when they themselves were directing

funds to MCR and receiving cancelled loan refunds (both by check and wire)

directly from MCR. If the lenders were concerned that J&P (or other closing

agents) were to control all funds, then the return of loan funds by MCR should

have set off alarms. Yet, no one ever questioned the source of the returned

funds.

At some point Household became aware of MCR's NSF checks issued to

borrowers.[89] Carse was advised by HFS about loans it sold to HCFS that were

not properly funded. Enclosed is a conversation log produced by Household that

reflects that a borrower contacted HFS on May 26, 2000 and complained that

MCR's checks related to the closing of their loan had been returned NSF.[90] This

is significant for two reasons, the first and obvious is that Household was on

notice that checks were being returned to MCR for lack of funds in the account;

and, secondly, it is an additional confirmation that Household knew MCR

controlled the disbursements to the borrowers during the closing process. There

---

[87] Exhibit 69 – HCFS, Warehouse Line Disbursement Schedule. Included are detail transaction summaries and request forms for 4/3/2000, 5/1/2000 and 6/23/2000.
[88] Exhibit 66 – Compendium of wire transfer worksheets reflecting wires from MCR to various lenders including HCFS "Clearing Group," Attn: Bob Carse.
[89] Exhibit 60 - 294:18-24 to 295:2-23.
[90] Exhibit 67 – HFS, Collections/Customer Service Loan Activity Microfiche 5/26/2000 entry.

Laffer & Gottlieb

Certified Public Accountants

Expert Report of Martin G. Laffer

U. S. v. Kenneth C. Ketner

Page 36

are additional examples of notification to HCFS regarding bounced checks from MCR, all received by subpoena from Household.

HCFS continued transacting business with MCR, even after learning of the bounced checks, because Household made a significant profit. HCFS funded loans knowing that borrower money was being used by MCR. The HFS division profited from purchasing closed loan files. Accordingly, HCFS closed a blind-eye to their own internal requirements.

## "The Scheme to Defraud Warehouse Lenders by Diverting Funds"

One of the contributing factors to the instant case was Household's corporate mentality to ignore problems of companies that were both a client of HFCS and HFS. The Reynolds report identified the potential conflict between Household's operating divisions.[91] In the Hammond deposition referred to by Reynolds, he described how Household, thru himself and Douglas Friedrich (senior vice-president in charge of both HCFS and HFS, who reported directly to David Schoenholtz, CFO of Household's public parent) tried to balance the relationship between both companies. Hammond stated, "But you know that we were cognizant of the facts that there were, you know, other relationships at Household that had to be considered in totality."[92] Household was making

---

[91] Exhibit 3, Reynolds Report.
[92] Exhibit 65, 250: 15-22 to 251: 1-19, 305: 10-12.

Laffer & Gottlieb

Certified Public Accountants

Expert Report of Martin G. Laffer
U. S. v. Kenneth C. Ketner
Page 37

money from the purchasing of loans from MCR and wanted to work things out to

maintain the profit stream and relationship.

Household (through their representatives) have always taken the position

that Island Mortgage (referred to in the Reynolds Report) and MCR are similar in

nature. Evidence is clear that HCFS had knowledge that substantial issues

existed at Island at least by June 12, 2000.[93] Carse had recommended not

reinstating the Island line of credit and Hammond had overruled him.  Carse

testified that he suspected diversion activities at Island during a conversation with

another Island lender.[94] Household with this knowledge continued to advance

funds under the same creditor agreement that MCR was working under to Island

and lost, according to Carse, Household lost $6,150,613.00 between 6/20/2000

and 6/23/2000 when the decision to finally terminate Island's line was made.[95]

On 6/22/2000 Carse knew that the FBI was involved in investigating the activities

of Island.[96]

Faced with the issues at MCR, Household had Ketner execute a personal

guarantee on 6/26/2000.[97] When asked why Household was requesting a

---

[93] Exhibit 70 - Memo from Yolanda Byford to Pat Howard re: Island Mortgage Network.  This was
referenced as Exhibit 45 to the 2/27/2000 Carse deposition.
[94] Exhibit 62, Carse deposition 325: 2 – 326: 4. (Reference is to our Exhibit 70, Byford Memo.)
[95] Exhibit 71 – Affidavit of Robert K. Carse in Island Mortgage Matter, 4: ¶2(f)
[96] Exhibit 70, p. 1.
[97] Exhibit 48.

Laffer & Gottlieb

Certified Public Accountants
Expert Report of Martin G. Laffer
U. S. v. Kenneth C. Ketner
Page 38

personal guarantee at the time. Carse replied "to offset any potential risk and motivate Ketner to take care of the situation." [98]

MCR had a number of bank accounts and banking relationships. LaSalle National Bank was the primary financial institution used by MCR. J&P wired a majority of the lender proceeds into a LaSalle equity disbursement account which was used by MCR to distribute borrower funds.

In reviewing the 300 boxes of records provided by the government prior to the previous trial date, we observed voluminous records of internal transfers from the "equity loan distribution" account to the "concentration" account. [99]  In September 1999, Benincosa transferred from the equity loan account $1.1 million into the concentration account. [100]  Yet, the MCR financial statement for September 30, 1999 reflects as a current asset, net operating cash of $705,044. [101]  Comparing the August 1999 cash balance of $613,470, the net cash increased approximately $100,000.  However, the September 1999 financial statement reflects a net loss of approximately $115,000. [102]  In reviewing the financial statements, it should be noted that Benincosa's September 1999 statement reports "Year-to-Date" (the "YTD") operations only, whereas all of the

---

[98] Exhibit 60, Carse deposition, 279: 10-11.

[99] The purpose of the concentration account was a "sweep account" that operated as a clearing account for MCR. Each evening the account balance was invested in overnight "repo" paper.
[100] Exhibit 72 (a) – Schedule of Internal Transfers for Equity Loan Distribution Account, September 1999. (Prepared by Laffer & Gottlieb from internal transfer records.)
[101] Exhibit 72 (c) – MCR's 9/30/1999 internal financial statement.

Laffer & Gottlieb
Certified Public Accountants
Expert Report of Martin G. Laffer
U. S. v. Kenneth C. Ketner
Page 39

other financial statements reflect (and properly so) monthly operations as well as

the YTD.  The September 1999 net loss was computed by subtracting the August

YTD from the September 1999 YTD.

The HomeFN statements reflect an overdraft balance at October 19, 1999

(the closest date to the 9/30/99 financial statement) of $81,486.14.[103]   This

account was created as an offset on MCR's financial statement.[104]  The account,

"Due to/from HomeFN Mortgage" was an effort to obfuscate the diversion of

funds by Benincosa and Bristol.[105]

As an aside, Benincosa issued himself a "bonus" check for September's

performance on 10/8/1999, for $10,000 (which also included his August 1999

performance bonus).[106]  The August 1999 financial statement reflects a monthly

loss of $103,378,[107] therefore under Benincosa's employment agreement, he

was not entitled to a bonus for either August or September 1999.[108]

All bank statements were mailed to MCR's Riverside office, where the

accounting department resided and were directed to Benincosa personally.

However, Benincosa, in conjunction with Randy Bristol (the manager of the

[102] *Ibid.*
[103] By December 1999 the HomeFN balances ranged $413,337.86 to negative $1,131,819.36.
(Exhibit 72(b).  It is believed that this account was used to create positive cash balances in
MCR's accounts reflected on the general ledger.  The HomeFN account appears to have been an
"off-balance-sheet" account.
[104] Exhibit 8(a), 2: ¶5.
[105] Exhibit 8 (c) from the outside accountant's workpaper file.
[106] Exhibit 29, p. 2 payment history.
[107] Exhibit 73 - Financial statements of MCR for various periods.
[108] Exhibit 26.

Laffer & Gottlieb
Certified Public Accountants
Expert Report of Martin G. Laffer
U. S. v. Kenneth C. Ketner
Page 40

Atlanta MCR office) opened another LaSalle Bank account under the name "HomeFN Mortgage Corporation," in October 1999 and directed the bank statements for this account to Randy Bristol at MCR's Atlanta address.[109] Ketner was not a signature on this account.[110]

James E. Reynolds, III, Managing Partner, Reynolds Financial Services Group, LLC, concluded in his analysis of the Island Mortgage losses, "In summary, the Plaintiffs have themselves to blame for the losses they suffered, and certainly not the depository bank. By attempting to blame their losses on the depository bank, the Plaintiffs are not taking responsibility for their own actions and inactions. . ."[111]  As mentioned above, the Island Mortgage and MCR problems were the same, involving the same Household personnel.

Monies Received by Ketner

The PSR states (¶ 65), *inter alia,* ". . . Ketner received at least $266,215 in laundered funds (half of the $526,430 deposited into the Heritage accounts)."

Sometime in mid-1999 Randy Bristol stated to Ketner that it was his observation that the loan closing agents were making a substantial profit from handling transactions.  Bristol suggested they contact someone who could become a closing agent, and they share in the profits.[112]  After discussion with

---

[109] Exhibit 10.  See address for account.
[110] Exhibit 51, letter advising of inability to locate signature card in response to subpoena. However, it is Ketner's position that he was not aware of this account and was not a signer on the account.
[111] Exhibit 3, p. 46.
[112] Exhibit 58(a), MOI, 3: ¶7.

Laffer & Gottlieb
Certified Public Accountants
Expert Report of Martin G. Laffer
U. S. v. Kenneth C. Ketner
Page 41

counsel, Ketner was able to enlist Allen Johnson, an Atlanta attorney to become a closing agent.  Johnson advised Ketner that it would not be illegal for Ketner and Bristol to share in the profits from the closing fees.  Johnson indicated that it was not illegal for him to share part of the profit, but thought he could have an "ethical issue" with the Georgia Bar.  Ketner confirmed this opinion with a local Orange County lawyer.[113]

Johnson had Kevin Mirecki, Esq. form separate entities for Ketner, Bristol and Johnson.  The first "sharing" payment to Ketner was on August 23, 1999 in the amount of $2,465.  There were four additional payments to Ketner's account at Heritage Bank totaling $290,000, for a total amount received of $292,465.  However, from this account, $135,000 was returned immediately to the MCR operating account and $25,645.42 was repaid to Johnson's personal Wells Fargo account.  The total amount of remitted funds was $160,645.42.  Therefore, Ketner only benefited $131,819.58 from the "sharing" arrangement with Johnson.[114]  It is noteworthy that Allen Johnson maintained control of the check register for this account, and payments to individuals not known to Ketner were made, including $5,000 to Johnson, in care of Nancy Reyes.

---

[113] Although Johnson testified (Ex. 58(a), 6: ¶19) that he knew "fee splitting" was illegal.  It is Ketner's position that Johnson advised him that it may be unethical for Johnson to allow sharing of the revenue, but that it was not illegal.  Ketner consulted with Robert Shauer, Esq., Ontario, California who advised him that Ketner was not engaging in an illegal act by sharing in the revenue.  (As noted earlier, Johnson was not admitted to the Georgia State Bar.)

Laffer & Gottlieb
Certified Public Accountants
Expert Report of Martin G. Laffer
U. S. v. Kenneth C. Ketner
Page 42

Household Withheld MCR's Funds

The PSR states (¶32) "according to one witness, by April 2000 the problem of bounced checks was out of control and included checks not being honored.  Ketner provided several explanations to the witness, including that checks were bouncing because Household took $1 million from Ketner's account without Ketner's knowledge or authorization.  The witness indicated that Ketner's explanation was preposterous, but Ketner somehow had the ability to make the witness accept it."

The reference to "one witness" was Kevin Bonds.[115]  In truth and fact, commencing February 29, 2000 HCFS withheld $1,104,679.07 of loan proceeds from MCR.[116]  The action of withholding loan proceeds caused MCR to have issued NSF checks, resulting in HCFS' squeeze to force Ketner to enter into the continuing guarantee on June 26, 2000.[117]

Conclusions

The PSR purports to objectively explain the facts of this complex case.  However, the PSR relied upon testimony by individuals who unfairly laid the entirely of MCR's problems on Ketner, in order to shield themselves from

---

[114] Exhibit 74 – Detail of Joc Monet, Heritage Bank account, and summary of Johnson transactions.  Support for the Johnson transactions is included for reference.
[115] Exhibit 18 (a).
[116] Exhibit 75 – HCFS Principal Holdbacks on Aged (90+) Loans, summary of Attached Warehouse Settlement Reports, and settlement reports.
[117] Exhibit 48.

Laffer & Gottlieb

Certified Public Accountants

Expert Report of Martin G. Laffer
U. S. v. Kenneth C. Ketner
Page 43

responsibility. In fact, it was demonstrated through the evidence that they lied, or at best, stretched the truth. Unquestioned acceptance of these false representations in the 302's and MOI's distorts Ketner's role in these crimes and undermines various conclusions in the PSR.

Ketner properly has entered a plea to the charges of wire fraud (18 USC §1343) and engaging in monetary transactions in property derived from specified unlawful activities (18 USC §1957). The factual basis for this plea is that Ketner participated in a fraud wherein loan proceeds from one borrower were used to fund the loan of a different borrower. This report is not meant to negate nor mitigate his actions.

Based upon the evidence reflected herein, Ketner should have entered a plea for his actions. Nevertheless, his reliance on an incompetent and fraudster CFO caused Ketner to operate a business which had far too much overhead and therefore too little profit to keep the company operating.

Unfortunately, Benincosa falsified the internal financial statements, inflating profits, so as to allow him to "earn his $60,000 annual performance bonus." The evidence clearly reflects that Benincosa helped himself to the bonus even when the falsely reported profits were below the minimum for his bonus. In fact, Benincosa issued bonus checks when there were operating losses.

Randy Bristol, the manager of the Atlanta operation, by far the largest of MCR's branches, earned $1.0 million in 1998 (of which the Form 1099 for

Laffer & Gottlieb
Certified Public Accountants
Expert Report of Martin G. Laffer
U. S. v. Kenneth C. Ketner
Page 43

Based upon the evidence reflected herein, Ketner should have entered a plea for his actions.  Nevertheless, his reliance on an incompetent and fraudster CFO caused Ketner to operate a business which had far too much overhead and therefore too little profit to keep the company operating.

Unfortunately, Benincosa falsified the internal financial statements, inflating profits, so as to allow him to "earn his $60,000 annual performance bonus."  The evidence clearly reflects that Benincosa helped himself to the bonus even when the falsely reported profits were below the minimum for his bonus.  In fact, Benincosa issued bonus checks when there were operating losses.

Randy Bristol, the manager of the Atlanta operation, by far the largest of MCR's branches, earned $1.0 million in 1998 (of which the Form 1099 for $700,000 was never filed by Benincosa).  Bristol assisted in the scheme to divert funds by setting up the HomeFN account, and had the LaSalle Bank monthly statements sent directly to his attention in Atlanta.  There is no evidence that Ketner was aware of this scheme until early 2000 when it was discovered by John Postma, CPA, and the outside auditor.

The evidence clearly demonstrates that upon learning of MCR's financial problems, Ketner funded $388,000 of his personal funds into the company, as well as restoring $135,000 from his "share of closing fees" from his Heritage

---

[117] Exhibit 48.

Laffer & Gottlieb
Certified Public Accountants
Expert Report of Martin G. Laffer
U. S. v. Kenneth C. Ketner
Page 44

Bank account.  Additionally, he executed the continuing guarantee to Household.

These are not the actions of someone who planned a fraud.

While other culpable participants have been able to avoid prosecution, the purpose of this report is not to evade responsibility, nor sanctify Ketner's actions.  Its intent is however to demonstrate the complexity of the business and the numerous improper and illegal actions by some of the other key executives and to provide more complete evidence relating to various erroneous conclusions reached in the PSR.

Respectfully submitted,

LAFFER & GOTTLIEB

Martin G. Laffer

Laffer & Gottlieb

Certified Public Accountants
Expert Report of Martin G. Laffer
U. S. v. Kenneth C. Ketner
Page 45

## EXHIBITS

1. Curriculum Vita of Martin G. Laffer.

2. History of Trial and Deposition Testimony for Martin G. Laffer.

3. Expert Report of James E. Reynolds on the Island Mortgage Network Matter for State Bank of Long.

4. Deposition of Kenneth C. Ketner, September 11, 2000.

5. Transcript of Beverly Fleming's, 11/19/03 2004 examination.

6. Report of examination of financial statements of HomeFN Mortgage Corporation, dated August 30, 1999 by Lesley, Thomas, Schwarz & Postma.

7. Corporate resolution of MCR, February 9, 2000, signed by Beverly Fleming, Corporate Secretary.

8. (a) John Postma interview.  Memorandum of Interview (MOI) by IRS SA Eric J. Helfand,
   (b) Mark Murphy interview, MOI by same agent.
   (c) Postma's workpapers for MCR's Due To/From HomeFN Mortgage account.

9. Thomas Neches & Company, LLP, Memorandum with attachment listing funds transferred by Johnson & Payne to LaSalle account XXXXX499 commencing 10/22/99.

10. HomeFN account, LaSalle National Bank statements.

11. Letter from Cory Youngberg, Lesley, Thomas, Schwarz & Postma of 12/17/99 addressing tax and economic considerations of Ketner selling certain assets of MCR.

12. Letter to MCR's branch managers from Beverly Fleming, dated 3/30/2000.

13. Exhibit 13 – Interoffice Memorandum to all personnel from Beverly Fleming, dated 8/31/2000.

Laffer & Gottlieb

Certified Public Accountants

Expert Report of Martin G. Laffer
U. S. v. Kenneth C. Ketner
Page 46

14. Beverly Fleming's *curriculum vita*.

15. Compendium exhibit of sample correspondence from Beverly Fleming to various state regulatory agencies addressing consumer complaints on mortgage loans.

16. Letter dated 4/5/2000 from Robert M. Snee, Esq. regarding a notice of cancellation of a loan on behalf of his client.  Included is a handwritten note to Al Johnson from Beverly.

17. Fleming letter of 6/12/2000 to Gayle Fletcher, Examiner, State of South Carolina.

18. (a) Kevin Bonds, FD-302, dated 8/24/04, by SA Paul L. Bonin.

18. (b) Donald William Petty, FD-302, dated 5/11/06, by SA Paul L. Bonin.

19. Kenneth Ketner's Pacific Mercantile Bank statements of 5/17/2000 and 7/15/2000 reflecting a check (no. 0101) from Ketner to Republic Bank 5/22/2000 $350,000; and, wires to MCR's LaSalle on account on 7/25/2000 and 7/26/2000 for $20,000 and $18,000 respectively.

20. Val J. Benincosa C.P.A., *curriculum vita*. And earlier version of Benincosa's *CV*.

21. State of Utah, Department of Business Regulation, Division of Registration, letters of 11/23/81 and 2/4/82 rejecting Benincosa's application for a CPA license.  The entire file is attached.

22. California Board of Accountancy license search results from CBA website reflecting no record for any licensee named "Benincosa."

23. 11/22/78 letter from Normand L. Gibbons, Associate Dean of Student Affairs and Services advising Benincosa he was not admitted into the Department of Business Administration.  The entire University of Utah file is enclosed.

24. Westlaw search of professional licenses for Benincosa disclosed his employer as Pickle's Boutique, a family apparel business, at the same address as his residence.

Laffer & Gottlieb
Certified Public Accountants
Expert Report of Martin G. Laffer
U. S. v. Kenneth C. Ketner
Page 47

25. 2004 Examination of Vallard John Benincosa, Friday, August 17, 2001. Case No. SA 00-19419 JB, Chapter 11.  Please note that the transcripts are not paginated.

26. Benincosa employment agreement with MCR, 5/20/97. Compendium of MCR checks to Benincosa, including bonus checks, all signed by Benincosa.

27. Compendium of MCR checks to Benincosa, including bonus checks, all signed by Benincosa.

28. Copies of the checks and check registers for the June, July & August bonuses.

29. 1998 Form 1099 to Benincosa from MCR, and bonus checks.

30. 1998 Form 1099 to Randy Bristol from MCR, and bonus checks.

31. 2004 examination of Benincosa, August 17, 2001, unpaginated.

32. Benincosa FD-302 of 1/22/2000 by SA John Connell.

33. Deposition of Dolores Mendoza, January 30, 2001.

34. Compendium of wire transfers for February 29, 2000

35. Compendium of overdraft notices of various dates.

36. Compendium of instructions signed by Val Benincosa, CFO replacing checks.

37. Roger W. Luby, *curriculum vita.*

38. Pacific Mercantile Bank, Mortgage Broker Agreement, dated 2/9/2000.

39. Corporate Resolution of MCR, dated 2/9/2000.

40. Resignation from MCR by Roger W. Luby, dated 9/9/2000.

41. MCHI (MCR's parent), 1,000 shares.  The entity should have been P L Miller, LLC, (Luby's wife's name) an entity which filed with the California Secretary of State on June 2, 2000.

Laffer & Gottlieb

Certified Public Accountants

Expert Report of Martin G. Laffer

U. S. v. Kenneth C. Ketner

Page 48

42. California Secretary of State, California Business Portal record for P. L. Miller, LLP.

43. Roger Luby, 3/16/2001, FD-302 fro SA John Connell.

44. U. S. Department of Housing and Urban Development, 1/8/2001 letter to Roger Luby. (The letter was actually addressed to "Mr. Roger Lube.")

45. Declaration of Roger W. Luby, August 13, 2001.

46. A compendium assortment of documents wherein Luby signs as CEO or president of MCR.

47. Ketner letter to Luby, 8/23/2000.

48. Continuing Guarantee, dated June 26, 2000 by Ketner to Household is the subject of the negotiations.

49. Roger Luby, FD-302 of 6/18/2004, SA Paul Bonin.

50. California Business Portal, Secretary of State, search for McShane.

51. Letter from ABN-AMRO, 3/9/2006 to Benjamin Gluck, Esq., Mr. Ketner's attorney

52. MCR checks to McShane & Associates and to P. L. Miller.

53. Ketner letter of 10/18/2000 to Luby.

54. Request for Dismissal, as to Luby only, transmitted September 6, 2001, executed by Carlos Solis.

55. Sample of daily funding logs for Republic and Household, reflecting "Corp Flip" and "Corp KK" for the branch.

56. Sample "purple file" transactions for 3 properties.

57. Detailed list of purple file properties (12 pages).

58. (a) Allen Johnson Memorandum of Interview, 5/18/2004.

Laffer & Gottlieb

Certified Public Accountants
Expert Report of Martin G. Laffer
U. S. v. Kenneth C. Ketner
Page 49

58. (b) Allen Johnson Memorandum of Interview, 5/26/2004.

59. Signature card from LaSalle National Bank, dated July 24, 1998 for the MCR Equity Disbursement Account.

60. Robert K. Carse deposition of October 9, 2001.

61. Three loan files are enclosed as samples of the loan packages Household acquired from MCR. It is evident that MCR was the disbursing agent, because MCR checks were included in the loan files. These files were reviewed by Household as part of their due diligence.

62. Robert Carse deposition of 2/27/03.

63. HCFS, Warehouse Line Purchase Schedule, various dates, July 1999.

64. Warehousing Line, Revolving Credit Agreement by and between MCR and MCFS, dated as of December 4, 1998.

65. Michael Hammond deposition dated 2/28/2003, 138:6-14).

66. Compendium of wire transfer worksheets reflecting wires from MCR to various lenders including _HCFS "Clearing Group," Attn: Bob Carse._

67. HFS, Collections/Customer Service Loan Activity Microfiche.

68. Scott Miller, FD-302, dated 1/3/2000 by SA John Connell.

69. HCFS, Warehouse Line Disbursement Schedule. Included are detail transaction summaries and request forms for 4/3/2000, 5/1/2000 and 6/23/2000.

70. Memo from Yolanda Byford to Pat Howard, undated.

71. Affidavit of Robert K. Carse in Island Mortgage Matter.

72. (a) Schedule of Internal Transfers for Equity Loan Distribution Account, September 1999. (Prepared by Laffer & Gottlieb from internal transfer records.)

72. (b) Home FN Mortgage Corp. MCR, LaSalle Bank statement for 10/31/99 and 12/31/99.

Laffer & Gottlieb

Certified Public Accountants
Expert Report of Martin G. Laffer
U. S. v. Kenneth C. Ketner
Page 50

72   (c) MCR internal financial statement, September 30, 1999.  (This exhibit is also included in the composite exhibit of financial statements, but is separated herein to relate to specific discussions of internal transfers.)

73. MCR internal financial statements: December 1997, January 1998, April 1998, June 1998, July 1998, September 1998, November 1998, December 1998, January 1999, February 1999, March 1999, June 1999, August 1999, September 1999 and April 2000.

74. Detail of Joc Monet, Heritage Bank account and summary of Johnson transactions.  Support for the Johnson transactions is included for reference.

75. HCFS Principal Holdbacks on Aged (90+) Loans, Summary of Attached Warehouse Settlement Reports, and settlement reports.

Laffer & Gottlieb

Certified Public Accountants
Expert Report of Martin G. Laffer
U. S. v. Kenneth C. Ketner
Page 44

Bank account. Additionally, he executed the continuing guarantee to Household.

These are not the actions of someone who planned a fraud.

While other culpable participants have been able to avoid prosecution,

the purpose of this report is not to evade responsibility, nor sanctify Ketner's

actions. Its intent is however to demonstrate the complexity of the business and

the numerous improper and illegal actions by some of the other key executives

and to provide more complete evidence relating to various erroneous conclusions

reached in the PSR.

Respectfully submitted,

LAFFER & GOTTLIEB

Martin G. Laffer

77

Laffer & Gottlieb

Certified Public Accountants
Expert Report of Martin G. Laffer
U. S. v. Kenneth C. Ketner
Page 45


## EXHIBITS

1. Curriculum Vita of Martin G. Laffer.

2. History of Trial and Deposition Testimony for Martin G. Laffer.

3. Expert Report of James E. Reynolds on the Island Mortgage Network Matter for State Bank of Long.

4. Deposition of Kenneth C. Ketner, September 11, 2000.

5. Transcript of Beverly Fleming's, 11/19/03 2004 examination.

6. Report of examination of financial statements of HomeFN Mortgage Corporation, dated August 30, 1999 by Lesley, Thomas, Schwarz & Postma.

7. Corporate resolution of MCR, February 9, 2000, signed by Beverly Fleming, Corporate Secretary.

8. (a) John Postma interview.  Memorandum of Interview (MOI) by IRS SA Eric J. Helfand,
   (b) Mark Murphy interview, MOI by same agent.
   (c) Postma's workpapers for MCR's Due To/From HomeFN Mortgage account.

9. Thomas Neches & Company, LLP, Memorandum with attachment listing funds transferred by Johnson & Payne to LaSalle account XXXXX499 commencing 10/22/99.

10. HomeFN account, LaSalle National Bank statements.

11. Letter from Cory Youngberg, Lesley, Thomas, Schwarz & Postma of 12/17/99 addressing tax and economic considerations of Ketner selling certain assets of MCR.

12. Letter to MCR's branch managers from Beverly Fleming, dated 3/30/2000.

13. Exhibit 13 – Interoffice Memorandum to all personnel from Beverly Fleming, dated 8/31/2000.

Laffer & Gottlieb

Certified Public Accountants
Expert Report of Martin G. Laffer
U. S. v. Kenneth C. Ketner
Page 46

14. Beverly Fleming's *curriculum vita.*

15. Compendium exhibit of sample correspondence from Beverly Fleming to various state regulatory agencies addressing consumer complaints on mortgage loans.

16. Letter dated 4/5/2000 from Robert M. Snee, Esq. regarding a notice of cancellation of a loan on behalf of his client. Included is a handwritten note to Al Johnson from Beverly.

17. Fleming letter of 6/12/2000 to Gayle Fletcher, Examiner, State of South Carolina.

18. (a) Kevin Bonds, FD-302, dated 8/24/04, by SA Paul L. Bonin.

18. (b) Donald William Petty, FD-302, dated 5/11/06, by SA Paul L. Bonin.

19. Kenneth Ketner's Pacific Mercantile Bank statements of 5/17/2000 and 7/15/2000 reflecting a check (no. 0101) from Ketner to Republic Bank 5/22/2000 $350,000; and, wires to MCR's LaSalle on account on 7/25/2000 and 7/26/2000 for $20,000 and $18,000 respectively.

20. Val J. Benincosa C.P.A., *curriculum vita.* And earlier version of Benincosa's *CV.*

21. State of Utah, Department of Business Regulation, Division of Registration, letters of 11/23/81 and 2/4/82 rejecting Benincosa's application for a CPA license. The entire file is attached.

22. California Board of Accountancy license search results from CBA website reflecting no record for any licensee named "Benincosa."

23. 11/22/78 letter from Normand L. Gibbons, Associate Dean of Student Affairs and Services advising Benincosa he was not admitted into the Department of Business Administration. The entire University of Utah file is enclosed.

24. Westlaw search of professional licenses for Benincosa disclosed his employer as Pickle's Boutique, a family apparel business, at the same address as his residence.

Laffer & Gottlieb

Certified Public Accountants
Expert Report of Martin G. Laffer
U. S. v. Kenneth C. Ketner
Page 47

25. 2004 Examination of Vallard John Benincosa, Friday, August 17, 2001. Case No. SA 00-19419 JB, Chapter 11. Please note that the transcripts are not paginated.

26. Benincosa employment agreement with MCR, 5/20/97. Compendium of MCR checks to Benincosa, including bonus checks, all signed by Benincosa.

27. Compendium of MCR checks to Benincosa, including bonus checks, all signed by Benincosa.

28. Copies of the checks and check registers for the June, July & August bonuses.

29. 1998 Form 1099 to Benincosa from MCR, and bonus checks.

30. 1998 Form 1099 to Randy Bristol from MCR, and bonus checks.

31. 2004 examination of Benincosa, August 17, 2001, unpaginated.

32. Benincosa FD-302 of 1/22/2000 by SA John Connell.

33. Deposition of Dolores Mendoza, January 30, 2001.

34. Compendium of wire transfers for February 29, 2000

35. Compendium of overdraft notices of various dates.

36. Compendium of instructions signed by Val Benincosa, CFO replacing checks.

37. Roger W. Luby, *curriculum vita.*

38. Pacific Mercantile Bank, Mortgage Broker Agreement, dated 2/9/2000.

39. Corporate Resolution of MCR, dated 2/9/2000.

40. Resignation from MCR by Roger W. Luby, dated 9/9/2000.

41. MCHI (MCR's parent), 1,000 shares. The entity should have been P L Miller, LLC, (Luby's wife's name) an entity which filed with the California Secretary of State on June 2, 2000.

Laffer & Gottlieb
Certified Public Accountants
Expert Report of Martin G. Laffer
U. S. v. Kenneth C. Ketner
Page 48

42. California Secretary of State, California Business Portal record for P. L. Miller, LLP.

43. Roger Luby, 3/16/2001, FD-302 fro SA John Connell.

44. U. S. Department of Housing and Urban Development, 1/8/2001 letter to Roger Luby. (The letter was actually addressed to "Mr. Roger Lube.")

45. Declaration of Roger W. Luby, August 13, 2001.

46. A compendium assortment of documents wherein Luby signs as CEO or president of MCR.

47. Ketner letter to Luby, 8/23/2000.

48. Continuing Guarantee, dated June 26, 2000 by Ketner to Household is the subject of the negotiations.

49. Roger Luby, FD-302 of 6/18/2004, SA Paul Bonin.

50. California Business Portal, Secretary of State, search for McShane.

51. Letter from ABN-AMRO, 3/9/2006 to Benjamin Gluck, Esq., Mr. Ketner's attorney

52. MCR checks to McShane & Associates and to P. L. Miller.

53. Ketner letter of 10/18/2000 to Luby.

54. Request for Dismissal, as to Luby only, transmitted September 6, 2001, executed by Carlos Solis.

55. Sample of daily funding logs for Republic and Household, reflecting "Corp Flip" and "Corp KK" for the branch.

56. Sample "purple file" transactions for 3 properties.

57. Detailed list of purple file properties (12 pages).

58. (a) Allen Johnson Memorandum of Interview, 5/18/2004.

Laffer & Gottlieb

Certified Public Accountants
Expert Report of Martin G. Laffer
U. S. v. Kenneth C. Ketner
Page 49

58. (b) Allen Johnson Memorandum of Interview, 5/26/2004.

59. Signature card from LaSalle National Bank, dated July 24, 1998 for the MCR Equity Disbursement Account.

60. Robert K. Carse deposition of October 9, 2001.

61. Three loan files are enclosed as samples of the loan packages Household acquired from MCR.  It is evident that MCR was the disbursing agent, because MCR checks were included in the loan files. These files were reviewed by Household as part of their due diligence.

62. Robert Carse deposition of 2/27/03.

63. HCFS, Warehouse Line Purchase Schedule, various dates, July 1999.

64. Warehousing Line, Revolving Credit Agreement by and between MCR and MCFS, dated as of December 4, 1998.

65. Michael Hammond deposition dated 2/28/2003, 138:6-14).

66. Compendium of wire transfer worksheets reflecting wires from MCR to various lenders including *HCFS "Clearing Group," Attn: Bob Carse.*

67. HFS, Collections/Customer Service Loan Activity Microfiche.

68. Scott Miller, FD-302, dated 1/3/2000 by SA John Connell.

69. HCFS, Warehouse Line Disbursement Schedule.  Included are detail transaction summaries and request forms for 4/3/2000, 5/1/2000 and 6/23/2000.

70. Memo from Yolanda Byford to Pat Howard, undated.

71. Affidavit of Robert K. Carse in Island Mortgage Matter.

72. (a)  Schedule of Internal Transfers for Equity Loan Distribution Account, September 1999.  (Prepared by Laffer & Gottlieb from internal transfer records.)

72. (b) Home FN Mortgage Corp. MCR, LaSalle Bank statement for 10/31/99 and 12/31/99.

Laffer & Gottlieb

Certified Public Accountants

Expert Report of Martin G. Laffer
U. S. v. Kenneth C. Ketner
Page 50

72   (c) MCR internal financial statement, September 30, 1999.  (This exhibit is also included in the composite exhibit of financial statements, but is separated herein to relate to specific discussions of internal transfers.)

73. MCR internal financial statements: December 1997, January 1998, April 1998, June 1998, July 1998, September 1998, November 1998, December 1998, January 1999, February 1999, March 1999, June 1999, August 1999, September 1999 and April 2000.

74. Detail of Joc Monet, Heritage Bank account and summary of Johnson transactions.  Support for the Johnson transactions is included for reference.

75. HCFS Principal Holdbacks on Aged (90+) Loans, Summary of Attached Warehouse Settlement Reports, and settlement reports.