# EXHIBIT 3

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

PRUDENTIAL SECURITIES CREDIT )
CORP., LLC,                   )
                              )
           Plaintiff,         )
                              )
     vs.                      )  No. CVSA00-538 GLT (EEx)
                              )
MORTGAGE CAPITAL RESOURCES    )
CORPORATION, et al.,          )
                              )
           Defendants.        )
_____)

DEPOSITION OF TAMMI LYNN COOLEY
Long Beach, California
Wednesday, April 4, 2001

Reported by:
LEIGHA D'ERRICO
CSR No. 11199
JOB No. 584965

Page 66

1  MR. MURIELLA: Go ahead.
2  BY MR. LOGAN:
3  Q Let's take a look again at page 1955 and page
4  1957. So here on this transaction involving the
5  property at — I think this is East 10th Street, you
6  actually closed this escrow on November 12th before you
7  received in the lender's wire for the proceeds for the
8  new loan, correct?
9  A It does appear to be such, yes.
10 Q And, in fact, you closed the escrow four days
11 before you got in the lender's wire for the proceeds for
12 the new loan, right?
13 A Yes, it could have been a weekend, but, yes.
14 Q Now, you didn't routinely close escrows and get
15 the lender's proceeds wired in four days later, did you?
16 A No.
17 Q But, in fact, with the MCR transactions you did
18 routinely wire-transfer out the payoff of the old loan
19 before you got the wire-transfer in of the new loan
20 proceeds; isn't that true?
21 MR. MURIELLA: Objection. Vague and ambiguous,
22 lack of foundation.
23 THE WITNESS: No, not routinely.
24 BY MR. LOGAN:
25 Q You're sure about that?

Page 67

1  A Yes.
2  MR. LOGAN: Let's take a break.
3  (Recess.)
4  MR. LOGAN: Let's go back on the record.
5  Q Ms. Cooley, would you take a look please at
6  page 1951. Would you tell us what this document is.
7  A It's a file copy of a receipt.
8  Q It's a receipt from MCR?
9  A Yes.
10 Q What was that amount for?
11 A 791.29.
12 Q What did it represent?
13 A Additional proceeds.
14 Q On the new loan?
15 A Yes.
16 Q This is a trust receipt, correct?
17 A Yes.
18 Q It shows a date of November 15th, 1999?
19 A Yes.
20 Q When you were typing in the date there or when
21 Benefit was putting in the date there, that was to be
22 the date that the funds were received?
23 A Yes.
24 Q And let's take a look, then, at page 1949 of
25 Exhibit 130. Would you tell us what this page is,

Page 68

1  please?
2  A It's a check register. It's a listing of
3  checks and receipts.
4  Q And who prepared the check registers on these
5  MCR related transactions?
6  A Either myself or Laurie.
7  Q And in the upper right-hand portion they show a
8  date printed. Here it shows November 17th, 1999. Was
9  the computer set up to automatically put that date in
10 there, or was that manually put it?
11 A It's automatically.
12 Q And so the date that's shown here on page 1949
13 was, in fact, as you understand it, the date on which
14 the check register was printed?
15 A Yes.
16 Q And so the actual closing date was what?
17 A November 12th.
18 Q So that's the date that the escrow actually
19 closed?
20 A Yes.
21 Q Let me have you take a look at page 1964. Is
22 this the cover letter to the seller enclosing her copy
23 of the HUD 1?
24 A Yes, it is.
25 Q And that was sent to MCR?

Page 69

1  A Yes.
2  Q And that's how it was routinely done on these
3  loans?
4  A Yes.
5  Q If you look at page 1965, it shows the
6  buyer's — strike that.
7  Is page 1965 of Exhibit 130 the cover letter
8  forwarding the buyer's copy of the HUD 1?
9  A Yes.
10 Q And again, that went to MCR?
11 A Yes.
12 Q And that was routine on these MCR related
13 transactions, right?
14 A Yes, it was.
15 Q Wasn't that unusual, in your experience, to
16 have the buyer's and seller's HUD 1 go to the lender?
17 A Not the buyer's. It's a little unusual for the
18 seller's, yes.
19 Q Let's go back to 1961. Again, this is the HUD
20 1 in Exhibit 130 on the East 10th transaction. Now, is
21 it correct to say that in this transaction there was no
22 cash in from the buyer for any purpose?
23 A Correct.
24 MR. MURIELLA: Directly from the buyer? I just
25 want to be clear about the question.

18 (Pages 66 to 69)

Page 70

BY MR. LOGAN:
Q I mean, Mr. Neighbarger — strike that.
Isn't it true that the closing statement shows that neither Mr. Neighbarger nor anyone on his behalf actually sent any cash in to this escrow?
MR. MURIELLA: Do you understand "anyone on his behalf"?
BY MR. LOGAN:
Q Well, we'll break it up. Isn't it true that the closing statement shows that the buyer, Mr. Neighbarger, never sent any cash into escrow?
A True.
Q And no one on his behalf sent any cash in, other than the proceeds of the new loan, correct?
A True.
Q And that was typical for the MCR related transactions, correct?
A Yes.
Q And then if you go to the seller's side, is it correct to say that the closing statement shows no cash going out to the seller?
A Correct.
Q And that was typical for the MCR related transactions, right?
A Yes.

Page 71

Q The only cash that went into — strike that.
Wasn't it typical on the MCR related transactions that the only cash into the escrow came from the lender?
A Yes.
Q And with the exception of closing costs, the only one who got any cash out of these escrows was, again, MCR, correct?
MR. MURIELLA: Excluding closing costs?
MR. LOGAN: Yes.
THE WITNESS: Yes.
BY MR. LOGAN:
Q Didn't these transactions kind of make you a little uneasy, Ms. Cooley?
MR. MURIELLA: Well, I'll object on the grounds of vagueness and ambiguity, and if you could also clarify in terms of time reference.
BY MR. LOGAN:
Q How about when you started to do them, back in 1998 when you first started to do these, it made you a little uncomfortable, didn't they?
MR. MURIELLA: Object on the grounds of vagueness and ambiguity.
BY MR. LOGAN:
Q You can answer that.

Page 72

A We had — I did take it to my manager, and we had a discussion in regards to these files.
Q And who was your manager again?
A Lee Selter.
Q And it was you who took the transactions to him to discuss, correct?
A Yes.
Q And why did you do that?
A I believe it was when our title report — when I got a title report and it had previous deeds of trust on there, and just wanted to get his opinion.
Q Did you routinely get title reports on these transactions?
A Yes.
Q Let me show you a page from the title file previously produced to us by Benefit. It's on the title file for the same transaction, and it bears the Bates stamp number P/T-PS01866 through 01935. Let me show you page 1922 through 1927. Is that the kind of document you were referring to?
A No.
Q What would you see?
A A preliminary title report.
Q Oh, okay. And there's a preliminary title report in this Exhibit 130, isn't there?

Page 73

A Yes.
Q And could you direct — what page is it?
A 1985.
Q And if you look at page 1991, this is the portion of the preliminary title report that would show you conveyances within the last six months?
A Yes.
Q And that was a routine feature of the preliminary title reports that you received?
A Yes.
Q And so in 1998, you noticed that on these MCR related transactions the preliminary title reports were showing a number of transactions — recent transactions on these properties, correct?
A Yes.
MR. MURIELLA: Object on the grounds of vagueness and ambiguity and lack of foundation.
BY MR. LOGAN:
Q Well, looking at page 1991, that's typical of what you would see in these preliminary title reports on these MCR related transactions, correct?
MR. MURIELLA: Objection. Vague and ambiguous, lack of foundation.
BY MR. LOGAN:
Q In other words, you'd see two or three

Page 74

transactions within the last six months, typically, on these MCR related transactions, correct?
 A Yes.
 Q And this made you uneasy at the least, right?
 A It made me question.
 Q And so you took it to Mr. —
 A Selter.
 Q — Selter. And when you had that discussion, where were you?
 A My office, I believe.
 Q And this was initiated by you, correct?
 A Yes.
 Q Was anyone else present?
 A We consulted our advisory title officer Dan Bryson as well.
 Q And was that by telephone or was he present?
 A He was present.
 Q So the three of you had a discussion?
 A Yes.
 Q How long did that discussion last?
 A I'm not certain.
 Q Well, give me your best estimate, please.
 A Half an hour, hour.
 Q Was anyone else present beyond the three of you?
 A No.

Page 75

 Q And what did you say at the outset of that conversation?
 A I'm sorry?
 Q What did you say at the outset of that conversation?
 A During that conversation or at the end of the conversation?
 Q The beginning, please.
 A At the beginning, I don't recall. We just reviewed — we went over what these transactions were, what it appeared, that there was previous transfers, that the seller is paying all costs.
 Q So didn't you start off the conversation by saying what it was that concerned you and why you were asking for the meeting?
 A Most likely, I don't recall the exact words.
 Q And the things that you mentioned were that there were a number of recent transactions, correct?
 A Yes.
 Q And that the seller was paying all the buyer's costs?
 A Yes.
 Q And that the seller was paying the buyer's down payment, right?
 A Yes.

Page 76

 Q And what else concerned you that you mentioned?
 A I don't recall.
 Q Well, didn't you say that you were concerned as to whether or not these were real deals?
 MR. MURIELLA: Objection. Vague and ambiguous, lack of foundation.
 BY MR. LOGAN:
 Q You can answer.
 A I don't recall saying that, no.
 Q Well, you said something to that effect, didn't you?
 A I don't —
 MR. MURIELLA: Objection. Argumentative.
 THE WITNESS: I don't recall that, no.
 BY MR. LOGAN:
 Q What did they say in response to your concerns?
 A They reviewed it, Dan went and looked at the title side of it to see if he could see anything that was happening, you know, that was obvious, inflated sales prices. He didn't see anything. I didn't see anything. The foundations were we had a buyer, we have a seller, we have sign instructions from the buyer and the seller. In the parameters of what we have, it's a premise of any other regular transaction. In everyday escrow you have a buyer, you have a seller, you have a

Page 77

lender, you have a payoff.
 Q That's what Mr. Bryson and Mr. Selter told you during that conversation?
 A That's what we determined amongst the three of us.
 Q Well, I'd like to know, to your best recollection, though, what did they say to you when you first raised your concerns?
 A I don't know. I don't recall.
 Q Did you make any notes to yourself of that conversation?
 A No.
 Q Did you discuss the fact that there was no cash ever going into these escrows from the buyer?
 A Most likely.
 Q Did you discuss that no cash went — strike that.
  Did you discuss that aside from the payment of closing costs, the only cash that went out of the escrow went to the lender?
 A To the payoff.
 MR. MURIELLA: If you know. If you have a recollection. We also don't you want to speculate.
 THE WITNESS: See, I don't know for certain the exact conversation. It was quite some time ago.

**PROOF OF SERVICE**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 1875 Century Park East, 23rd Floor, Los Angeles, California 90067-2561.

On April 23, 2007, I served the following document(s) described as **NOTICE OF OBJECTIONS AND OBJECTIONS OF DEFENDANT KEN KETNER TO PRESENTENCE INVESTIGATION REPORT** on the interested parties in this action as follows:

**BY MAIL:** By placing a true copy thereof in sealed envelopes addressed to the parties listed on the attached Service List and causing them to be deposited in the mail at Los Angeles, California. The envelopes were mailed with postage thereon fully prepaid. I am readily familiar with our firm's practice of collection and processing correspondence for mailing. It is deposited with the U.S. Postal Service on that same day in the ordinary course of business. I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing affidavit.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and of my own personal knowledge.

Executed on April 23, 2007, at Los Angeles, California.

_____
Nicole A. Brosman

1
2

**SERVICE LIST**
*U.S.A. v. Kenneth Ketner*
**Case No. SA-CR-05-36JVS**

3  Andrew Stolper                                   Nancy O'Connor
   Brent G. Tabacchi                                U.S. Probation Office
4  U.S. Attorney's Office                           21041 Burbank Blvd., Suite 200
   411 W. Fourth Street, Suite 8058                 Woodland Hills, CA 91367
5  Santa Ana, CA 92701                              Telephone: (818) 346-1875
   Telephone: (714) 338-3536                        **Probation Officer**
6  Facsimile: (714) 338-3708
   **Counsel for United States of America**

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28