GEORGE CARDONA
Acting United States Attorney
WAYNE GROSS
Assistant United States Attorney
Chief, Santa Ana Branch Office
ANDREW STOLPER (205462)
Assistant United States Attorney
    411 West Fourth Street, 8th Floor
    Santa Ana, CA  92701-4599
    Telephone:  (714) 338-3536
    Facsimile:  (714) 338-3708
    Andrew.Stolper@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA


UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. SA CR 05-36-JVS |
| | ) | |
| Plaintiff, | ) | **GOVERNMENT'S REVISED SENTENCING** |
| | ) | **POSITION FOR DEFENDANT KENNETH** |
| v. | ) | **KETNER; DECLARATION OF ANDREW** |
| | ) | **STOLPER** |
| KENNETH KETNER | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

    Plaintiff United States of America, by and through its
attorney of record, Assistant United States Attorney Andrew
Stolper, hereby files its sentencing position for defendant
Kenneth Ketner ("defendant").  The government's position is based
upon the attached Memorandum of Points and


///

///

///

Authorities, the files and records in this matter, the

declaration of Andrew Stolper, as well as any evidence or

argument presented at hearing on this matter.

Per the stipulation filed on June 8, 2007, the government

hereby withdraw's its previous sentencing position and requests

the court not review or consider it.


DATED: June 13, 2007              Respectfully submitted,

                                  GEORGE CARDONA
                                  Acting United States Attorney

                                  WAYNE GROSS
                                  Assistant United States Attorney
                                  Chief, Southern Division


                                  _____/S/_____
                                  ANDREW STOLPER
                                  Assistant United States Attorney

# TABLE OF CONTENTS

DESCRIPTION                                                          PAGE

TABLE OF AUTHORITIES  . . . . . . . . . . . . . . . . . .  ii

MEMORANDUM OF POINTS AND AUTHORITIES  . . . . . . . . . .  3

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . .  3

II.   GOVERNMENT'S POSITIONS . . . . . . . . . . . . . . .  3

      A.    Factual Background  . . . . . . . . . . . . . .  3

            1.    Before MCR . . . . . . . . . . . . . . .  3

            2.    MCR  . . . . . . . . . . . . . . . . . .  4

            3.    After MCR  . . . . . . . . . . . . . . .  7

            4.    Post-Indictment  . . . . . . . . . . . .  10

      C.    A Sentence of 63 Months Is Well Justified . . . . .  14

III.  CONCLUSION . . . . . . . . . . . . . . . . . . . . .  17

DECLARATION OF ANDREW STOLPER . . . . . . . . . . . . . .  18

i

# TABLE OF AUTHORITIES

DESCRIPTION                                                              PAGE

STATUTES

18 U.S.C. § 1343 ........................................... 3

18 U.S.C. § 1957 ........................................... 3

ii

### MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### INTRODUCTION

Defendant Kenneth Ketner ("defendant") stands convicted of one count of wire fraud in violation of 18 U.S.C. § 1343 and one count of money laundering in violation of 18 U.S.C. § 1957. Defendant's convictions are the result of guilty pleas taken before this Court on August 1, 2006.

The parties, in their plea agreement, agreed that defendant's total offense level was 24 with a corresponding sentencing range of 51-63 months. Stolper Decl. Ex. A. It is the government's position that defendant be sentenced to 63 months based on the aggravating factors discussed below.

### II.

### GOVERNMENT'S POSITIONS

A. <u>Factual Background</u>

    *1.  Before MCR*

Defendant's real-estate fraud began before Mortgage Capital Resources ("MCR"). In the early 1980s defendant worked as a branch manager for GMAC Mortgage in Riverside, California. Stolper Decl. Ex. B. According to Tami Ruffoll, an employee of defendant, defendant instructed her to prepare fraudulent VA Form and rent receipts to enable borrowers to qualify for loans. <u>Id</u>. Ms. Ruffoll reported this fraudulent conduct to GMAC's main office. <u>Id</u>. Three weeks later, she observed defendant being escorted out of the building. <u>Id</u>. On his way out, defendant threatened Ms. Ruffoll's life. <u>Id</u>.

3

1    By 1990, defendant was head of California Mortgage
2    Corporation ("CFC"). Stolper Decl. Ex. C. Defendant hired
3    Roberta Martin to be a loan processor, and then made Ms. Martin
4    his assistant. Id. In the mid 1990s defendant asked Ms. Martin
5    to serve a the figure-head president of CFC. Id. Defendant then
6    started MCR. Id. Shortly after Ms. Martin became "President,"
7    CFC declared bankruptcy. Id. After the bankruptcy, the
8    Department of Housing and Urban Development ("HUD") conducted an
9    audit and discovered that many of CFC's HUD insured loans were
10   fraudulent. Id. Because Ms. Martin was the "president" of CFC,
11   she was held responsible by HUD for over $200,000 worth of
12   losses. Id. Defendant agreed to make the payments to HUD on
13   Ms. Martin's behalf. To assure that defendant made those
14   payments, Ms. Martin followed defendant to MCR as his personal
15   assistant. Id.

16       *2. MCR*

17       Defendant was in control of MCR throughout its existence.
18   PSR ¶ 15. Defendant was responsible for two fraud schemes taking
19   place simultaneously at MCR. First, defendant orchestrated what
20   has become known as the "Purple File Property" scheme. PSR ¶¶
21   19-24, Stolper Decl. Exs. B-F. MCR was a mortgage company that
22   funded loans using warehouse lines of credit. Id. These
23   warehouse lines of credit allowed MCR to fund loans to borrowers
24   using these lines of credit for a short term, usually 60 days.
25   Id. Most loans that were funded with the warehouse line of
26   credit were going to packaged and sold to warehouse lenders. Id.
27   For the warehouse lender to purchase the loan it had to meet
28   certain specific criteria. Id. For example, loans that were in

                                    4

default would not be purchased by the warehouse lenders.  Id.
For loans in default, MCR would have to foreclose on the loan
itself or try to find an alternate buyer for the loan, often at
an economic loss.  Id.  Properties that mortgage company
forecloses on are known in the industry as "real-estate owned" or
"REO."  Id.

Defendant did not wish for MCR to take losses by foreclosing
on properties.  Id.  Instead, defendant's scheme had his friends
and family[1] pretend to buy the properties from MCR, and borrow
money from MCR to do so.  Id.  MCR would then originate a new
loan for the straw buyer.  Id.  This would give defendant another
60 days, generate additional loan origination fees for MCR, and
prevent MCR having to take a loss on these loans.  Id.  In total,
defendant orchestrated hundreds of these transactions employing
as straw buyers his employees, in-laws, friends, and the co-
defendant, Allen Johnson.  Id.

The second scheme defendant orchestrated at MCR was to steal
warehouse lenders' money.  PSR ¶¶ 25-34, Stolper Decl. Exs. B-F
When MCR would originate a loan it would request funding from the
warehouse lender.  Id.  The warehouse lender did not wish to send
funds directly to MCR.  Id.  Instead, the warehouse lenders sent
the money to either an escrow company or an attorney to act as a
closing agent.  Id.  This third-party closing agent was supposed
to confirm that the loan agreements were proper, and the
warehouse lender's security interest in the property was

---

[1]    Defendant's straw buyers include his wife's parents,
mistress's parents, Alan Johnson, Victor Boyd (who submitted a
letter in support of defendant's character), and Paul Olivera
(discussed further below).

established, only then release the warehouse lenders funds to the borrower and dispersing some of the funds to MCR as a fee.  Id.

Rather than use a third-party as the escrow agent, defendant put Allen Johnson, a recent law-school graduate and friend of his, in place as the escrow agent for MCR.  Id.  Defendant paid-off Johnson to abdicate his fiduciary duties and forward the warehouse lenders directly to MCR.  Id.  In some cases, MCR would fund the loans as Johnson should have.  Id.  In many others, Ketner would take the warehouse lender's money and use it to pay MCR's expenses, including expenses relating to defendant's extravagant lifestyle.  Id.  As evidence of Ketner's direct control over the money in Johnson's trust account, Ketner had funds wired from that account directly to Ferrari of Orange County to pay for a new sports car.  Id.

To conceal his fraudulent activities, defendant, along with Johnson and others, set up a series of off-shore accounts to launder some of the fraudulent proceeds.  PSR ¶ 41-48, Stolper Decl. Ex F.  Defendant set up a bank account in Nevis, in Luxembourg, and in Nevada in the name "Paul Hernandez" using a fake identification provided by Paul Olivera.  Id. and Stolper Decl. Ex. G.  Defendant would then wire money around the world so it could arrive at his Nevada for him to spend.  PSR ¶¶ 41-48.

Defendant was using warehouse lender's money to pay for MCR's, and his own personal, expenses.  As a result, the checks MCR was writing to its borrowers were bouncing.  PSR ¶¶ 30-34, Stolper Decl. Exs. C-F.  In response, defendant directed Roberta Martin and Terry Stone (a paralegal who worked for MCR) to use money that warehouse lenders were forwarding to Allen Johnson to

1  fund new loans to be diverted to replace the money defendant
2  embezzled and fund old loans.  Id.  This created a Ponzi scheme,
3  except instead of using new investor's money to pay back old
4  investors, defendant was using new loan money to make good on old
5  loans.

6      Like all Ponzi schemes, defendant's ultimately collapsed
7  under its own weight.  Defendant's creditors, particularly
8  Household Bank, learned enough about what was going and shut off
9  MCR's money flow.  This forced MCR, and defendant, into
10 bankruptcy.  Defendant, and his wife, filed for bankruptcy in
11 December, 2000.  Stolper Decl. Ex. H.

12          3.   After MCR

13     Bankruptcy did not, however, end defendant's fraudulent
14 schemes.  The "Purple File Properties" had straw owners that
15 defendant had put in place to "own" dozens of properties around
16 the southland.  For example, defendant used Pamela Stewart
17 (defendant's mistress) to be the straw owners of 14311 Weeping
18 Willow Lane in Fontana and 2856 N. Supelveda Ave., San
19 Bernardino, in May, 2000 – seven months before defendant declared
20 bankruptcy.  Stolper Decl. Ex. H.  According to Pamela Stewart,
21 defendant controlled every aspect of these properties, made all
22 payments for the properties, and had total control over the
23 properties.  Id.  Defendant did not, however, list these
24 properties as owned by him on his bankruptcy schedules.  Stolper
25 Decl. Ex. H.

26     After defendant emerged from bankruptcy, he began to sell
27 off the "Purple File" properties that defendant parked in his
28 friends and family's names.  For example, according to Ms.

Stewart, defendant sold off 14311 Weeping Willow Lane in Fontana in December 2001.  Stolper Decl. Ex. H.  Although property was owned, in name, by Ms. Stewart's parents, defendant directed that Ms. Stewart forward the sales proceeds for that property to defendant, which she did.  Id.  In 2004, defendant sold the 2856 N. Supelveda Ave., San Bernardino, property.  Id.  He did so without consulting Ms. Stewart's parents, the titular owners of the property, and directed that the proceeds be paid to defendant and Ms. Stewart's business.  Id.  In response to the government investigation of this transaction, defendant had Ms. Stewart sign backdated promissory notes to make it appear as though the payments to defendant were loans opposed to proceeds of defendant's bankruptcy fraud.  Id.[2]

Defendant's bankruptcy did not wipe out his debt to a number of his victims.  Surviving defendant's bankruptcy were nondischargable judgements from Household Bank ($5,000,000), Regions Bank ($750,000), and Commerce Title ($400,000), and Conseco ($775,000), and others.  Stolper Decl. Ex. J.  In total, defendant emerged from bankruptcy with over $6.9 million in nondischargeable judgments resulting from his MCR fraud.  Id.  The judgements, signed by Judge Barr, require defendant to provide his creditors copies of his tax returns, commencing with tax year 2000, until such time as defendant pays down the

---

[2]   According to Beverly Fleming, a long-time employee of defendant, she was approached by defendant to be a straw buyer of a property on which CFC had foreclosed, years before MCR. Stolper Decl. Ex. D.  Per Ms. Fleming, defendant, much like he did at MCR, kept the REO's out of the CFC bankruptcy, treating them as his own "personal property" thereby denying his creditors the recovery they were entitled.  Id.

judgments.  _Id_.   The bankruptcy judgements against defendant were entered in late 2001 through early 2002.  _Id_.

In November, 2001, while defendant's bankruptcy was ongoing, defendant entered into a "handshake" partnership with Rick Arvielo where defendant would get 50% of the profits from a mortgage company called New American Financial in return for defendant's services.  Stolper Decl. Exs. I and K.  Defendant requested that Mr. Arvielo not pay him direct W-2 wages.  _Id_. Instead, defendant requested that Mr. Arvielo pay "NFC Consultants, Inc." or "Danbury Consultants."  _Id_.  These were straw-companies set up and controlled by defendant but held in the names of defendant's daughter and step-daughter.  Stolper Decl. Exs. L-N.  According to defendant's daughter and Ms. Stewart, "NFC" stands for "no fucking choice," because defendant felt he had no choice but to set up these shell companies, lest he have to pay his victims the money he owes them.  Stolper Decl Exs. I and L-N.

Mr. Arvielo complied with defendant's wishes.  From November, 2001 through May, 2004, Mr. Arvielo paid defendant's straw companies over $3.5 million.  Stolper Decl. Exs. I and K. During this same time period, defendant filed no tax returns, paid no personal income tax, and paid his creditors and victims nothing.

In addition to setting up Danbury and NFC to deprive defendant's creditors any chance of collecting any money (not to mention the IRS), defendant also set up a straw owner for his new home in Newport Beach.  Defendant recruited Paul Olivera, who previously served as a straw buyer for defendant's "Purple File"

properties, was defendant's bookie, and who provided defendant

with a fake identification to set up a Nevada bank account to

receive the proceeds of his laundered MCR money,

as the "purchaser" of 22 Cape Danbury in Newport Beach for over

$1.1 million.  Stolper Decl. Ex. G.  Mr. Olivera completed the

purchase in on March 26, 2001.  Stolper Decl. Ex. O.  The

evidence makes it clear that defendant is the true owner of this

house: defendant decided to purchase it; defendant makes the

mortgage payments (initially $6,400); defendant decided when it

was time to refinance the house to reduce the mortgage payment to

$4,400; and defendant lives in the house; and defendant could not

provide any rental agreement for the house.  PSR ¶¶ 160-162,

Stolper Decl. Ex. G.  Finally, in June, 2006, defendant's

criminal attorneys took a $149,900 deed of trust on this

property, presumably for legal fees for defendant.  Stolper Decl.

Ex. O.

    4.   *Post-Indictment*

    The grand jury indicted defendant February 16, 2005, for

defendant's MCR-related fraud.  The investigation of defendant's

tax evasion, however, continued after indictment.  As part of

that investigation, the grand jury subpoenaed Danbury Consultants

and NFC for all documents in their custody or control.  In

response to that subpoena, defendant, through his previous

counsel, produced 89 promissory notes.  Stolper Decl. Ex. P.[3]  In

these promissory notes, defendant (60 times) and his wife (29

---

[3]      It should be noted that defendant also backdated
promissory notes to make a transaction appear legitimate in
conjunction with the Purple File properties.  Stolper Decl. Ex.
I.

10

1  times) "borrowed" money from these corporations and, in turn,
2  used this money to live on.   Stolper Decl. Ex. P.

3       Because defendant was borrowing the money, so the argument,
4  goes, he need not pay taxes on the money he is receiving from
5  these companies that he controls.   These promissory notes
6  appeared highly suspicious, as if they were prepared in response
7  to the grand jury subpoena.   This suspicion was compounded by the
8  fact the owners of these corporations (defendant's daughter and
9  step-daughter) had no knowledge that their corporations were
10  loaning defendant money.   On March 9, 2005, the grand jury
11  subpoenaed Danbury Consultants and NFC for the original
12  promissory notes so the grand jury could confirm whether
13  defendant and his wife executed these promissory notes after the
14  fact in an attempt to obstruct the grand jury investigation.
15  Stolper Decl. Ex. Q.

16       In response to this demand, defendant's counsel informed the
17  government that defendant could not locate the original
18  subpoenas.   Id.   Government counsel, on behalf of the grand jury,
19  then directed the custodians of record for Danbury and NFC to
20  appear before the grand jury to testify how these records were,
21  or in this case, were not maintained.   Id.   Defendant's previous
22  counsel informed the government that defendant was the only
23  person who could testify as custodian of records and that he was
24  going to refuse to so on the basis of his 5th Amendment rights.
25  Id.

26       Defendant also attempted to deceive federal authorities with
27  regard to the "straw buyer" transactions involving Ms. Stewart's
28  parents.   Stolper Dec. Ex. I.   According to Ms. Stewart, the

money that went from the properties owned by her parents, but controlled by defendant, was provided to defendant as a loan. Id. This was the position that Ms. Stewart took when she was first interviewed by the FBI and IRS-CID. Id. The grand jury subpoenaed Ms. Stewart's company to see there was a loan agreement and one was produced. Id. In a later interview, Ms. Stewart confessed that defendant gave her this loan agreement and backdated so it would appear to be contemporaneous documentation - rather than created after the fact in response to the government's investigation. Id.

Finally, as part of defendant's plea he was obligated:

Within six months of entering a guilty plea pursuant to this agreement, to file with Internal Revenue Service ("IRS") Federal income tax returns for tax years 2001 through 2005, to pay any amounts due and owing (including penalties), and to comply with all rules and regulations of the IRS.

Stolper Decl. Ex. A. Defendant changed his plea pursuant to the plea agreement on August 1, 2006. His tax returns, and payments, were due to the IRS on February 1, 2007. Defendant filed his tax returns (albeit a few days late) but neglected to include any payments for his taxes - obviously the most important part of the process. In total, defendant owed the following taxes, penalties, and interest per his tax returns[4]:

---

[4] Nothing in the government's sentencing position should be construed to mean that the government believes defendant's tax returns are accurate.

12

| TAX YEAR | TAXES, PENALTIES, AND INTEREST |
|---|---|
| 2000 | $12,634.52 |
| 2001 | $23,701.67 |
| 2002 | $26,985.03 |
| 2003 | $127,320.92 |
| 2004 | $151,536.65 |
| 2005 | $56,320.83 |
| HomeZippr Trust Fund Recovery | $202,689.26 |
| **TOTAL** | **$601,188.88** |

Stolper Decl ¶ 2.

In early April, counsel for the government informed defendant's counsel that he had not lived up to his obligations in the plea agreement and that the government was going to request the Court declare a breach of the plea agreement.  In response, defendant rushed to pay some of the taxes that are due an owing.  Starting on April 10, 2007 and continuing to June 13, 2007 defendant paid over $400,000 in taxes[5] – a sufficient amount to bring him into compliance with the plea agreement under a compromise worked out by the parties to avoid breach litigation.

While defendant ultimately complied with the plea agreement, there are two things worth noting: (1) defendant only started paying his taxes due under the plea agreement *after* he was told

---

[5]     Some of the money paid by defendant to the IRS was drawn on the account of Paul Olivera.  Stolper Decl. Ex. R.

1  the government might seek a substantially longer sentence than
2  his plea agreement called for; and (2) defendant was able to put
3  together over $400,000 in less than 8 weeks when he felt his plea
4  agreement in jeopardy.  This ability to quickly muster assets is
5  in stark contrast to the last six years where he has not paid his
6  creditors, victims or the IRS, one cent.

7  C.   A Sentence of 63 Months Is Well Justified

8       The evidence is clear that, from the early 1980s continuing
9  until well *after* defendant was indicted, defendant has been
10 engaging in some kind of fraud.  Defendant's fraud at MCR was
11 extensive in terms of the number of people who defendant had
12 assist perpetrate the fraud, in terms of amount of money
13 misdirected, and in terms of the number of people who MCR
14 disappointed with bounced checks instead of the loan proceeds
15 that they deserved.  Defendant's intent and knowledge is perhaps
16 best evidenced by the international money laundering he engaged
17 in as part of the fraud.  Defendant's long history of fraudulent
18 conduct and the nature of the fraud at MCR are, alone, sufficient
19 to warrant a high-end sentence.

20      The parties agreed that the loss in this case is over $5
21 million.  While the dollars were taken from financial
22 institutions the harm was spread among hundreds of borrowers who
23 thought they were going to be receiving the proceeds of a loan
24 and instead received either no check at all or one that bounced.
25 These "borrowers" were left having a lien or deed of trust taken
26 out against their homes to secure a loan that they never
27 received.  At the time MCR collapsed, Household undertook a phone
28 audit of the customer who were supposed to have received funds

14

from MCR.  This phone audit confirms that defendant took at least $9.2 million of warehouse lenders money that was supposed to be funded that Household confirmed that was not.  Stolper Decl. Ex. S (Household phone audit spreadsheet, with names and phones numbers of borrowers redacted).  This is not case where only large institutional lenders were hurt.  Defendant marketed debt consolidation loans through MCR to individual borrowers trying to consolidate their usually high interest rate consumer debt into a lower interest rate home equity loan.  These "borrowers" were left by defendant with no money from MCR with a deed of trust on their home reducing, if not eliminating, their ability to obtain a loan from another lender to consolidate their debt.

Defendant's misconduct did not end at MCR.  Instead, there is evidence that defendant, after he defrauded MCR's warehouse lenders, cheated them in bankruptcy court by not disclosing the fact that defendant continued to own some of the "Purple File" properties.  In effect, defendant defrauded his victims not once, but twice: first by stealing from them; and then by keeping his assets secret during the bankruptcy, collecting the proceeds from their sale secretly on the side.

In 2001, as part of the bankruptcy, defendant stipulated, and the bankruptcy court ordered, that defendant provide his tax returns to his victims so that they may enjoy some recovery if defendant prospered after his bankruptcy.  Defendant, to his credit, did prosper.  Defendant has made millions of dollars in the years since the bankruptcy.  But defendant did not honor the stipulations or court orders.  Instead, defendant cheated his victims once again, this time by just not filing income tax

returns so his victims were unaware that defendant had the
financial ability to start repaying them with the added benefit
of evading taxes.   Defendant also set up shell corporations, held
by others, to receive payment for defendant's services so
defendant could conceal his prosperity from his victims.   And by
and setting up shell corporations to evade receiving W-2 income
and by failing to file tax returns or pay taxes for over a half-
decade, defendant added the United States Treasury to his long
list of victims.

Defendant's misconduct did not cease after he was indicted.
Defendant provided 89 promissory notes from Danbury Consultants
and NFC to the grand jury.   These promissory notes were intended
to make it appear the income defendant was receiving was not
income but loans.   This claim, and the promissory notes defendant
provided to justify it, are obviously bogus.   Much like the
promissory note that defendant and Ms. Stewart backdate to make
it appear as though the proceeds of the "Purple File" property
sales being given to defendant were "loans," defendant's 89
promissory notes were created to make it deceive the government
into believing the money he was receiving from Danbury and NFC
was not income.   Indeed, Danbury Consultants and NFC were set up
so that defendant could have a corporate straw to hide his income
from his victims and the government.   The promissory notes
defendant produced to the grand jury appear to be another fraud
that defendant has undertook to evade responsibility.

Defendant continued to try and evade paying taxes even after
the guilty plea.   Defendant, through counsel, negotiated a very
favorable plea agreement with the government.   One of the terms

of that plea was that defendant had to file tax returns and pay his taxes.  Defendant filed his tax returns but did not start paying the hundred of thousands of dollars in taxes due and owing until *after* the government informed him the plea agreement had been breached.  Defendant's attempt to evade paying these taxes echo all defendant's previous conduct engineered to avoid taking responsibility, with the attendant financial consequences, of his fraudulent activities.  Indeed, defendant's own home is held in someone else's name to guarantee the defendant does not have to take financial responsibility and repay the money he stole.

**III.**

**CONCLUSION**

A high-end sentence of 63 months is a just and reasonable.

17

**DECLARATION OF ANDREW STOLPER**

I, Andrew Stolper, declare as follows:

    1.  I am the Assistant United States Attorney assigned to United States v. Kenneth Ketner.

    2.  I have been in frequent contact with the IRS Revenue Agent responsible for Kenneth Ketner ("defendant").  The information concerning defendant's outstanding taxes was provided to me by the Revenue Agent on April 23, 2007, supplemented by defendant's counsel on June 13, 2007.

    3.  Attached, as described in the table BELOW, are true and correct copies of the following documents:

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| A | Defendant's plea agreement |
| B | Interview report for Tami Ruffoll |
| C | Interview reports for Roberta Martin |
| D | Interview reports for Beverly Fleming |
| E | Interview reports for Terry Stone and Roger Luby |
| F | Interview reports and plea agreement for co-defendant Allen Johnson |
| G | Interview reports for Paul Olivera |
| H | Defendant's bankruptcy petition and selected schedules printed from PACER |
| I | Interview reports for Pamela Stewart |
| J | Bankruptcy court non-dischargeable judgements against defendant printed from PACER. |
| K | Interview report for Rick Arvielo |
| L | Interview report for Kristen Ketner |
| M | Interview report for Christine Glenn |

18

| N | Secretary of State printouts for Danbury Consultants and NFC |
|---|---|
| O | Transaction reports for 22 Cape Danbury, Newport Beach, California printed from WESTLAW |
| P | Promissory Notes |
| Q | Correspondence concerning promissory notes |
| R | Some of defendant's recent payments to the IRS |
| S | Household phone survey with names and telephone numbers redacted |

I certify under penalty of perjury the foregoing is true and correct to the best of my knowledge.

6/15/07

DATE

ANDREW STOLPER

19