COPY

FILED

2006 JUL 19 PM 3: 50
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
SANTA ANA

1  DEBRA WONG YANG
   United States Attorney
2  WAYNE R. GROSS
   Assistant United States Attorney
3  Chief, Santa Ana Branch
   KENNETH B. JULIAN (Cal. State Bar # 149840)
4  Assistant United States Attorney
   Deputy Chief, Santa Ana Branch
5  BRENT G. TABACCHI (Cal. Bar No. Pending)
   Assistant United States Attorney
6      Ronald Reagan Federal Building and Courthouse
       411 West Fourth Street, Suite 8000
7      Santa Ana, California 92701
       Telephone: (714) 338-3540
8      Facsimile: (714) 338-3708
       Brent.Tabacchi@usdoj.gov
9
   Attorney for Plaintiff
10 United States of America

11              UNITED STATES DISTRICT COURT

12        FOR THE CENTRAL DISTRICT OF CALIFORNIA

13                  SOUTHERN DIVISION

14 UNITED STATES OF AMERICA,     ) Case No. SA CR 05-36-JVS
                                 )
15              Plaintiff,       ) PLEA AGREEMENT FOR DEFENDANT
                                 ) KENNETH KETNER
16        v.                     )
                                 )
17 KENNETH KETNER,               )
                                 )
18              Defendant.       )
                                 )
19                               )

20

21     1.   This constitutes the plea agreement between defendant

22 KENNETH KETNER ("defendant") and the United States Attorney's

23 Office for the Central District of California ("the USAO") in the

24 above-captioned case.  This agreement is limited to the USAO and

25 cannot bind any other federal, state or local prosecuting,

26 administrative or regulatory authorities.

27 //

28 //

EXHIBIT A

PLEA

2.   Defendant agrees to plead guilty to counts nine and sixteen of the indictment in <u>United States v. Kenneth Ketner</u>, Case No. SA CR 05-36-JVS.

NATURE OF THE OFFENSES

3.   In order for defendant to be guilty of count nine, which charges a violation of Title 18, United States Code, Section 1343, the following must be true: (1) the defendant knowingly devised or knowingly participated in a scheme to defraud; (2) the statements made or facts omitted as part of the scheme were material; (3) the defendant acted with the intent to defraud; and (4) the defendant used, or caused someone to use, wire communications in commerce to carry out or to attempt to carry out the scheme or plan.

In order for defendant to be guilty of count sixteen, which charges a violation of Title 18, United States Code, Section 1957, the following must be true: (1) the defendant knowingly engaged or attempted to engage in a monetary transaction; (2) the defendant knew the transaction involved criminally derived property; (3) the property had a value of greater than $10,000; (4) that the property was, in fact, derived from wire fraud; and (5) the transaction occurred in the United States.

Defendant admits that defendant is, in fact, guilty of these offenses as described in counts nine and sixteen of the indictment.

PENALTIES AND RESTITUTION

4.   The statutory maximum sentence that the Court can impose for a violation of Title 18, United States Code, Section 1343

2

21

1  that occurred prior to July 30, 2002 is: 5-years imprisonment; a
2  3-year period of supervised release; a fine of $250,000 or twice
3  the gross gain or gross loss resulting from the offense,
4  whichever is greatest; and a mandatory special assessment of
5  $100.

6      The statutory maximum sentence that the Court can impose
7  for a violation of Title 18, United States Code, Section 1957 is:
8  10-years imprisonment; a 3-year period of supervised release; a
9  fine of $250,000 or twice the gross gain or gross loss resulting
10  from the offense, whichever is greatest; and a mandatory special
11  assessment of $100.

12      Therefore, the total maximum sentence for all offenses to
13  which defendant is pleading guilty is: 15-years imprisonment; a
14  3-year period of supervised release; a fine of $500,000 or twice
15  the gross gain or gross loss resulting from the offense,
16  whichever is greatest; and a mandatory special assessment of
17  $200.

18      5.  Defendant understands that defendant will be required to
19  pay full restitution to the victims of the offenses.  Defendant
20  agrees that, in return for the USAO's compliance with its
21  obligations under this agreement, the amount of restitution is
22  not restricted to the amounts alleged in the counts to which
23  defendant is pleading guilty and may include losses arising from
24  charges not prosecuted pursuant to this agreement as well as all
25  relevant conduct in connection with those charges.  Defendant
26  further agrees that defendant will not seek the discharge of any
27  restitution obligation, in whole or in part, in any present or
28  future bankruptcy proceeding.

3

6.   Supervised release is a period of time following imprisonment during which defendant will be subject to various restrictions and requirements.   Defendant understands that if defendant violates one or more of the conditions of any supervised release imposed, defendant may be returned to prison for all or part of the term of supervised release, which could result in defendant serving a total term of imprisonment greater than the statutory maximum stated above.

7.   Defendant also understands that, by pleading guilty, defendant may be giving up valuable government benefits and valuable civic rights, such as the right to vote, the right to possess a firearm, the right to hold office, and the right to serve on a jury.

8.   Defendant further understands that the conviction in this case may subject defendant to various collateral consequences, including but not limited to, deportation, revocation of probation, parole, or supervised release in another case, and suspension or revocation of a professional license. Defendant understands that unanticipated collateral consequences will not serve as grounds to withdraw defendant's guilty plea.

<u>FACTUAL BASIS</u>

9.   Defendant and the USAO agree and stipulate to the statement of facts provided below.   This statement of facts includes facts sufficient to support a plea of guilty to the charge described in this agreement and to establish the sentencing guideline factors set forth in paragraph 12 below.   It is not meant to be a complete recitation of all facts relevant to the underlying criminal conduct or all facts known to defendant

4

1 | that relate to that conduct.  The stipulated facts are as
2 | follows:

3 |       At all times relevant to this plea agreement, Kenneth Ketner
4 | was one of the operators of Mortgage Capital Resources ("MCR"), a
5 | mortgage brokerage firm located in Orange County, California, and
6 | elsewhere.  Drawing on lines of credit from commercial lenders--
7 | most notably, Household Commercial Financial Services
8 | ("Household")--MCR purported to fund home loans for borrowers
9 | throughout the country.

10 |       As part of its business, MCR requested on hundreds of
11 | occasions that Household wire money from the line of credit to
12 | fund specific mortgages.  In these requests, MCR identified the
13 | specific borrower to whom these funds would be disbursed.
14 | Relying upon these representations, Household agreed to fund the
15 | specified loans and wired money for that purpose to a closing
16 | agent, attorney Allen Johnson.  Household expected that MCR and
17 | Johnson would not use this money for any purpose other than to
18 | fund the loans of the identified borrowers.

19 |       Rather than complying with their promises and
20 | representations to Household, Ketner, with the knowing assistance
21 | of other MCR officers and employees, diverted for improper and
22 | fraudulent uses the money earmarked for the borrowers.  In this
23 | way and to facilitate this scheme, Ketner improperly directed
24 | Johnson to transfer Household's money from his attorney-client
25 | trust account to an MCR-controlled account at La Salle Bank.
26 | Acting on such directions, Johnson diverted millions of dollars
27 | belonging to Household to MCR's accounts.  With the knowing
28 | assistance of other MCR officers and employees, Ketner then used

1  this money to operate MCR and to pay his own personal expenses,
2  such as payments on his house, boat, and credit cards.

3      Having improperly diverted this money to his own benefit and
4  for his own purposes, Ketner and MCR could not fund many of the
5  mortgages for which Household had wired money.  To conceal this
6  fact, Ketner instructed his employees to fund their way out of
7  this problem.  More precisely, he caused MCR to find new loans
8  that Household would agree to fund; Ketner then caused the money
9  earmarked for these new loans to pay off the original borrowers
10 whose funds had been misappropriated.

11     To further this scheme, on or about May 22, 2000, Ketner
12 caused Household to wire approximately $346,500 from its accounts
13 in Illinois to Johnson's client trust account at Sanwa Bank in
14 California.  In causing this wire transfer, Ketner did not intend
15 to use the money as promised--namely, to fund the loan of
16 borrowers identified in the wire transfer requests.  Rather,
17 Ketner intended to divert these proceeds to fund the loans of
18 borrowers whose money MCR already had misappropriated.  As a
19 result of this scheme, including his misappropriation and
20 diversion of funds, Ketner caused Household and other lenders to
21 suffer approximately $9.2 million in losses.

22     Ketner also laundered a portion of the money that MCR
23 received as a result of this scheme.  Having fraudulently caused
24 Household to wire money to Johnson's client trust account, Ketner
25 then caused Johnson to transfer the proceeds from this fraud to
26 MCR's account at La Salle Bank.  From this location, Ketner
27 caused the proceeds from the fraud to be further disbursed to
28 other bank accounts in the United States.  For instance, on or

6

about May 22, 2000, Ketner caused to be wired from Johnson's bank account at Sanwa Bank to one of MCR's accounts at La Salle Bank $335,000 that Ketner knew was derived from his wire fraud scheme.

<u>WAIVER OF CONSTITUTIONAL RIGHTS</u>

10.   By pleading guilty, defendant gives up the following rights:

a) The right to persist in a plea of not guilty.

b) The right to a speedy and public trial by jury.

c) The right to the assistance of legal counsel at trial, including the right to have the Court appoint counsel for defendant for the purpose of representation at trial.  (In this regard, defendant understands that, despite his or her plea of guilty, he or she retains the right to be represented by counsel - and, if necessary, to have the court appoint counsel if defendant cannot afford counsel - at every other stage of the proceedings.)

d) The right to be presumed innocent and to have the burden of proof placed on the government to prove defendant guilty beyond a reasonable doubt.

e) The right to confront and cross-examine witnesses against defendant.

f) The right, if defendant wished, to testify on defendant's own behalf and present evidence in opposition to the charges, including the right to call witnesses and to subpoena those witnesses to testify.

g) The right not to be compelled to testify, and, if defendant chose not to testify or present evidence, to have that choice not be used against defendant.

7

1   By pleading guilty, defendant also gives up any and all

2 rights to pursue any affirmative defenses, Fourth Amendment or

3 Fifth Amendment claims, and other pretrial motions that have been

4 filed or could be filed.

5                          SENTENCING FACTORS

6   11.   Defendant understands that the Court is required to

7 consider the United States Sentencing Guidelines ("U.S.S.G." or

8 "Sentencing Guidelines") among other factors in determining

9 defendant's sentence.   Defendant understands, however, that the

10 Sentencing Guidelines are only advisory, and that after

11 considering the Sentencing Guidelines, the Court may be free to

12 exercise its discretion to impose any reasonable sentence up to

13 the maximum set by statute for the crimes of conviction.

14   12.   Defendant and the USAO agree and stipulate to the

15 following applicable Sentencing Guideline factors[1]:

16 Wire Fraud

17       Base Offense Level  :     6    [U.S.S.G. § 2F1.1(a)]

18       Specific Offense
         Characteristics
19
         Loss in Excess
20       of $5,000,000
         (i.e., $9,200,000)  :    +14   [U.S.S.G. § 2F1.1(b)(1)(O)]
21
         More Than
22       Minimal Planning    :    +2   [U.S.S.G. § 2F1.1(b)(2)(A)]

23       Supervisor/
         Leader              :    +3   [U.S.S.G. § 3B1.1(b)]
24
         Subtotal for
25       Offense             :    25

26  _____

27       [1]  The parties stipulate and agree that the United States
   Sentencing Guidelines effective November 1, 1998, i.e., the 1998
28 Guidelines, govern this case.

                               · 8

1  <u>Money Laundering</u>

2          Base Offense Level  :      20    [U.S.S.G. § 2S1.1]

3          Specific Offense
           Characteristics
4
           Funds in Excess
5          of $200,000         :      +2    [U.S.S.G. § 2F1.1(b)(1)]
           Subtotal for
6          Offense             :      22

7  <u>Grouping Calculations and Acceptance</u>

8          Pre-grouping
9          Subtotal            :      25

10         Grouping Adjustment :      +2    [U.S.S.G. § 3D1.4(a)]

11         Acceptance of
           Responsibility      :      -3    [U.S.S.G. § 3E1.1(a)]
12
           Total Adjusted
13         Offense Level       :      24

14  The USAO and defendant agree that no other specific offense

15  characteristics, departures, or adjustments apply.

16      13.   There is no agreement as to defendant's criminal

17  history or criminal history category.

18      14.   The stipulations in this agreement do not bind either

19  the United States Probation Office or the Court.  Both defendant

20  and the USAO are free to: (a) supplement the facts by supplying

21  relevant information to the United States Probation Office and

22  the Court; (b) correct any and all factual misstatements relating

23  to the calculation of the sentence; and (c) argue on appeal and

24  collateral review that the Court's sentencing calculations are

25  not error, although each party agrees to maintain its view that

26  the calculations in paragraph 12 are consistent with the facts of

27  this case.

28  //

## DEFENDANT'S OBLIGATIONS

15. Defendant agrees that he or she will:

a) Plead guilty as set forth in this agreement.

b) Not knowingly and willfully fail to abide by all sentencing stipulations contained in this agreement.

c) Not knowingly and willfully fail to: (I) appear as ordered for all court appearances, (ii) surrender as ordered for service of sentence, (iii) obey all conditions of any bond, and (iv) obey any other ongoing court order in this matter.

d) Not commit any crime; however, offenses which would be excluded for sentencing purposes under U.S.S.G. § 4A1.2® are not within the scope of this agreement.

e) Not knowingly and willfully fail to be truthful at all times with Pretrial Services, the U.S. Probation Office, and the Court.

f) Pay the applicable special assessment at or before the time of sentencing unless defendant lacks the ability to pay;

g) To fill out and deliver to the USAO a completed financial statement listing defendant's assets on a form provided by the United States Attorney's Office;

h) Within six months of entering a guilty plea pursuant to this agreement, to file with the Internal Revenue Service ("IRS") Federal income tax returns for tax years 2001 through 2005, to pay any amounts due and owing (including penalties), and to comply with all rules and regulations of the IRS.

//
//
//

10

## THE USAO'S OBLIGATIONS

16.    If defendant complies fully with all defendant's obligations under this agreement, the USAO agrees:

a) To abide by all sentencing stipulations contained in this agreement.

b) At the time of sentencing, provided that defendant demonstrates an acceptance of responsibility for the offense up to and including the time of sentencing, to recommend a two-level reduction in the applicable sentencing guideline offense level, pursuant to U.S.S.G. § 3E1.1, and to recommend and, if necessary, move for an additional one-level reduction if available under that section.

c) At the time of sentencing to move to dismiss the remaining counts of the indictment as against defendant. Defendant agrees, however, that at the time of sentencing the Court may consider the dismissed counts in determining the applicable Sentencing Guidelines range, where the sentence should fall within that range, the propriety and extent of any departure from that range, and the determination of the sentence to be imposed after consideration of the sentencing guidelines and all other relevant factors.

## BREACH OF AGREEMENT

17.    If defendant, at any time between the execution of this agreement and defendant's sentencing on a non-custodial sentence or surrender for service on a custodial sentence, knowingly violates or fails to perform any of defendant's obligations under this agreement ("a breach"), the USAO may declare this agreement breached.  If the USAO declares this agreement breached, and the

11

1   Court finds such a breach to have occurred, defendant will not be
2   able to withdraw defendant's guilty plea, and the USAO will be
3   relieved of all of its obligations under this agreement.

4      18.   Following a knowing and willful breach of this
5   agreement by defendant, should the USAO elect to pursue any
6   charge that was either dismissed or not filed as a result of this
7   agreement, then:

8          a) Defendant agrees that any applicable statute of
9   limitations is tolled between the date of defendant's signing of
10  this agreement and the commencement of any such prosecution or
11  action.

12         b) Defendant gives up all defenses based on the statute
13  of limitations, any claim of preindictment delay, or any speedy
14  trial claim with respect to any such prosecution, except to the
15  extent that such defenses existed as of the date of defendant's
16  signing of this agreement.

17         c) Defendant agrees that: I) any statements made by
18  defendant, under oath, at the guilty plea hearing; ii) the
19  stipulated factual basis statement in this agreement; and iii)
20  any evidence derived from such statements, are admissible against
21  defendant in any future prosecution of defendant, and defendant
22  shall assert no claim under the United States Constitution, any
23  statute, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of
24  the Federal Rules of Criminal Procedure, or any other federal
25  rule, that the statements or any evidence derived from any
26  statements should be suppressed or are inadmissible.

27  //
28  //

12

31

<u>LIMITED MUTUAL WAIVER OF APPEAL AND COLLATERAL ATTACK</u>

19.   Defendant gives up the right to appeal the Court's determination of the applicable Sentencing Guidelines range, including the method by which the Court calculated that range, with the following exceptions:   the defendant can appeal (a) any upward departure in offense level or criminal history category; (b) any determination that the total offense level is above 24; and (c) the court's determination of defendant's criminal history category.   Defendant retains the ability to appeal his sentence on all other grounds, including in particular the reasonableness of the sentence imposed by the court, with the exception that defendant gives up the right to appeal the following conditions of probation and/or supervised release that may be imposed by the court: standard conditions set forth in district court General Orders 318 and 01-05; the drug testing conditions mandated by 18 U.S.C. §§ 3563(a)(5) and 3583(d); and the alcohol and drug use conditions authorized by 18 U.S.C. § 3563(b)(7).

20.   Defendant also gives up any right to bring a post-conviction collateral attack on the conviction or sentence, including any order of restitution, except a post-conviction collateral attack based on a claim of ineffective assistance of counsel, a claim of newly discovered evidence, or a retroactive change in the applicable Sentencing Guidelines, sentencing statutes, or statutes of conviction.

21.   The USAO gives up its right to appeal the Court's Sentencing Guidelines calculations, provided that (a) the Court does not depart downward in offense level or criminal history category and (b) the Court determines that the total offense

1  level is 24 or above and imposes a sentence within the range

2  corresponding to the determined total offense level and criminal

3  history category.

COURT NOT A PARTY

5      22.   The Court is not a party to this agreement and need not

6  accept any of the USAO's sentencing recommendations or the

7  parties' stipulations.   Even if the Court ignores any sentencing

8  recommendation, finds facts or reaches conclusions different from

9  any stipulation, and/or imposes any sentence up to the maximum

10 established by statute, defendant cannot, for that reason,

11 withdraw defendant's guilty plea, and defendant will remain bound

12 to fulfill all defendant's obligations under this agreement.   No

13 one - not the prosecutor, defendant's attorney, or the Court -

14 can make a binding prediction or promise regarding the sentence

15 defendant will receive, except that it will be within the

16 statutory maximum.

NO ADDITIONAL AGREEMENTS

18     23.   Except as set forth herein, there are no promises,

19 understandings or agreements between the USAO and defendant or

20 defendant's counsel.   Nor may any additional agreement,

21 understanding or condition be entered into unless in a writing

22 signed by all parties or on the record in court.

23 //

24 //

25 //

26 //

27 //

28 //

14

No. 0622   P. 2

1        PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING

2        24.   The parties agree and stipulate that this Agreement

3   will be considered part of the record of defendant's guilty plea

4   hearing as if the entire Agreement had been read into the record

5   of the proceeding.

6        This agreement is effective upon signature by defendant and

7   an Assistant United States Attorney.

8   AGREED AND ACCEPTED

9   UNITED STATES ATTORNEY'S OFFICE
    FOR THE CENTRAL DISTRICT OF CALIFORNIA

10  DEBRA WONG YANG

11  United States Attorney

12  _____          2/17/06
    BRENT G. TABACCHI                         Date

13  Assistant United States Attorney

14       I have read this agreement and carefully discussed every

15  part of it with my attorney.  I understand the terms of this

16  agreement, and I voluntarily agree to those terms.  My attorney

17  has advised me of my rights, of possible defenses, of the

18  sentencing Guideline provisions, and of the consequences of

19  entering into this agreement.  No promises or inducements have

20  been made to me other than those contained in this agreement.  No

21  one has threatened or forced me in any way to enter into this

22  agreement.  Finally, I am satisfied with the representation of my

23  attorney in this matter.

24

25  _____          7/15/06
    KENNETH KETNER                            Date

26  Defendant

27       I am KENNETH KETNER's attorney.  I have carefully discussed

28  every part of this agreement with my client.  Further, I have

                                  15

1  fully advised my client of his/her rights, of possible defenses,
2  of the Sentencing Guidelines' provisions, and of the consequences
3  of entering into this agreement.  To my knowledge, my client's
4  decision to enter into this agreement is an informed and
5  voluntary one.
6
7  _____        __7/17/06_____
   TERRY BIRD, ESQ.                 Date
8  Benjamin Gluck
   Counsel for Defendant
9  KENNETH KETNER
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

                                16

## CERTIFICATE OF SERVICE BY MAIL

1

2     I, **Linda Lewis**, declare:

3     That I am a citizen of the United States and resident or

4  employed in Orange County, California; that my business address

5  is Office of United States Attorney, 411 West Fourth Street,

6  Eighth Floor,  Santa Ana, California 92701-4599; that I am over

7  the age of eighteen years, and am not a party to the above-

8  entitled action; that I am employed by the United States Attorney

9  for the Central District of California who is a member of the Bar

10  of the United States District Court for the Central District of

11  California, at whose direction the service by mail described in

12  this Certificate was made; that on **July 19, 2006**, I deposited in

13  the United States mail, Santa Ana, California in the above-

14  entitled action, in an envelope bearing the requisite postage, a

15  copy of: **PLEA AGREEMENT FOR DEFENDANT KENNETH KETNER**

16  addressed to:   Benjamin Gluck
17                         Bird Marella
                          1875 Century Park East
18                         23rd Floor
                          Los Angeles, CA 90067
19
    at his/her last known address, at which place there is delivery
20
    service by United States mail.
21
22     This Certificate is executed on **July 19, 2006** at Santa Ana,

    California.
23
24     I certify under penalty of perjury that the foregoing is

    true and correct.
25

26

27                                    Linda Lewis

28

APR-13-2007  10:23                                                              P.21

FD-302 (Rev. 10-6-95)

-1-

### FEDERAL BUREAU OF INVESTIGATION

Date of transcription    02/22/2005

      Tami Ruffoll, date of birth ████ 1957, who resides at
████████████ Orange, CA, 92866, home telephone number
████ cellular telephone number ████████████, contacted
Assistant United States Attorney Andrew Stolper based on a news
report she heard on the radio about Ken Ketner. AUSA Stolper then
forwarded the call to the interviewing agent. Ruffoll was advised
of the identity of the interviewing agent and the purpose of the
interview. She then voluntarily provided the following
information:

      In 1981 or 1982, Ruffoll was working at GMAC Mortgage in
Riverside, CA. The branch manager of the office was Ken Ketner.
Ketner instructed Ruffoll to fraudulently fill out bogus rent
receipts on behalf of borrowers to facilitate the approval of
loans. Ketner also told her to fraudulently change or modify VA
forms (MCRV's) to facilitate the approval of VA loans. MCRV
(Master Certificate of Reasonable Value) was a form required by the
Veterans Administration that depicts whether or not a sub-division
is qualified for a VA loan, and if so, it reflects a value that the
VA will consider for lending purposes on a specified property.
Ruffoll refused to comply with Ketner's demand to commit fraud.

      A short time later Ruffoll observed a friend/co-worker,
Cheryl Last Name Unknown (LNU), conducting the same or similar
fraud that Ketner had demanded of her. Ruffoll asked Cheryl LNU
why she was filling out the documents in a fraudulent manner.
Cheryl LNU told her that Ketner had instructed her to fill out the
paper work with specific instructions as to the fraudulent
representations. Ruffoll told her friend not to commit fraud on
Ketner's behalf. Ketner learned of Ruffoll's instruction to the
other employer and told Ruffoll not to instruct others regarding
this matter.

      Ruffoll then telephonically contacted the main GMAC
office, located in San Diego, and told them of Ketner's fraudulent
behavior. She then started her already planned three week
vacation.

      Upon her return to work, Ruffoll observed Ketner being
escorted out of the office. She was not aware of the exact
circumstances regarding his departure and the escort requirement,

---

Investigation on  2/18/2005  at  Santa Ana, CA                    (telephonically)

File # 29B-LA-224315                              Date dictated  2/22/2005

by  SA Paul L. Bonin/plb

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

EXHIBIT _B_

FD-302a (Rev. 10-6-95)


29B-LA-224315


| Continuation of FD-302 of | Tami Ruffoll | , On 2/18/2005 | , Page | 2 |
|---|---|---|---|---|

but assumed it had something to do with her passing on Ketner's fraud to the San Diego office.

Before leaving, Ketner threatened Ruffoll by telling her that he knew where she lived and that she would not live there long.

Ruffoll agreed to cooperate with the investigation, to include testifying, and attempting to identify and locate the other employee from GMAC who was instructed to conduct fraud by Ketner.

APR-13-2007  10:21                                                      P.13

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription   05/03/2004

Roberta L. Martin, date of birth ▮▮▮▮▮ 1954, SSN ▮▮▮▮▮ ▮▮▮▮▮ who resides at ▮▮▮▮▮▮ Highland, CA, home telephone number ▮▮▮▮▮ work telephone number ▮▮▮▮▮ was interviewed pursuant to a proffer agreement at the Santa Ana United States Attorney's office. Also present was Martin's attorney, Richard Beswick, telephone number ▮▮▮▮▮, Assistant United States Attorney Andrew Stolper, and IRS-CID Special Agent Eric Helfand. Martin was advised of the identity of the interviewing agent and the purpose of the interview. She then voluntarily provided the following information:

Other than her previous 2001 interview with the FBI, Martin has not met with law enforcement or other investigative entities regarding her knowledge of Mortgage Capital Resources (MCR) or Kenneth Ketner. The law firm of Marshack and Schulman asked Martin to appear for a deposition; but it never took place. This was in connection with a civil law suit on behalf of Benefit Land Title.

Martin last spoke with Ketner about two years ago. He called Martin late one night. Martin recognized Ketner to be drunk. His stated purpose of the call was to apologize and to invite Martin to lunch. Martin declined the lunch invitation, and did all she could to avoid his further contact attempts.

Martin first met Ketner around 1982. Both worked at S&L Mortgage, Ketner as a loan officer and Martin as a loan processor. Later, both worked for Colonial Mortgage performing similar duties. Ketner then began working at California Financial Corporation (CFC). In about 1990, Martin also came to work at CFC, first as a loan processor and later as Ketner's assistant. Ketner was the CEO or owner of CFC.

In the mid 1990's Ketner decided to declare Bankruptcy on behalf of CFC, and start a new company called Mortgage Capital Resources. Ketner stepped down as president of CFC and asked Martin to be the new figurehead president. Martin agreed. Soon thereafter the department of Housing and Urban Development (HUD) conducted an audit at CFC and discovered a number of HUD insured loans were fraudulent. HUD decided to hold CFC accountable for the bad loans. Although Martin was the current President in name only

Investigation on   4/30/2004   at   Santa Ana, CA

File #   29B-LA-224315                          Date dictated   5/03/2004

by   SA Paul L. Bonin/plb

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

EXHIBIT 

HFR-13-2007  10:21                                              P.14

FD-302a (Rev. 10-6-95)


29B-LA-224315


Continuation of FD-302 of   Roberta L. Martin          .On 4/30/2004  , Page   2

she was partially liable according to Ketner and HUD.  Ketner
settled with HUD and agreed to pay $200,000 - 300,000.  Ketner told
Martin that since he was the actual President he would not ask her
to make any of the quarterly payments to HUD.  Ketner made all
payments on her behalf.

     At around this same time Ketner started MCR.  He named
himself as President, and Martin started as Ketner's administrative
assistant.  She later became the funding manager.  Martin agreed
to work at MCR because she wanted to make sure Ketner made the
required payments to HUD for which she was liable.  MCR was totally
controlled by Ketner, who was a micro-manager.  No decisions were
made without the approval of Ketner.  Randy Bristol worked there
and had a small interest in the company.

     If a proposed property loan came to MCR, attempts to
originate the loan started.  First the loan proposal went to the
underwriting department.  If the buyer (borrower) was approved, the
property was inspected, loan documents were drawn, and the borrower
would sign escrow documents.  The loan was then submitted to MCR's
funding department.  MCR would then contact the bank with whom a
line of credit was already in place.  The bank would wire the
necessary funds to the escrow company.  The funds were not supposed
to come to MCR.  The purpose of the escrow company was to hold the
funds until closing and to make sure the funds were used for their
intended purpose.  The escrow/settlement agency released the funds.

     MCR also funded second mortgages.  The process of funding
these loans was different, but Martin was not sure of these
details.  Checks issued to individuals who applied for and received
second mortgages often bounced.

     Robert Johnson was an attorney who shared office space
with MCR.  Johnson performed duties relating to MCR, but he always
dealt directly with Ketner.  MCR had an office in Georgia.  The
closing agent (escrow) duties in Georgia could legally be handled
by an attorney, and Johnson performed this duty for MCR.  Matt
Hadari handled the books for Johnson.  Johnson and Ketner were
friends before doing business together.  Martin was given signature
authority on Johnson's business account.  It was explained to her
that a second signature was required for the account and Martin
agreed to perform this function.  When Johnson presented a check
for her signature she complied.  Funds often went from the Johnson
account (to be used for loans) directly to various MCR accounts, to

FD-302a (Rev. 10-6-95)

29B-LA-224315

Continuation of FD-302 of     Roberta L. Martin            , On  4/30/2004  , Page    3

include the general operating account. This seemed inappropriate
to Martin. Martin often heard Ketner tell Johnson to wire money
from the Johnson account to MCR accounts. All money transactions
were done at the direction of Ketner. Martin also heard Ketner
tell Hadari to wire funds from the Johnson account.

Ketner was paid about $16,000 per month in salary, and
received considerable additional compensation by using company
funds for expenses. Martin is not sure exactly how much this
additional compensation amounted to. When Ketner wanted money he
would call accounting and have them issue a check. Ketner lived on
Lido Island. The monthly house payments were sent in by Martin on
checks from Ketner's personal account. The house was sold in 1999
or 2000. Ketner purchased a Ferrari automobile in 1999. The car
was financed, but a considerable down payment was made. Martin is
not sure of the source of the down payment.

In 1996, Ketner asked Martin to assist in covering up bad
loans. Certain properties were financed with fraudulent loan
documentation. The loans were financed by lines of credit to CPC
and MCR. To conceal the problem, Ketner had Martin and others act
as straw buyers. The properties were bought and sold numerous
times by the straw buyers to keep the issuers of the lines of
credit from discovering the fraud. Ketner promised Martin the
situation was temporary and would stop as soon as he could sell the
properties legitimately. Martin understood that she was not
actually purchasing the property. Documentation supporting the
straw sales were prepared and submitted with all participating
parties' understanding of the fraudulent nature of the transaction.
Ketner used his strong, persuasive personality to convince Martin
and others to act as straw buyers. Many others (names not
provided) were asked and participated as straw buyers. Martin
prepared loan documentation for the straw sales that revealed who
the other participants were. Two individuals who refused to
participate as straw buyers were Pam Stewart and Beverly Fleming.
Eventually, Martin also refused to be named as a straw buyer.

Loan files relating to the "straw sales" were maintained
in purple files so as not to mix them with legitimate loan files.
This also insured that the loans would not be submitted for sale to
companies that could possible discover the scheme. Eventually the
constant flipping of the properties created title problems alerting
the issuers of the lines of credit to potential problems.
Eventually Household Financial, the issuers of a line of credit to
MCR conducted an audit and discovered Ketner's fraudulent property

FD-302a (Rev. 10-6-95)


29B-LA-224315


Continuation of FD-302 of ___Roberta L. Martin_____ , On _4/30/2004_ , Page __4__

flipping.  Others who knew about the fraud related to the purple
file loans were Val Benincosa and Beverly Fleming.  Martin heard
both discussing the purple files with Ketner.

       Martin was shown a letter dated 3/17/1999, from MCR to
Johnson and Payne.  The letter was supposedly signed by Ketner.
Martin had vague recollection of the letter, or a similar letter
that Johnson asked Martin to sign with Ketner's signature.  Martin
often signed Ketner's signature if asked by Ketner.  On this
occasion Johnson presented the letter and asked Martin to sign for
Ketner.  The letter was back dated.  Martin signed and likely left
a copy for Ketner.  Martin agreed to sign the letter because
Johnson and Ketner had a close relationship and it did not seem
like a strange request.

       On at least one occasion Ketner went to the Caymans
Islands with Pam Stewart.  Both Ketner and Stewart told Martin of
the trip.  Rumors of a sexual relationship between Ketner and
Stewart circulated, but both were married to other people, and
Martin has no independent knowledge or confirmation of these
rumors.  Ketner told Martin he opened a bank account there with the
help of an attorney whose office was in the same building as MCR.
Martin is aware that MCR funds were sent to this bank account, but
is not familiar with the details of the transfer.

       At times payroll checks to MCR employees were not being
honored at the bank due to insufficient funds in the MCR operating
account.  Money was then made available from the Johnson/Payne
account to cover these checks.

       HOMEZIPPER.com (HZ) was a company started by Ketner.  It
was to be an online mortgage company.  Ketner solicited investors
for HZ, to include employees at MCR.  In July, 2000, Martin
invested $7500 in HZ, and was issued 137,000 HZ shares.  Ketner's
plan was to take HZ public in the near future, and promised
investors great returns.

       Another company associated with Ketner was KCK, which
Martin understood to be some kind of consulting firm.
       In addition to her salary, Martin received $1200/month in
the form of a loan.  The agreement with Ketner called for her to
pay this money back upon the sale of her Highland, CA, house.  To
date she has not sold the house.  Martin also drove a Mercedes
automobile while employed at MCR paid for by the company.

APR-13-2007  10:22                                                                 P.17

FD-302a (Rev. 10-6-95)

29B-LA-224315

Continuation of FD-302 of ___Roberta L. Martin_____ ,On _4/30/2004_ , Page __5__

    After the debt to HUD was paid, in late 2000, Martin quit MCR.

05/04/2001

ROBERTA L. MARTIN, DOB ██████/1954, SSN ███████
██████████, Highland, California, telephone number
████████ was interviewed at the Santa Ana office of the
FBI.  MARTIN'S Attorney, RICHARD BESWICK, 323 West Court Street,
#402, San Bernadino, California, telephone number (███████████
was present during the interview.  The interview was conducted
under a Proffer Agreement with the United States Attorneys
Office.

In May 1990, MARTIN began working at CALIFORNIA
FINANCIAL CORPORATION (CFC) as a loan processor.  She became an
administrative assistant to KENNETH KETNER, and then ran the
funding department for a couple years.  In 1995 MORTGAGE CAPITAL
RESOURCES (MCR) purchased CFC and MARTIN became a Vice-President.
She worked at the Hutton Center office from 1996 until she left
the company in about October 2000.  Her salary was $78,500 at the
time.

SA Connell asked MARTIN about the so-called "purple
files", which were loans taken out on real estate owned (REO)
properties by MCR employees and KETNER'S friends and family
members.  MARTIN explained that MCR had to repurchase from
investors several loans that went bad.  She does not know why MCR
did not foreclose on these REO properties and sell them to pay
off the loans.  Instead, KETNER put new loans on the properties
to repay the existing loans.  MARTIN was involved in putting the
new loan packages together, but KETNER told her who the borrowers
would be on each loan.  MARTIN obtained closing statements for
the borrowers and put the information from the original loan
applications into the computer in order to generate the notes,
deeds and printed copy of the loan application.  DEBBIE BERMAN
and at least one other assistant of MARTIN'S did some of this
inputting work as well.

SA Connell showed MARTIN a list of six property
transactions, which is attached to this document.  MARTIN
acknowledged that she permitted her name to be used to purchase
these properties.  MARTIN signed the notes and deeds on these
transactions with an in-house notary, but did not complete or
sign any loan applications to purchase them.  She did not receive
any compensation for doing this and did not seek to use the

05/04/2001      Santa Ana, CA

29B-LA-224315

SA John Connell

HPR-13-2007   10:19

P.03

29B-LA-224315


Roberta Martin                       05/04/2001          2

properties as tax write-offs.  She participated in these
transactions only because KETNER asked her to.

        At the time MARTIN'S loans occurred, the lending banks
were not requiring that MCR supply them with the borrower's loan
applications.  When the banks began to require MCR supply the
loan applications, loan applications for each borrower were put
together.  There was one master application for each borrower.
This master application was used to obtain several loans for each
borrower.  Escrow and title were opened on these transactions,
but these loans did not go through the normal procedures at MCR.
No underwriting was done on these loans, there was no appraisals
performed, they were kept segregated from the other loans in a
separate drawer, and no credit reports were ordered for the
borrowers.  Credit reports were ordered however, when the lending
banks began requesting them for the loans they were going to
fund.  Only one credit report was ordered for each borrower even
though those borrowers applied for several loans.  The first
credit report ordered was used for all subsequent loans.

        These loans were placed on MCR'S warehouse lines and
funded by banks, such as Republic Bank.  KETNER made many of
these loans FHA loans.  MCR, not the borrowers, were making the
interest payments on these loans.  MARTIN does not know where the
money came from to make these payments, as it was an accounting
function.

        MARTIN helped KETNER set up a bank account at Citizens
Business Bank (CBB).  MARTIN, KETNER and MARTIN'S ex-brother in-
law, RONALD MARTIN, were co-signers on the account.  The account
was used to deposit rent checks collected on the REO properties,
which had renters living in them.  Checks were written from the
account to pay for utilities, repairs and other expenses related
to the properties.  Early in 2000 when MCR was having problems
with the funding checks they disbursed to their borrowers not
clearing, a significant amount of money was deposited to the CBB
account.  RONALD MARTIN went to the bank to get cashiers checks
that were used to replace the borrowers' checks that did not
clear.

        MCR also had an account at Southern California Bank.
Money was wired through this account and used to pay off the
existing loans on the REO properties.  There was also a minimal

29B-LA-224315

Roberta Martin                        05/04/2001          3

amount of wiring from this account to replace funding checks that
did not clear around the second quarter 2000.  MCR also
maintained accounts at LaSalle Bank and Bank of America (BOA).
MARTIN handled a lot of KETNER'S finances with his personal
banker at BOA.

     MARTIN explained that funds from warehouse lines were
used to pay off older loans instead of funding the loans those
funds were designated for.  MARTIN does not know what caused this
situation.  KETNER gave MARTIN verbal instructions to move money
between accounts, which she passed on to ELIZABETH CONWAY,
DELORES MENDOZA or VAL BENINCOSA.  KETNER also gave these
instructions directly to CONWAY, MENDOZA or BENINCOSA on some
occasions.  There were no discussions or meetings concerning
these funding procedures, as KETNER made all the decisions
himself.  KETNER was in charge at MCR the entire time MARTIN was
employed there.

     MARTIN was aware that MCR sold investors loans which
had not been funded.  MARTIN does not know if this was
intentional or not.  MCR'S Atlanta office was responsible for
selling loans.  MARTIN also acknowledged that MCR was making
payments to those investors on behalf of the borrowers who had
not been funded yet.  MARTIN occasionally talked to borrowers
whose funding checks had not cleared.  KETNER had given MARTIN
instructions on what to say to these borrowers, which included
excuses for why their funds did not clear.

     MARTIN stated that the only reason she stayed with MCR
till October 2000, was because she was named in a Department of
Housing and Urban Development (HUD) settlement agreement, that
was not paid off until mid 2000.  She left MCR after the
settlement was paid.  MARTIN explained that before MCR purchased
CFC, MARTIN became President of CFC.  Due to real estate rules
that forbid an individual from owning multiple real estate
businesses, KETNER, who was then the President of CFC, turned
over his title to MARTIN so he could be President of MCR.  HUD
had to pay out money on several CFC originated loans, and
therefore took action against KETNER and MARTIN, who was now
President of the company.  KETNER and MARTIN signed a settlement
agreement with HUD to repay $245,000.  BESWICK provided the FBI
with copies of this settlement agreement and copies of several
payment checks and cover letters, which are attached to this

APR-13-2007  10:19                                                    P.05

29B-LA-224315

            Roberta Martin                    05/04/2001         4

document.  The money used to pay HUD on this settlement agreement
came from MCR'S corporate penalty account.

       MCR maintained a corporate apartment in Atlanta.
MARTIN is aware of another corporate apartment at the Colony in
Newport Beach.  KETNER hosted annual trips to Cabo San Lucas for
MCR'S loan officers and branch managers as a thank you for their
work.

       KETNER had owned 30% of CITY MORTGAGE, located in
Phoenix, Arizona.  Due to real estate rules about owning multiple
businesses, KETNER put his ownership in MARTIN'S name.  MARTIN
did not get any paperwork regarding her ownership of the
business, but does remember signing something.  CITY MORTGAGE
originated loans, which were submitted to MCR.

       MARTIN identified the following individuals:

       GARY TIMMONS - former employee of PNC Bank, formerly
            Sears, with which MCR had a warehouse line-of-
            credit;  TIMMONS then went to LaSalle Bank, with
            which MCR opened a warehouse line-of-credit

       ALBERT ADAMS - KETNER'S step-father in-law in LaQuinta
            (married to SHIRLEY GREELEY)

       ANNE M. ALEXANDER - MCR loan officer in Palm Desert

       RICHARD G. BENTER - KETNER'S friend/associate in the
            insurance business

       VICTOR H. BOYD II - KETNER'S friend

       MONIQUE BRAUD - MCR loan officer in Culver City

       DIANE L. CALZADA - KETNER'S friend

       DIANNE D. DAVID - business associate of KETNER'S and
            MCR employee for a short time;  DAVID worked with
            MIKE BARRON, another business associate of
            KETNER'S

       SHIRLEY A. GREELEY - KETNER'S mother in-law in LaQuinta

47

MAR-15-2007  10:19                                                      P.06

29B-LA-224315

Roberta Martin                          05/04/2001              5

      (married to ALBERT ADAMS)

CHARLES HERMANSEN - business associate of KETNER'S

JOHN J. MAGNER - MCR loan officer in Santa Ana

CHARLES E. NEIGHBARGER - MCR loan officer in Riverside
    and MCR'S broker of record

PAUL OLIVERA - KETNER'S friend

SHELLY M. PAYNE - MCR'S funding manager in Riverside

DONALD W. PETTY - MCR'S Vice President of Production in
    Santa Ana

PAM STEWART - MCR loan officer in Santa Ana

LANNY E. ROSS - MCR'S branch manager in Culver City,
    which was formerly located in Los Angeles

JOHN B. SHERMAN - MCR employee in production department

CHARLES VUYTOWECZ - MCR branch manager in Rancho
    Bernardo

MICHAEL VUYTOWECZ - MCR loan officer in Rancho Bernardo

JOHN S. WHEATLEY - KETNER'S friend and business
    associate in commercial leasing in Upland/Ontario
    area;  WHEATLY found office space for MCR

BERNADINE TRUST - VICTOR BOYD'S mother's trust

FIRST CALIFORNIA PARTNERS - run by a friend of KETNER'S

NORTON PARTNERS - run by the same friend of KETNER'S
    who runs FIRST CALIFORNIA PARTNERS

S.C.I.T.S. EDUCATIONAL FOUNDATION - JAMES TRAUDT signed
    the paperwork for this entity;  ALLEN JOHNSON was
    involved as well

48

**Internal Revenue Service**
**Criminal Investigation**

**Memorandum of Interview**



---

**In Re:**   KENNETH CHRISTOPHER KETNER   **Location:**   Beverly Fleming's Residence
█████████████
Perris, CA 92570

**Investigation #:**  950430082
**Date:**  June 17, 2004
**Time:**  Approximately 4:05pm - 5:40pm
**Participant(s):**  Beverly Fleming, Witness
Emanuel Gonzalez, Special Agent
Eric J. Helfand, Special Agent

On the above stated date and time, Special Agents Emanuel Gonzalez and
Eric Helfand identified themselves to Beverly Fleming and displayed their
credentials for her review. Although at the time the interview was scheduled
Fleming was informed of the topics to be discussed, she was again informed
that the interview would center around KEN KETNER and the operations of
Mortgage Capital Resources (MCR). Fleming was also advised of the
importance that her statements be truthful. Fleming stated she understood,
and voluntarily provided information during the course of the interview.

The following is a summary of information provided by Fleming during the
course of the interview:

Personal Information:

1. Beverly Fleming has lived at ████████Lane for approximately 20 years.
   Her home phone number is █████████ and her cell phone number is█████
   ████████

2. Fleming currently is employed by Home Loan Mortgage. Previous to this she
   was employed by IndyMac, Nationwide Residential Capital, MCR, and
   California Financial Corporation (CFC).

U.S. Treasury Criminal Investigation

**EXHIBIT** *D*

Association with KETNER at CFC:

3. KETNER contacted Fleming in 1993, and offered her a position at his company CFC, a mortgage lending company. At the time Fleming was employed in the mortgage industry, and stated KETNER did not have a good reputation. Fleming stated that she contemplated KETNER'S job offer for approximately 6 months before accepting the position.

4. Fleming stated that eventually CFC succumbed to financial difficulties, and filed bankruptcy. Previous to filing bankruptcy, CFC possessed a number of REO's. These REO's were properties that CFC had financed for borrowers, the borrower had subsequently defaulted on the loan, causing CFC to repossess the property. Fleming stated these REO's were not included in CFC's bankruptcy, and were considered the personal property of KETNER. While an employee of CFC, KETNER asked Fleming to put title to one of the REO's in her name. KETNER told Fleming that at his level of income, he could not take a tax deduction for the property, and stated she could use the property for tax purposes. KETNER informed Fleming that the property would be managed by a property management company, and she would not have to do anything. Fleming refused KETNER'S offer. She did not feel comfortable participating in such a transaction. Although KETNER did not use the term, Fleming felt as if he was asking her to become a "straw buyer" for an REO property. KETNER did not ask Fleming to participate in any such transactions again, but did ask others to participate in similar transactions. Fleming stated that these REO's were somehow transferred to MCR, the company that KETNER founded immediately following the demise of CFC.

MCR and "Purple Files":

5. In approximately 1995, after the failure of CFC, Fleming became the Manager of MCR's loan processing office in Riverside, CA. Fleming stated that this was referred to as the "Corporate" office, while the office that KETNER worked out of in Santa Ana was referred to as the "Executive" office. Fleming stated that from the day she began working at MCR, until the day she left in August 2000, KETNER was the individual in charge of MCR. She noted that KETNER was a very hands-on leader, and directed the company's daily operations. KETNER, Roberta Martin (KETNER'S assistant), Al Johnson (attorney), a legal assistant, Pam Stewart, Mike Barron, and Dianne David (Barron's girlfriend) worked in the Santa Ana office. Fleming did on occasion travel to the Santa Ana office for business.

U.S. Treasury Criminal Investigation

6. Fleming stated the following functions were performed at the Riverside office:
   - Underwriting
   - Funding
   - Quality Control
   - Appraisals
   - Servicing
   - Shipping
   - Accounting

Fleming had management responsibility over all of the above functions, with the exception of accounting. Fleming also had oversight responsibility for multiple lines-of-credit which MCR had with various warehouse lending institutions. The lines-of-credit were used to fund loans originated by MCR. Fleming noted the loans that came through the Riverside office for processing were exclusively 1st mortgage loans. Fleming stated that although she was not sure of his exact title, Val Benicosa acted as the CFO for MCR's operations, and managed the accounting department out of the Riverside office.

7. Following is Fleming's summary of the standard flow of loan documents and funds once branch offices forwarded loan packages to MCR's corporate office in Riverside:

   - Complete 1st mortgage loan packages arrived in Riverside, and were forwarded to the appraisal, underwriting, and quality control departments to perform their respective tasks.

   - If authorized by the underwriting department, loan packages were forwarded to the shipping department, where the loan information was packaged and sent to a title company. The title company would perform a title search on the particular property as part of the loan process.

   - After confirming clear title on the property, the title company contacted MCR's funding department. MCR's funding department would then request funds be drawn from one of its warehouse lines-of-credit, and for the funds to be transferred to the title company, who acted as an independent third-party for distribution of the loan funds to the appropriate parties.

8. Fleming stated that process identified above was used for the vast majority of loan packages that came through the Riverside office. However, shortly after she began working at MCR in 1995, she began receiving "Purple File" loan documents from KETNER'S assistant, Roberta Martin. Fleming stated these particular loans were referred to as "Purple Files" because they arrived from Santa Ana in purple file folders, so they could be differentiated from normal loan packages. Fleming said when she saw one of the "Purple Files", she knew it was "Ken's loan". Fleming stated that the "Purple File" loans were for the REO's that KETNER had somehow transferred from CFC to MCR. The "Purple Files" were not complete loan packages, and contained a limited number of

documents signed (notarized) by the individuals.purporting to apply for the loans. "Purple Files" were not processed in the same manner as regular loans, and the   following is Fleming's summary of the "Purple File" processing sequence:

- Roberta Martin provided Riverside office, via mail or in-person, "Purple Files".

- "Purple Files" bypassed MCR's underwriting and shipping departments, and were sent to the title company.

- Martin identified to MCR's funding department which MCR line-of-credit the loan funds were to be drawn from. The "Purple File" was then returned to Martin in Santa Ana. Fleming assumed that Martin received her direction from KETNER because of his before mentioned hands-on leadership role.

- Although Fleming did not have direct involvement with this side of the transaction, she believes that Martin advised the title company to pay-off a particular MCR line-of-credit with the loan proceeds derived from the "Purple File". Again, Fleming assumed that Martin received her direction from KETNER.

9. Although the "Purple Files" were not delivered directly to her, Fleming indicated that the frequency with which the Riverside office received "Purple Files" increased from 1995 to 2000. Employees at the Riverside office would inform her by saying, "We have another Purple File". As the frequency increased, Fleming recognized that the files were for the same properties, but with different loan applicant names. Fleming also noticed that the same loan applicant names (all MCR employees and KETNER acquaintances) were being cycled between different "Purple File" properties. Beginning in approximately 1999, Fleming noticed that particular "Purple File" properties were appearing on 2 MCR lines-of-credit simultaneously, indicating that MCR had requested funds for 2 loans on the same property, at the same time. As a result of her oversight responsibility for the warehouse lines-of-credit, and her awareness of "Purple File" irregularities, Fleming questioned KETNER regarding "Purple Files" being on 2 lines-of-credit simultaneously. KETNER told Fleming she was wrong, and that he had proof that properties were paid off on one line-of-credit before being used to request funds from another line-of-credit. Fleming stated that after questioning KETNER regarding a particular line-of-credit, her oversight responsibility for that line-of-credit was subsequently taken away. Fleming questioned KETNER on different occasions regarding different lines-of-credit, and each time her oversight responsibility for the line-of-credit was subsequently taken away. Fleming stated that Shelly Payne and Tina Pline, both of whom worked in MCR's funding department, were also aware of irregularities with the "Purple Files". After Fleming questioned KETNER about the funding irregularities, Payne and Pline were directed not to give "Purple File" funding sheets to Fleming.

10. Fleming did not have conversations with any of the individuals who appeared as borrowers on the "Purple Files", and could not recall any specific names. Fleming did have a conversation with Martin regarding the situation, and when Fleming asked Martin what was going on, Martin appeared to be upset and replied, "You really do not want to know". Fleming believed Martin was "in a bad situation" (at MCR). Fleming stated other names may have appeared on the titles of "Purple File" properties, but they were really KETNER'S properties.

11. When asked why KETNER was doing this (with the "Purple Files"), Fleming responded, "it was obvious....he was floating money". Fleming believed KETNER was using the funds to pay bills, and pay for other various items.

<u>MCR-Atlanta and bounced checks:</u>

12. Fleming stated that MCR had a large loan operations center in Atlanta, GA, that handled a significant number of 2nd mortgage and debt-consolidation type loans. Fleming identified Kevin Bonds and Randy Bristol as individuals who held management positions at MCR-Atlanta. After she mentioned Bonds' name, Fleming recalled hearing that KETNER asked Bonds to become a title holder on one of the "Purple File" properties, but when Bonds learned that he would not actually own the property, he became upset and refused KETNER'S offer. Fleming stated that MCR-Atlanta's closing agent, Al Johnson, worked in MCR's executive suites in Santa Ana. Fleming described a closing agent's role as being that of an independent third-party who facilitates the distribution of loan funds, analogous to an escrow/title agent. Fleming recalled that Johnson's business operated under the names Johnson & Dooley and Johnson & Payne.

13. Fleming described the flow of loan funds relating to MCR-Atlanta's 2nd mortgage/loan consolidation loans as follows:

  - MCR requested loan funds from one of its warehouse lines-of-credit.
  - The funds were transferred to closing agent Johnson & Dooley / Johnson & Payne.
  - Fleming stated that the funds must have then been transferred from the closing agent to an MCR controlled bank account, since it was MCR who cut checks to the borrowers.

14. When asked why loan funds intended for borrowers were transferred from the closing agent to MCR, Fleming stated she did not know why this occurred, and that it actually negated the role of the closing agent as an independent third-party who distributed loan funds. Fleming stated that she heard rumors that KETNER had an ownership interest in Johnson & Payne (closing agent), and was under the impression that KETNER and Johnson were "pushing money" to each other.

15. Fleming became aware of problems involving MCR's Atlanta office towards the later part of her term of employment at MCR (could not recall specific time

U.S. Treasury Criminal Investigation

period).  Fleming stated that prior to the problems, MCR-Atlanta cut checks for borrowers, and sent them directly to the borrower (or designee), but that at some point KETNER directed that the checks be sent to him in Santa Ana. KETNER determined what happened with them after that.  This is when Fleming began receiving telephone calls from MCR borrowers stating that the checks they had received from MCR had bounced.  Fleming stated the callers were very upset, and she did not know what to tell them, so she contacted KETNER.  KETNER simply told her he was working on the problem, and he would handle it.  Fleming stated that shortly after her conversation with KETNER, legal assistant Terry Stone was hired to handle calls from borrowers whose loan checks had bounced.

16. In a conversation with Fleming, Randy Bristol stated KETNER directed him to fund a certain dollar amount of loans, and that it was Bristol's responsibility to meet KETNER'S demand, whether the loans were ready to be funded or not.

17. Fleming overheard telephone conversations between accounting employee Eliza Au, Val Benincosa, and KETNER, where Au and Benincosa informed KETNER that payroll needed to be funded, and they did not know where the funds were going to come from.  It is Fleming's presumption that the funds that were supposed to be going to borrowers were being used to fund MCR's payroll, along with other expenses.  Fleming assumed that KETNER was directing this action, since he directed the flow of money at MCR.

18. According to Fleming there became a point in time when Au and Benincosa would not transfer funds in MCR's accounts without a written request from KETNER.

Post-MCR associations with KETNER:

19. Fleming left MCR in approximately August 2000.  She worked as a consultant for Nationwide Residential Capital (NRC), a company that planned on acquiring some of MCR's assets, for approximately 30 days after leaving MCR.  Fleming stated that the deal between MCR and NRC was never completed.

20. Matt Heidari, an accountant who had previously worked for KETNER, contacted Fleming approximately 1 year after she left MCR, and informed her that MCR had filed for bankruptcy, and that KETNER had listed her as an MCR officer on the bankruptcy petition.  Fleming was surprised by this because she was not an officer of MCR.  Around the same period of time Fleming was contacted by the IRS regarding MCR's unpaid employment taxes.  Fleming informed them she was no longer an employee, and had no knowledge about the situation.  The IRS also contacted Fleming regarding HomeZipper.  Fleming stated that she was never an employee of HomeZipper, and was never on the company's payroll.  She stated she may have signed a document as an officer.  Fleming theorized that KETNER used her name on corporate documents and bankruptcy filings because she has a good reputation, and also to conceal his involvement.  Fleming believes that KETNER does not currently have assets in

his name because of possible civil judgments against him, and heard in the past that KETNER had hired a criminal attorney because he thought he·was going to jail.

21. Fleming's last contact with KETNER was approximately 6 months ago. KETNER attempted to contact her regarding business that New American Financial (NAF) was conducting with Home Loan Mortgage (her current employer). Fleming stated KETNER was not listed as an officer or owner of NAF, and must have been acting as a consultant for the mortgage broker located in Newport Beach, CA. Grant King was listed as the broker of record for NAF. Fleming ended up talking with Pam Stewart, a former MCR loan processing employee, who was also working for NAF. Stewart was also involved with the development of HomeZipper. Fleming usually spoke to Stewart when dealing with NAF. Fleming stated that Home Loan Mortgage funded a limited number of loans that were originated by NAF. Fleming did not believe that NAF had access to warehouse lines-of-credit. Fleming became aware that NAF lost its FHA approval, and made sure that Home Loan Mortgage terminated its business relationship with NAF.

22. Fleming stated that KETNER and Stewart have created another mortgage brokerage named Segway Financial. Stewart is the owner of record for Segway Financial. Fleming does not know any further details about the company, and stated that Home Loan Mortgage does not do business·with Segway Financial.

23. Fleming stated that while she was employed at MCR, KETNER and Stewart were "traveling companions", and believed in they had an intimate involved, despite their efforts to conceal the relationship. Fleming mentioned that KETNER and Stewart shared apartments in Atlanta and Newport Beach.

24. Fleming stated that Stewart was on MCR's payroll, and when asked if this was her only source of income, Fleming responded that she did not know. Fleming did mention that she thought KETNER purchased Stewart a 2 karat diamond ring. She also mentioned that Stewart recently purchased a $1 million dollar home in Laguna Niguel. Fleming thought this was unusual for a loan processor to be able to afford a million dollar home. Fleming stated that KETNER may have been somehow involved with the down payment or purchase of Stewart's Laguna Niguel home.

Miscellaneous Info.:

25. Fleming was deposed in October 2003 by MCR's bankruptcy trustee. She stated that during the deposition she was asked to identify numerous loan reconveyance documents, relating to "Purple File" properties, that she signed while employed at MCR. Fleming acknowledged that she signed the documents, explained that she would have signed these documents during the normal course of operations, and at the time probably didn't even look to see the addresses of the properties, or the names listed as the owners. When reviewing the documents at the deposition, Fleming did become aware that the names of individuals listed as owners were all friends or associates of KETNER.

26. Fleming was also contacted by an attorney for Household Bank. She could not remember the attorney's name, and was never interviewed or deposed.

27. Fleming thought she had a copy of an e-mail that was sent to her by KETNER, in which he stated he was sorry for putting her in such a bad situation (regarding MCR and related matters). Fleming was going to look for the e-mail and send a copy to S/A Helfand.

28. Fleming heard that KETNER filed for personal bankruptcy, but does not know any details about the situation.

I completed this memorandum on 06/25/2004, after refreshing my memory from notes made during and immediately after the interview with Beverly Fleming.

Eric J. Helfand
Special Agent

This memorandum contains a summary of pertinent information obtained from Beverly Fleming.

Emanuel Gonzalez
Special Agent

U.S. Treasury Criminal Investigation

APR-13-2007  10:23                                                              P.23

FD-302 (Rev. 10-6-05)

-1-

FEDERAL BUREAU OF INVESTIGATION

Date of transcription   03/22/2005

       Terry Lee Stone, date of birth ▓▓▓▓▓ 1948, Social
Security Number ▓▓▓▓▓▓▓▓ who resides at 19 Siera, San Anselmo,
CA, mailing address ▓▓▓▓▓, Corte Madera, CA 94976, cellular
telephone number ▓▓▓▓▓▓ work telephone number ▓▓▓▓▓
was interviewed in the office of the United States Attorney, Santa
Ana, CA. Also present was FBI Special Agent William Bondurant and
Assistant United States Attorney Andrew Stolper. Stone was advised
of the identity of the interviewing agent and the purpose of the
interview. He then voluntarily provided the following information:

       In 1999, Stone was working as a paralegal for a personal
injury attorney. On or about March 22, 1999, Stone met Ken Ketner
at Arches restaurant in Newport Beach, CA. Stone and Ketner
engaged in conversation, and by the end of the evening Ketner told
Stone he could offer Stone a better paying paralegal job at his
mortgage company. Stone expressed interest in the offer, and
provided Ketner with contact information.

       A few weeks later Stone was telephonically contacted by
an attorney named Allen Johnson. Stone was interviewed and hired
by Johnson to work as Johnson's paralegal. Johnson had an office
at Ketner's mortgage company, Mortgage Capital Resources (MCR),
located next to Ketner's office. Ketner occupied the corner
office, and was in total control of MCR. Johnson was acting as
legal in-house counsel for MCR. Stone never worked on anything
suggesting that Johnson was Ketner's personal attorney. As part of
his paralegal duties, Stone was never advised, nor did he perform
any duties, having to do with Ketner's personal legal issues.

       Initially, Stone was tasked with representing MCR in
small claims court. Periodically, borrowers would fail to make
initial loan payments to MCR. This was usually due to confusion on
the borrowers' behalf. Sometimes borrowers were required to make
initial payments directly to MCR until the loan was sold to or
funded by another lending institution. This sometimes resulted in
confusion, and payments not being made. Stone would then initiate
a small claims action. Usually this resulted in the borrower
becoming aware of the misunderstanding and the issue would be
resolved.

---

Investigation on   02/18/2005   at  Santa Ana, CA

File #  29B-LA-224315                          Date dictated   03/21/2005

   SA Paul L. Bonin
by  SA William M. Bondurant/mab

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.


EXHIBIT E

FD-302a (Rev. 10-6-95)


29B-LA-224315
TERRY LEE STONE                                    02/18/2005

Continuation of FD-302 of _____ , On _____ , Page ___2___


    A short time later, Stone was summoned to a meeting with Ketner and his (Ketner's) assistant, Roberta Martin. It was explained to Stone at this meeting that MCR was experiencing some significant problems and it was Stone's new responsibility to deal with issues regarding these problems. Checks drawn on loan funds issued to borrowers were bouncing. Borrowers were calling MCR and demanding explanations. Stone was told he was now to be the point of contact for these customers, to track complaints, and to devote all of his time dealing with the issue. Within one day of receiving these duties, Stone received over 200 complaint calls. Stone passed this information on to Ketner, but dealt mostly with Roberta Martin.

    Stone's understanding of the loan funding process suggested that no legitimate reason existed wherein funded loan proceeds would not be available for their intended specified loan.

    Stone prepared a spread sheet depicting details of customer complaints and bounced checks. Stone then took note of new funds available to MCR, and after consulting with Martin, made recommendations on the disbursements of these new funds to cover previous loans. Stone does not know if Martin obtained input from Ketner, or anyone else regarding these disbursements, but assumed Ketner was making the decisions since Martin was his assistant. At some point Ketner told Stone that his (Stone's) primary duty was to deal with customer complaints and satisfy previously made loans with funds intended for new loans. This was Stone's full time job from the meeting until MCR closed.

    One day Stone went to Martin with his updated spreadsheet and suggestions on which borrower should receive funds, but Martin told Stone that it could no longer continue. Stone then met with Ketner who said MCR was going to declare bankruptcy. Ketner told Stone to find a small office somewhere from which the bankruptcy proceedings could be conducted. Later, Ketner told Stone to file Chapter 11 on behalf of MCR.

    Stone maintained contact with Ketner after the Bankruptcy filing. Ketner told Stone to list one of the MCR vehicles, a Mercedes, at a substantially reduced value on the bankruptcy schedule. Stone believed the Mercedes was valued at approximately $36,000, but Ketner told Stone to list the value at $6,000. Ketner explained his purpose for undervaluing the asset was to allow a friend to purchase the car at the reduced value. Stone refused to comply with Ketner's fraudulent request.

FD-302a (Rev. 10-6-95)


29B-LA-224315
TERRY LEE STONE                                           02/18/2005

Continuation of FD-302 of _____ , On _____ , Page ___3___


     Along with payments for numerous Mercedes owned or leased
by MCR, Stone was aware of other questionable expenses paid by MCR.
Ketner was known to be intimately involved with another MCR
employee, Pam Stewart.  Ketner was married, and Stewart may have
been.  An apartment in Newport Beach was leased by MCR for what was
supposedly storage purposes.  This apartment actually served as a
"love shack" utilized by Stewart and Ketner.  Stewart worked at
MCR, but Stone never understood her exact role at the company.

     After MCR declared bankruptcy, Ketner and Stewart went to
work for another mortgage company called New American.  Stone
visited Ketner at New American to inquire about a job, but nothing
ever came of it.

     Stone met Cheryl Ketner on one or two occasions, but she
never worked at MCR.

     Stone was paid about $30,000 a year for his duties
described earlier.  He was paid by MCR, despite supposedly working
for Johnson.

     Stone heard mention of purple file properties, but never
understood issues relating to them.

     MCR maintained a large office in Atlanta.  During his
bankruptcy work, Stone could not locate any one at the Atlanta
office to obtain a list of assets and liabilities.

03/27/2001

TERRY STONE, DOB ████████1948, SSN █████████████, ████ was
████████ Costa Mesa, California, ████████████████ was
interviewed at the office of MORTGAGE CAPITAL RESOURCES (MCR),
3001 Red Hill Avenue, 1-204, Costa Mesa, California, (714) 513-
1219.  STONE was previously aware of the identity of the
interviewing agent and provided the following information.

STONE was hired by MCR on 05/03/1999 as a paralegal.
He was interviewed by ALAN JOHNSON, an attorney who worked with
MCR.  STONE did not have any prior experience in the mortgage
banking business.  His main focus at MCR was small claims
actions.  STONE'S supervisor was ROBERTA MARTIN.

Around May 2000, KENNETH KETNER asked STONE to field
phone calls from borrowers whose funds had not cleared.  STONE
received many phone calls from irate borrowers who desperately
needed their loan money.  Between May and July, borrowers' checks
were slowly being replaced, but after July, MCR ran out of money
to fund the borrowers' replacement checks.  STONE does not know
why borrowers' checks were bouncing and is not familiar with the
flow of money at MCR.  At this point MCR fell apart; and in early
September, KETNER asked STONE to set up MCR'S present office at
3001 Red Hill.

KETNER resigned and sold his stock in MCR to PL MILLER
on 01/03/2000, but stayed on as a consultant.

STONE provided a corporate history on MCR, which is
attached to this document.

03/26/2001        Costa Mesa, California

29B-LA-224315

SA John Connell

HPK-13-2007  10:20                                                          P.08

03/27/2001

ROGER LUBY, DOB ███████████ SSN ████████████
████████████, Corona Del Mar, California, was interviewed at The Arches Restaurant in Newport Beach, California. After being advised of the identity of the interviewing agent and the purpose of the interview, he provided the following information.

LUBY got involved with CFC Corporation in 1995 or 1996 to raise funds for the company. He helped form MORTGAGE CAPITAL RESOURCE CORPORATION (MCR) by purchasing the assets of Mortgage Bankers Acceptance Corporation, after CFC went bankrupt. LUBY owned 25% of MCR and KENNETH KETNER owned 60%. In September 2000, LUBY resigned as President of MCR, MORTGAGE CAPITAL HOLDINGS (MCH) and MIOBI INVESTMENTS. KETNER was LUBY'S predecessor in MCH and MIOBI. LUBY does not have any records or documents related to these companies.

LUBY advised that PL MILLER stands for the name of his wife, PAM MILLER. PL MILLER never had any bank accounts, employees or office space. The sale of MCR stock to LUBY'S company, PL MILLER, never took place.

GARY TIMMERMAN of LaSalle Bank, who used to be with PNC Bank, is a good friend of KETNER'S.

LUBY stated that he and his wife purchased and sold several properties through KETNER as investments for tax write-offs. LUBY acknowledged he purchased 14191 Green Vista Drive in Fontana, 29810 Via Viento in Menifee, and 811 W Avenue #J11 in Lancaster, and his wife purchased 2603 Cold Creek Avenue in Rosamond and 2717 Cold Creek Avenue in Rosamond.

03/16/2001       Newport Beach, CA

29B-LA-224315

SA John Connell

61

APR-13-2007  10:20                                                          P.11

FD-302 (Rev. 10-6-95)

-1-

FEDERAL BUREAU OF INVESTIGATION

Date of transcription   06/18/2004

    Roger Luby, date of birth ███████████ who resides a██████████, Corona Del Mar, CA, SSN █████████, cellular telephone number ███████████ was interviewed at COCO's restaurant in Newport Beach, CA.  Luby was advised of the identity of the interviewing agent and the purpose of the interview.  He then voluntarily provided the following information:

    In approximately 1998 or 1999, Ken Ketner approached Luby about certain properties financed by Mortgage Capital Resources (MCR).  Ketner explained that the properties were sold, but the loan could not be sold by MCR because they were "improperly packaged."  This implied that a problem with the loan package existed making it impossible to sell.  Examples include missing documents, incomplete files, or possible fraudulent information.  Ketner asked Luby to be a straw buyer for several of these properties to clean up the paper work, making it more attractive to a bank or investor.  Luby had nothing to do with the property to include receiving rent payment, paying the monthly mortgage, or future sale.  Luby's wife also acted as a straw buyer on several properties at Ketner's request.  Luby complied with Ketner's request, despite understanding the illegal nature of the action, because he thought of Ketner as a friend.

    Paul Olivera is a long time associate of both Ketner and Luby.  Olivera used to be a bookie, but does not do that anymore.  Olivera was Ketner's bookie.  Olivera lives part time in Newport Beach, and part time in the Riverside area.  He frequents the Ritz restaurant every Thursday for lunch.

    Luby had, and still has, tax problems dating back to 1977.  Because of these problems, Luby asked Ketner to help him purchase a house in Newport Beach in 1991.  Luby asked Ketner to act as his straw buyer to keep the IRS from knowing about the purchase.  The house was about $350,000, and Luby put between $10,000 and $20,000 down.  The money was Luby's, the payments were made by Luby, and when the house was sold proceeds went to Luby.  On paper it appeared that Ketner was performing all of these functions.  Luby took the appropriate tax adjustment for owning the property despite it being in Ketner's name.

    Luby described Ketner as a Napoleonic character and a control freak.  He often bragged about his sexual exploits,

---

Investigation on   6/18/2004   at Newport Beach, Ca

File #  29B-LA-224315                          Date dictated  6/18/2004

by   SA Paul L. Bonin/plb

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

APR-13-2007  10:21                                                          P.12

FD-302a (Rev. 10-6-95)


29B-LA-224315


Continuation of FD-302 of ___Roger Luby_____ , On _6/18/2004_ , Page __2__

including his affair with Pam Stewart.  Ketner ran the entire
operation at MCR.  Others with knowledge of what was going on at
MCR would be Pam Stewart, Roberta Martin and Beverly Flemming.

        Ketner lives in a house in Newport Beach that is in the
name of Paul Olivera.  Ketner frequents Billies At The Beach three
or four times a week in the afternoon.

        Luby agreed to cooperate with the FBI regarding this
investigation.