Terry W. Bird - State Bar No. 49038
  twb@birdmarella.com
Jason D. Kogan - State Bar No. 107707
  jdk@birdmarella.com
John M. McCoy III - State Bar No. 166244
  jmm@birdmarella.com
BIRD, MARELLA, BOXER, WOLPERT,
  NESSIM, DROOKS & LINCENBERG, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California  90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

Attorneys for Defendant Kenneth Ketner

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. SA CR-05-36JVS |
| Plaintiff, | **SENTENCING MEMORANDUM OF DEFENDANT KEN KETNER** |
| vs. | Date:          July 2, 2007 |
| KENNETH KETNER, | Trial Date:    May 30, 2006 |
| Defendant. | |

# **TABLE OF CONTENTS**

**Page**

I      INTRODUCTION .................................................................................... 1

II     BACKGROUND ..................................................................................... 6

    A.     Mr. Ketner's Background and The Significant Deficits That
        Have Contributed To His Poor Judgment. ...................................... 6

    B.     The Offense Conduct ...................................................................... 9

    C.     Other Conduct ............................................................................... 12

    D.     Mr. Ketner's Current Circumstances ........................................... 14

    E.     Mr. Ketner's Service To The Community, Friends, And Family ......... 16

    F.     Character Letters. .......................................................................... 16

    G.     Mr. Ketner's Substantial Mitigation And Cooperation Efforts
        Since MCR's Collapse. ................................................................. 17

III    SENTENCING ANALYSIS .................................................................. 18

    A.     Sentencing Guidelines Calculation Per The Plea Agreement.............. 19

    B.     The PSR Ignores The Plea Agreement, Misconstrues The Facts,
        And Misapplies The Law. .............................................................. 21

        1.     Contrary to the Government's Stipulation, the PSR
            Improperly Applies a Four-Level Increase Under
            2F1.1(b)(7)(B) (Offense Affecting Financial Institution
            And Defendant Individually Received $1 Million) .................... 22

        2.     Contrary to the Government's Stipulation, the PSR
            Improperly Applies a Four-Level Increase Under
            § 3B1.1(a) (Organizer/Leader). .................................................. 24

        3.     The PSR's Calculation Of The Amount Of Loss Is
            Without Sufficient Basis, Is Contrary To Government's
            Position, And Is Wrong. .............................................................. 26

        4.     Contrary to the Government's Stipulation, the PSR
            Improperly Applies a Two-Level Increase Under § 3B1.3
            (Abuse of Trust). ....................................................................... 26

IV     CONCLUSION ..................................................................................... 29

SENTENCING MEMORANDUM OF DEFENDANT KEN KETNER

# **TABLE OF AUTHORITIES**

**Page**

## **Federal Cases**

*Bockting v. Bayer*,
  399 F.3d 1010 (2005) ................................................................. 22

*Crawford v. Washington*,
  541 U.S. 36 (2004) ...................................................................... 22

*Lilly v. Virginia*,
  527 U.S. 116 (1999) .................................................................... 22

*United States v. Andrews*,
  447 F.3d 806 (10th Cir. 2006) .................................................. 19

*United States v. Booker*,
  543 U.S. 220 (2005) .......................................................... 18, 19

*United States v. Bortnick*,
  2006 WL 680544 (E.D. Pa. 2006) ........................................... 23

*United States v. Broderson*,
  67 F.3d 452 (2d Cir. 1995) ....................................................... 28

*United States v. Castellano*,
  349 F.3d 483 (7th Cir. 2003) .................................................... 23

*United States v. Colton*,
  231 F.3d 890 (4th Cir. 2000) .................................................... 23

*United States v. Gonzalez-Huerta*,
  403 F.3d 727 (10th Cir. 2005) .................................................. 18

*United States v. Huckins*,
  53 F.3d 276 (9th Cir. 1995) ............................................... 21, 22

*United States v. Lopez-Flores*,
  444 F.3d 1218 (10th Cir. 2006) ................................................ 19

*United States v. Mares*,
  402 F.3d 511 (5th Cir. 2005) .................................................... 18

*United States v. Millar*,
  79 F.3d 338 (2d Cir. 1996) ....................................................... 23

*United States v. Thorn*,
  317 F.3d 107 (2d Cir. 2003) ..................................................... 28

*United States v. Trujillo-Terrazas*,
  405 F.3d 814 (10th Cir. 2005) .................................................. 19

ii
SENTENCING MEMORANDUM OF DEFENDANT KEN KETNER

1

## **Federal Statutes**

2  18 U.S.C. § 1343 .................................................................................... 1

3  18 U.S.C. § 1957 .................................................................................... 1

4  18 U.S.C. § 3553 ............................................................................. 5, 19

5  U.S.S.G. § 2F1.1 ...................................................................... 19, 23, 24

6  U.S.S.G. § 3B1.1 ................................................................................ 19

7  U.S.S.G. § 3B1.3 ................................................................................ 26

8  U.S.S.G. § 3D1.4 ................................................................................ 20

9  U.S.S.G. § 5H1.3 .................................................................................. 5

10  U.S.S.G. § 5H1.4 .................................................................................. 5

11  U.S.S.G. § 5H1.5 .................................................................................. 5

12  U.S.S.G. § 5H1.7 .................................................................................. 5

13  U.S.S.G. § 5H1.11 ................................................................................ 5

14  U.S.S.G. § 5H1.12 ................................................................................ 5

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I

# INTRODUCTION

Defendant Ken Ketner comes before this Court having pled guilty to one count of wire fraud in violation of 18 U.S.C. § 1343 and a related count of money laundering in violation of 18 U.S.C. § 1957. These convictions stem from Mr. Ketner's involvement in fraudulent mortgage lending practices during the year 2000.

Mr. Ketner acknowledges that he has committed serious crimes. He has admitted this and he recognizes that he should and will be punished for what he has done. By raising the issues discussed in this memorandum and by attempting to place his offense conduct in proper context, Mr. Ketner in no way intends to evade responsibility for what her did or to minimize the seriousness of his offenses. He signed the plea agreement and admitted his guilt in open court because he is in fact guilty. Mr. Ketner does not expect to, and certainly is not attempting to, avoid the consequences of his actions.

Mr. Ketner's plea had a transformative impact on his life. Faced with the reality of his past actions, Mr. Ketner has come to grips with more than his incarceration. The self-reflection necessitated by his plea has required him to proactively deal with his alcoholism, parental abandonment, mental and cognitive disabilities, as well as his bad acts. He now spends much of his considerable energies on both self-rehabilitation and community service. While he has always served as a supportive father figure for his children, now he is honest with them about his mistakes and criminal behavior. None of this transformation is offered to excuse prior bad acts. It is addressed, however, to provide a perspective which is required by the law, ignored by the government, and inadequately explored in the Pre-Sentence Report ("PSR"). Most importantly, these perspectives provide the Court with confidence that the Defendant's sentence can effect positive rehabilitation and not just serve society's need for vengeance or conformity.

1      It is respectfully suggested that in addition to Mr. Ketner's acknowledgement

2  of wrongdoing there are six other factors that should weigh heavily on the Court's

3  sentencing decision.

4      First, the Court's sentencing determination should be guided by the

5  conclusions and factual stipulations reflected in the July 15, 2006, Plea Agreement,

6  which the Government reached after investigating and litigating this case for well

7  over five years.  This has been a complicated case, with multiple parties engaged in

8  a number of types of misconduct.  Over the course of five years, the government

9  investigated the case, interviewed scores of witnesses, and reviewed thousands of

10  documents.  Notwithstanding the length and size of this investigation, the

11  government has admitted that it still left significant portions of the original record

12  unreviewed.[1]  After all of this investigation, the government came to certain

13  conclusions relative to Mr. Ketner, conclusions that differ significantly from the

14  PSR.  For example, the government concluded that others in MCR participated in

15  misconduct and that Mr. Ketner does *not* deserve a four-level "organizer/leader"

16  adjustment.  Given the complexities of this case and the intensity at which it was

17  litigated, the conclusions agreed upon and memorialized in the Plea Agreement

18  should carry great weight.  Indeed, if not for the factual and legal conclusions

19  embodied in the plea agreement, this case could not have been resolved short of a

20  lengthy, time consuming trial.

21      Second, the instant plea and sentencing is the direct result of Mr. Ketner's

22  confronting psychological and physical impairments with which he has lived

23  throughout his life.  These impairments are rooted in childhood diseases, physical

---

[1]  The government admitted to this Court that it had not reviewed some 300 boxes of original MCR documents reflecting the transactions at issue in this case.  The government also admitted the importance of these documents.  Specific examples of what was found in these documents are discussed below and in the Laffer Report.

1  handicaps, abandonment by each of his parents, fluctuating mood disturbances, and

2  mental disorders.  The impact of these challenges has manifested itself in self-

3  destructive conduct including alcoholism, which in turn led to organic impairment to

4  Mr. Ketner's short-term memory and attention to detail.  These serious and

5  observable conditions are now professionally diagnosed and discussed below and in

6  the attached reports.

7      The government has given *no* consideration to these conditions and

8  apparently has chosen to wholly discount or purposely ignore their existence and

9  impact on Mr. Ketner.  This is understandable given the government's consistently

10  cynical and dismissive view of Mr. Ketner.  While the Probation Office has

11  acknowledged and reported some of these conditions, it has expended a wholly

12  inadequate amount of effort in assessing the connection between these conditions

13  and Mr. Ketner's actions and efforts towards rehabilitation.

14      Third, the Court should give little weight to the untested and unsupported

15  "facts" set forth in the PSR and in the government's position in asking the Court for

16  the high end of the plea agreement.  Just as the facts should not be unfairly

17  construed to minimize Mr. Ketner's culpability, neither should they be unfairly

18  construed to overstate it.  The Court's determination of the appropriate sentence in

19  Mr. Ketner's case should take into account certain demonstrable and

20  incontrovertible facts that illuminate exactly what happened here.  These

21  demonstrable facts are set out below and in the report and exhibits prepared by

22  Martin G. Laffer, which is attached hereto as Exhibit A.[2]

23      Fourth, Mr. Ketner has demonstrated his contrition through extraordinary

24  efforts to make amends for his wrongdoing.  In the course of trial preparation, Mr.

25  Ketner uncovered significant evidence of ongoing criminal conduct in other,

26

27  [2]  All references to the Laffer Report Exhibits are noted as "Laffer Exhibit(s)."

28

1   unrelated matters involving persons who would have been called to testify against

2   him.  Mr. Ketner produced that information to the FBI, which confirmed that the

3   information is of value.  Other evidence of ongoing criminal activity by persons

4   unrelated to Mr. Ketner's case has also been produced to the government.  While

5   there is no § 5K agreement in this matter, Mr. Ketner has produced this information

6   to demonstrate his intention to fully cooperate with law enforcement and to

7   demonstrate his intention to properly put this conduct behind him.

8        Fifth, as acknowledged by the government, Mr. Ketner has now fully

9   complied with his plea-agreement obligations concerning taxes.  In fact, Mr. Ketner

10  has never acted in bad faith as to this obligation.  His filing was late, however, he

11  subsequently expended extraordinary efforts to assure the Court and the government

12  that he would do even more than was required of him as to the payment of taxes.

13  He did this notwithstanding the initial good faith advice of his tax consultants who

14  recommended to him that once his filings were made, payment of the precise

15  amount of taxes due and owing could and would have to be negotiated with the IRS.

16  Moreover, rather than litigate over the ambiguous and poorly drafted language in the

17  plea agreement related to the tax issue, Mr. Ketner elected to borrow significantly in

18  order to avoid extended and distracting litigation with the government as to the

19  original intent of the provisions dictated by the government.  That language was

20  negotiated in the context of Mr. Ketner's personal taxes and was never understood

21  by his counsel or Mr. Ketner to include contested liability for the corporate taxes

22  referred to in the government's brief.  Thus, in order to demonstrate his good faith

23  and willingness to go beyond his obligations, Mr. Ketner not only has incurred

24  significant debt, he also has prepaid taxes for liability which is demonstrably not his.

25  The government has acknowledged that there has been no breach.  Predictably,

26  however, it has erroneously sought to discount and distort Mr. Ketner's actions and

27  intentions.

28

1    Sixth, the Government's sentencing memorandum makes sweeping

2 accusations regarding conduct outside the scope of MCR ranging from the early

3 1980s until literally just a few weeks ago.  The common denominator of all of these

4 allegations is that they are just that – untested allegations.  While the Court may fix

5 a sentence within the guidelines range based on any available evidence, it is unfair

6 for the Government to simply throw mud against the wall in the hopes that some

7 will stick.  And that is exactly what is happening here.  As shown below, many of

8 the Government's assertions are, firstly, based on nothing more than an unverified

9 statement of an individual, often an individual with significant exposure and, thus,

10 an ax to grind.  Secondly, as also shown below, many of the assertions are simply

11 and demonstrably wrong.

12    Even under the Guidelines, fixing a sentence within a range is supposed to

13 take into account all aspects of the offense conduct and of the defendant himself.

14 *See* U.S.S.G. Ch.5, Pt.H, intro. comment.  Among others, these include factors such

15 as mental and emotional conditions, *see* U.S.S.G. § 5H1.3, substance abuse, *see id.,*

16 § 5H1.4, employment history, *see id.,* § 5H1.5, role in the offense, *see id.,* § 5H1.7,

17 record of good works, *see id.,* § 5H1.11, and evidence of a disadvantaged

18 upbringing, *see id.,* § 5H1.12.  Moreover, now that the Guidelines are advisory, the

19 factors from 18 U.S.C. § 3553 are especially relevant.  Specifically, § 3553(a)(1)

20 *mandates* consideration of "the history and characteristics of the defendant."

21    Despite these statutory and Guidelines mandates, the Government makes no

22 effort at all to take into account the undisputed facts regarding Mr. Ketner's

23 upbringing, background, current mental condition, or good works, including Mr.

24 Ketner's efforts to assist law enforcement.  Even the Probation Office changed its

25 recommendation based on these considerations.  The Government, on the other

26 hand, ignores them entirely, choosing instead to spend the hundreds of pages in its

27 sentencing memorandum and attachments repeating accusations that it never even

28 bothered to investigate.  Nowhere in those hundreds of pages does the government

1  even mention Mr. Ketner's upbringing, his diagnosed neuropsychological

2  impairments, his substance abuse, his good deeds in the community, or his efforts to

3  provide information to law enforcement.

4         As will be shown below, outside of the offense conduct, much of what is in

5  the Government's memorandum can be easily shown to be wrong.  And even much

6  of the Government's assertions regarding the offense conduct itself is wrong too.

7  But what is not in the memorandum is also very informative.  The Government's

8  complete failure to address the factors that guide sentencing within the range speaks

9  loudly about the extent to which the Government's memorandum is even intended to

10  present a full and fair portrayal of Mr. Ketner for sentencing purposes.  The Court

11  should bear this in mind when it considers that memorandum's advice.

## II

## BACKGROUND

**A.    Mr. Ketner's Background and The Significant Deficits That Have**
**        Contributed To His Poor Judgment.**

16         An exhaustive report prepared by Dr. Sheila Balkan provided a critical

17  overview of Mr. Ketner's background, the extraordinary challenges he has faced,

18  and how they relate to the offense conduct.  This report also summarizes the results

19  of several others who have evaluated or treated Mr. Ketner, including psychologists,

20  psychiatrists, addiction specialists, and others[3].  We will not repeat all of the Balkan

---

[3]     The professionals who have recently evaluated or treated Mr. Ketner include
Richard Romanoff, Ph.D., who is frequently appointed to do psychological
assessments for the District Court; Annette L. Ermshar, Ph.D., who does evaluations
for the San Bernardino County Superior Court system; Joseph S. Haraszti, M.D., an
assistant professor at the USC School of Medicine; Jerry Brown, Ph.D., a
psychologist who is former Deputy Probation Officer; and Robert W. Timmons, an
addiction specialist.

Report's analyses and conclusions here, however, certain conclusions are worth addressing.[4]

- When he was about six years old, Mr. Ketner contracted Legg-Calve Perthes disease, a degenerative disease of the joints that left him in a wheelchair and unable to walk.

- Mr. Ketner's parents separated before he was a year old and he was initially raised by his mother. When Mr. Ketner was eight years old, his mother simply left him in his wheelchair in a hotel room in south Los Angeles, whereupon Mr. Ketner went to live with his father and stepmother. But Mr. Ketner's father's alcohol abuse led to his abandoning Mr. Ketner about three years later when Mr. Ketner was eleven.

- Despite these challenges, Mr. Ketner taught himself to walk again and managed to get along in school until about the eighth grade. At that point, Mr. Ketner's stepmother moved from Covina to Alta Loma and Mr. Ketner had trouble fitting in with his new classmates. It was about this time that he started abusing alcohol. This abuse continued for the next 40-odd years.

- As the Balkan report summarizes and as the reports of the other doctors specify, Mr. Ketner suffers from several organic neurophysiological impairments. In addition to depression and severe ADHD, he suffers from cyclothymia, which is characterized by severe, chronic fluctuating mood disturbances similar to bi-polar disorder. It is common for sufferers of cyclothymia to engage in substance abuse as an effort to

---

[4]   A complete copy of the Balkan Report, which includes reports by the other specialists, is attached as Exhibit B.

self-medicate.[5]

- It is the opinion of the various doctors and specialists who have diagnosed and treated Mr. Ketner that, first, Mr. Ketner's impairments result from his traumatic childhood. For example, Dr. Richard Romanoff states "I believe that Mr. Ketner's core psychological difficulties . . . is most likely the result of his exposure to an unusually traumatic childhood." Second, these experts conclude that Mr. Ketner's substance abuse is both a result of as well as an aggravating factor of his impairments. Finally, these experts conclude that Mr. Ketner's impairments, along with his substance abuse, contributed to his bad judgment in relation to the facts at issue here. For example, Dr. Romanoff states: "I believe that the combination of difficulties noted above directly contributed to significantly and seriously undermining his competency to handle many of the complexities associated with his business." And Dr. Annette L. Ermshar concludes that as a result of his organic impairments, "one can expect [Mr. Ketner] to exhibit poor reasoning, impulsive behaviors, emotional lability [i.e., instability], and impaired problem solving skills."

Again, it must be made completely clear that Mr. Ketner does not claim that his difficult upbringing and current conditions excuse his conduct. On the contrary, Mr. Ketner has admitted his guilt and recognizes his culpability for his actions. However, as he stands before the Court to be sentenced, the Court deserves to know the influences that affected Mr. Ketner and the influences that, while not excusing his conduct, indisputably played a role in it.

---

[5] Mr. Ketner is currently under the care of a psychiatrist, Dr. Joseph S. Haraszti, who has prescribed several medications to treat Mr. Ketner's cyclothymia.

**B.      The Offense Conduct**

Mr. Ketner has acknowledged his wrongdoing by pleading guilty to counts Nine and Sixteen of the indictment.  As stated in the indictment, between May and August 2000, Mr. Ketner participated with others at MCR – including co-defendant Allen Johnson – in a scheme to divert loan proceeds intended for specific residential loans to fund other obligations.  Plea Agreement pages 6-15; Indictment ¶ 33.  In effect, the defendants engaged in a misguided Ponzi scheme designed to keep MCR afloat during this three-month period.  Again, Mr. Ketner acknowledges and does not shirk from admitting the life-altering error in judgment that led him to voluntarily participate in this misconduct.

In order to place Mr. Ketner's conduct in proper context, the Court is respectfully directed to the Laffer Report.  In that report, Mr. Laffer summarizes the evidence establishing that Mr. Ketner's activities in relation to the warehouse lenders was different from a typical scenario.  Specifically, Mr. Laffer discusses the evidence showing that certain people within the warehouse lenders were aware of much of what Mr. Ketner and others at MCR were doing.  For example, employees at Household Bank were given documents showing that MCR was disbursing mortgage checks to borrowers.  While it may be true that certain higher level management at the bank were unaware of this, it is just as true that Mr. Ketner dealt with vice-presidents and other people at the bank who emphatically knew about it.[6] Obviously, this fact is important in order to understand the context in which Mr. Ketner acted.  The Laffer Report at pages 228-29 outlines the evidence establishing that the warehouse lenders knew that MCR controlled the disbursement of the

_____

[6]   Household is currently in litigation with its insurance carrier over the extent of Household employees' shared responsibility for the losses at issue here.  Accordingly, Household has a clear interest in "spinning" certain facts, such as whether any of its employees knew about what Mr. Ketner was doing.

1 | warehouse funds directly, and learned that MCR checks written to borrowers were
2 | returned NSF.

3 | As more fully discussed in the Laffer Report, Mr. Ketner was not in charge of
4 | MCR's day-to-day operations and cash flow in the period leading up to the offense
5 | conduct. Rather, Mr. Ketner had focused his energies and attention – which were
6 | limited by his documented cognitive deficiencies and alcoholism – to the launching
7 | of a new venture, known as "Home FN" or "Home ZipR." By early 2000, Mr.
8 | Ketner was not even a corporate officer of MCR.

9 | Unbeknownst to Mr. Ketner, other individuals affiliated with MCR –
10 | primarily Val Benicosa and Randy Bristol began diverting funds intended for MCR
11 | loan accounts to their personal and corporate uses. Mr. Ketner eventually learned of
12 | the devastating problems occasioned by these unauthorized diversions of funds, he
13 | devoted himself to attempting to salvage MCR's ability and enabling it to meet its
14 | financial obligations. He infused substantial personal funds *into* MCR and also
15 | signed a personal guarantee of MCR's obligations to Household.

16 | However, Mr. Ketner made a critical – and unlawful – error of judgment. In
17 | order to meet MCR's funding obligations to the warehouse lender, he authorized the
18 | use of loan proceeds on newer loans to pay off the obligations on older loans. In so
19 | doing, he hoped to keep MCR operating, and its obligations satisfied, until a
20 | financial recovery could be achieved. This misapplication of funds was illegal,
21 | which is why Mr. Ketner has pleaded guilty and agrees that he should be punished.

22 | But as discussed more fully elsewhere, it would be manifestly unfair to base
23 | Mr. Ketner's sentence on other – unproven and inaccurate – factual allegations not
24 | supported by the plea (or any reliable evidence).

25 | Notably, however, the bulk of the government's memorandum and the PSR
26 | have nothing to do with this misconduct. Instead, they postulate various *other*
27 | alleged misconduct, none of which is supported by substantial evidence – and
28 | indeed is *refuted* by the only reliable evidence.

1    For example, the government discusses at length a so-called "straw buyer
2    scheme" involving what have been referred to as the "purple loan files."  But the
3    government's distorted characterization of the purported "straw buyer" transactions
4    is contrary to the evidence.  As established conclusively in the exhaustive expert
5    analysis of CPA Martin Laffer and the evidence summarized therein, there simply
6    were no "straw buyers."[7]

7    The "purple file" transactions were short-term sales of residential real estate
8    purchased and resold by employees and affiliates of MCR.  While such transactions
9    can be aggressive and financially risky, they involved no "straw buyers" and no
10    fraud.  Each such transaction involved a real purchaser, and most critically the
11    nature of the transactions was disclosed to and sanctioned by the lender.  Laffer
12    Report at 28-29.  Indeed the Laffer report discusses contemporaneous faxes sent to
13    the lenders expressly describing these transactions as "corporate flips" for "KK,"
14    namely Ken Ketner.

15    As noted above, the government also suggests that Mr. Ketner participated in
16    a "straw buyer scheme" to "defraud" MCR's warehouse lenders.  But the evidence
17    clearly shows that there *were* no straw buyers, and that the transactions in question
18    were accurately described to the lenders.

19    Finally, the government greatly exaggerates Mr. Ketner's role in the wrongful
20    conduct at MCR while minimizing the roles of others.  This is not surprising given
21    that the government has relied almost entirely on unsworn, self-serving hearsay
22    statements from other participants who already had a strong incentive to minimize
23    their own responsibility.

[7]  Indeed, the Probation Office has now conceded that the "purple file" transactions
are more accurately described as "non-arms-length" rather than fraudulent, and that
the nature of the transactions was disclosed to the lenders.  *See* May 14, 2007
Second Addendum To The  Presentence Report, at p. 3.

1      In sum, Mr. Ketner is fully prepared to have this Court impose a sentence

2  based on Mr. Ketner's undeniable responsibility for the misconduct he actually

3  engaged in at MCR.  He simply urges the Court to base the sentence on that

4  conduct, not on unproven conduct falsely attributed to him.

5  **C.      Other Conduct**

6      While the Government's Sentencing Memorandum is remarkably thin on

7  several very important issues, such as Mr. Ketner's background and circumstances,

8  it spends much time making allegations beyond the scope of the plea agreement and

9  beyond the activities at MCR.  Unfortunately, most of these allegations are nothing

10 more than unsupported and unconfirmed accusations.  They are demonstrably

11 untrue.

12     For example, the government begins its litany of accusations by parroting an

13 accusation purportedly made by Tami Ruffoll, who supposedly worked with Mr.

14 Ketner at GMAC Mortgage in "the early 1980s(!)."  The government claims that

15 Ms. Ruffoll claims that Mr. Ketner told her to commit fraud while they worked

16 together and the government uses this assertion as part of its claim that Mr. Ketner

17 deserves the high end of the range.

18     Several problems are evident with this: First, the government admits that it

19 has no evidence corroborating Ms. Ruffoll's story.  Indeed, the government claims

20 nothing more than Ms. Ruffoll's say-so; it didn't even try to corroborate it.  Second,

21 Ms. Ruffoll was a "walk-in," namely a person who called the government one day

22 after hearing about Mr. Ketner in the media.  Such witnesses are notoriously

23 unreliable.  Third, the alleged incident supposedly took place in the "early 1980s,"

24 over 25 years ago!  Even if Ms. Ruffoll were acting in good faith, she could easily

25 be mistaken about something that happened so long ago.

26     And indeed she is: In fact, Mr. Ketner never even worked at GMAC in the

27 "early 1980s."  He worked there from 1984 to 1986.  And more importantly, Mr.

28 Ketner was never terminated by GMAC for committing fraud.  In fact, Mr. Ketner

1  sued GMAC over the termination and *GMAC paid him $175,000 in damages.*[8] Ms.

2  Ruffoll's story is just wrong. It is probably a mixture of false memory, speculation,

3  and imagination, but wrong nevertheless. She, of course, bears no blame for

4  contacting the government. But the government, on the other hand, should do better

5  than to merely parrot every (possibly wrong) allegation that it hears. Unfortunately,

6  its sentencing memo does just this.

7        Another example of the government's assertion of demonstrably wrong facts

8  involves the claim regarding CFC Mortgage. The government claims that a witness,

9  Roberta Martin, said that Mr. Ketner was involved with fraudulent loans while he

10  was the head of CFC. Specifically, the government claims that Ms. Martin said that

11  the Department of Housing and Urban Development "conducted an audit and

12  discovered that many of CFC's HUD insured loans were fraudulent." But once

13  again, while Ms. Martin may indeed have said this, her accuracy deserves to be

14  investigated. And such investigation involves nothing more than checking the HUD

15  records regarding the audit. But the government apparently couldn't be bothered.

16        The records of the audit reveal that HUD concluded that certain loans did not

17  meet HUD guidelines. *But there was no allegation, much less a finding of fraud.*

18  Once again, it is possible that Roberta Martin is mistaken. This excuses her but it

19  does not excuse the government which ought to have something more than a bare

20  unproven allegation before making accusations like those it asserts here.

21        At this stage of the proceedings, unless the Court were inclined to hold

22  evidentiary hearings, it is simply impossible for Mr. Ketner to rebut every single

23  allegation made in the Government's sentencing memorandum. As shown, some

24  are easily proved entirely false. Others, however, are just as false but take longer to

---

26  [8]  The lawsuit was *Ketner v. GMAC Mortgage Corp.*, Riverside County Superior

27  Court, Case No. 185461. Even before it settled, neither party ever made any
allegations of fraud.

28

1 prove because they require closer analysis of accounting records or other

2 information.

3     For example, the Government makes sweeping accusations of bankruptcy

4 fraud.  And it is worth noting again that these are nothing more than accusations; the

5 issue of bankruptcy fraud was never included in the indictment and has never been

6 litigated.  While it is beyond the scope of a sentencing memo to litigate the accuracy

7 of these accusations, certain facts are easily proved wrong and they demonstrate the

8 unreliability of the entire accusation.

9     For example, the government asserts that Mr. Ketner sold certain "purple file"

10 properties "without consulting" with their "titular" owners.  Gov. Sentencing Memo.

11 at p.8.  And the Government makes this assertion based on a statement made not by

12 the "titular" owners but by their daughter.  One would expect that if the Government

13 were interested in learning what actually happened, it would ask the "titular" owners

14 themselves.  But one would be wrong.  While the Government deemed this

15 allegation important enough to include in the sentencing memorandum as grounds

16 for a heightened sentence, it didn't deem it important enough to confirm whether it

17 is true.  And indeed it is not: *all of the sale documents on the property in question*

18 *are **signed** by none other than the "titular" owners* – the same ones the Government

19 claims were unaware of the sale.

20     The government also claims that Mr. Ketner took the money from the sales.

21 Again, this is wrong.  Analysis of the records shows that Mr. Ketner did receive

22 reimbursement for hard costs he incurred while he managed the properties.  Other

23 than that, he received nothing.

24     In short, the government's allegations of other misconduct should not be

25 relied upon.

26 **D.    Mr. Ketner's Current Circumstances**

27     Although progress in such matters is rarely linear, it is significant that Ketner

28 has made great strides in acknowledging and addressing his impairments and

1  addictions.  For instance, the PSR does not reveal that Dr. Brown has reported that

2  Ketner "has shown steady progress in his [addictive behavior] treatment."  (Balkan

3  Report, Ex. F at page 13.)  Dr. Brown is a psychologist with a specialization in

4  addictive behavior, who is also a former Orange County Deputy Probation Officer

5  and a consultant with the State of California's correctional system.  As Dr. Brown

6  has reported,

7       "[Ketner] is sober for the first time in his adult life.  I have been

8       impressed with his ability to talk openly about his involvement in a

9       criminal matter and his willingness to accept responsibility.  In therapy,

10      he is learning the importance of sobriety in his life.  I do not believe

11      that with his continuing involvement in treatment and the 12-Step

12      Program that Mr. Ketner would be at risk to reoffend."

13  (*Id.*, page 13.)

14      In addition, Ketner has been meeting with addiction specialist Robert

15  Timmins.  Timmins has worked in the field of addiction treatment for 35 years and

16  was a chief consultant in the establishment of the national drug court system.  He

17  has managed Ketner's recovery from alcoholism since July 13, 2006.  Timmins

18  concluded in part that

19      "Based on my evaluation, I found Mr. Ketner to be amenable to

20      treatment and a good candidate for Alcoholics Anonymous . . . .  Mr.

21      Ketner has been in compliance with all aspects of his treatment plan . . .

22      I have spent time with Mr. Ketner since he entered recovery and found

23      him to be genuine in his desire to change and stay sober."

24  (*Id.*, pages 14-15.)

25      Ken's AA sponsor since October 2006, Jim Cordwell, also has reported that

26      "Ken and I talk several times a week and he is attending multiple AA

27      meetings weekly.  Ken understands that this battle is a life battle and

28

1   not a short-term war . . . I can assure you that Ken takes to the AA
2   Program with dedication and rigorous sincerity.  Having been active in
3   AA for such a long time, I feel qualified to judge Ken in this important
4   respect. Ken has and will win his battle." (*Id.*, p. 15)

5   **E.     Mr. Ketner's Service To The Community, Friends, And Family**

6   Unfortunately, the PSR does not accurately reflect or report these sincere and
7   legitimate efforts by Mr. Ketner nor does the PSR give sufficient credit to
8   Mr. Ketner's long term devotion to his family and community.  This is also reported
9   in some detail in the various letters written by family, friends and community
10  representatives, as reported by Sheila Balkan in her report.  (Balkan Report, pages
11  15-22.)  More recently, Mr. Ketner has dedicated extraordinary energy and time to
12  the rebuilding of a neighborhood in New Orleans, severely damages by Hurricane
13  Katrina.  His participation in the Broadmoor Improvement Association has helped
14  local New Orleans residents salvage an area of their city earmarked for complete
15  elimination.  Reverend Jerry Kramer, deeply involved in the Broadmoor rebuilding
16  efforts, calls Mr. Ketner "invaluable to their team and their organization's ability to
17  move forward." (*Id.*, pages 23-24).  Kramer credits Mr. Ketner with spearheading
18  an email and fundraising campaign necessary to support the Reverend's work.

19  **F.     Character Letters.**

20  The numerous letters attached to the Balkan Report reveal a dimension to
21  Mr. Ketner's character which is unexplored and unacknowledged by the
22  government and PSR.  The Reverend Jerry Kramer in New Orleans and the Senior
23  Pastor of St. James Church in Newport Beach, Fr. Praveen Bunyan, reveal
24  Mr. Ketner's spiritual commitment to the general community.  Each describes
25  Mr. Ketner's consistent convictions about and dedication to his church and religious
26  beliefs.  Fr. Bunyan attests to Mr. Ketner's devotion to his wife and family.  He also
27  confirms Mr. Ketner's longstanding contributions to others in need and especially
28  those in New Orleans.

1   Others, like Albert Britcher and Debi Barish, know Mr. Ketner in personal,
2   business and professional contexts, attest to his positive, mentoring impact on their
3   lives.  They also confirm that Mr. Ketner accepts responsibility for the actions and
4   inactions which led to his guilty plea.

5   Jim Cardwell is Ken's AA sponsor.  Mr. Cardwell is a long-time real estate
6   professional and a sober member of AA for over 32 years.  He has attested to Mr.
7   Ketner's commitment to remaining sober and to his family ties and devotion.  As
8   Mr. Cardwell has said of Mr. Ketner, "I remember a few days after Ken pleaded
9   guilty to his participation in the crimes, his attitude was to seek help, not sorrow."
10  That attitude is reinforced regularly.  As Mr. Cardwell also has said, "In October
11  (2006) . . . Ken asked me to be his sponsor in AA.  We have been working together
12  since and Ken has expressed an extreme commitment to solve his problems.  Ken
13  and I talk several times a week and he is attending AA meetings weekly.  Ken
14  understands that this is a life battle and not a short-term war."

15  The letter of support from Mr. Ketner's wife, Cheryl, and his daughter,
16  Kristen, reveal the depth of devotion each has to Mr. Ketner.  They do not hide from
17  Mr. Ketner's weakness, but more importantly, they reflect the fact that he has
18  always been a caring, loving man.  That perspective is confirmed by the balance of
19  letters offered by personal friends, business associates, parishioners, and long time
20  friends of Mr. Ketner and his family.  These testaments do not square with the
21  cynical, one-dimensional, skewed picture offered by the government.  The narrow
22  perspective offered there reflects a superficial assessment and a lack of perspective
23  driven by self-serving conclusions rather than in-depth consideration of the nuanced
24  layers of Mr. Ketner's character.

25  **G.    Mr. Ketner's Substantial Mitigation And Cooperation Efforts Since**
26  **MCR's Collapse.**

27  After the bankruptcy of MCR, Mr. Ketner assisted in providing helpful
28  information to the trustee of MCR, Richard Marshack and his attorney who in his

1  letter to the court dated September 14, 2006 stated: "Mr. Ketner proved to be a

2  valuable resource for the purposes of pursuit of claims against former employees

3  and affiliates of MCR.  He made himself available for meetings and provided

4  information and documents that allowed the trustee to prosecute claims against and

5  defend against certain others."  This effort shows Mr. Ketner's commitment to the

6  creditors of MCR.  Claims or fear of a claim by the estate of MCR against former

7  employees of MCR tainted their statements to the government about Mr. Ketner and

8  his involvement.

9       Mr. Ketner has made several efforts to cooperate with the government in this

10  case and other ongoing crimes being perpetrated by former associates of MCR's.

11  Mr. Ketner's former attorney had expressed Mr. Ketner's desire to the government –

12  prior to his indictment on February 18, 2005 – that he would like the opportunity to

13  present the factual events of what happened at MCR.  This request was denied and

14  the indictment that is before this Court was issued.  During preparation for trial and

15  prior to entering his plea agreement, it was discovered that potential witnesses in the

16  Ketner case were involved in illegal or questionable actions.  Just after Mr. Ketner's

17  plea agreement, he informed the government of two such actions.  While no

18  promises of § 5K motions were made, Mr. Ketner was told that the information

19  would be accepted and reviewed.  The information was collected and presented to

20  the FBI and has been called of "value" to its work.

21                                          **III**

22                           **SENTENCING ANALYSIS**

23       Following the ruling in *United States v. Booker*, 543 U.S. 220, 245 (2005),

24  Sentencing Guideline calculations are no longer mandatory.  Although sentencing

25  courts must still consider the advisory Guidelines range, "they are not required to

26  impose a sentence within [this] range."  *United States v. Gonzalez-Huerta*, 403 F.3d

27  727, 731 (10th Cir. 2005).  The advisory Guidelines range includes "applying a

28  'departure' as allowed by the Guidelines."  *United States v. Mares*, 402 F.3d 511,

1  519 n.7 (5th Cir. 2005).  However, the advisory Guidelines range is "but one factor

2  among others to be considered at sentencing." *United States v. Lopez-Flores*, 444

3  F.3d 1218, 1220 (10th Cir. 2006).  Consequently, after *Booker*, "a sentence, rather

4  than having to comply with the Guidelines, must be reasonable." *Lopez-Flores*, 444

5  F.3d at 1220.

6      Once the advisory Guidelines sentence has been determined, the Court must

7  consider other relevant facts and circumstances.  In particular, pursuant to 18 U.S.C.

8  § 3553(a), the Court must "impose a sentence sufficient, but not greater than

9  necessary" to serve such needs as respect for the law, just punishment, deterrence,

10  and protection of the public.  After *Booker*, these § 3553(a) factors "have a new

11  vitality in channeling the exercise of sentencing discretion." *United States v.*

12  *Trujillo-Terrazas*, 405 F.3d 814, 819 (10th Cir. 2005).  Thus, for example, "[w]hile

13  the guidelines discourage consideration of certain factors for downward departures,

14  *Booker* frees courts to consider those factors as part of their analysis under

15  § 3553(a)." *United States v. Andrews*, 447 F.3d 806, 812 (10th Cir. 2006).  As a

16  result, after *Booker*, "district courts now have more discretion to tailor sentences to

17  the individual circumstances of a defendant." *Trujillo-Terrazas*, 405 F.3d at 819.

18  **A.    Sentencing Guidelines Calculation Per The Plea Agreement.**

19      The base offense level for the wire fraud count (Count 9 of the Indictment) is

20  6.  U.S.S.G. § 2F.1.1(a).[9]  Because the loss amount exceeds $5,000,00, a 14-point

21  enhancement applies.  U.S.S.G. § 2F1.1(b)(1)(O).  A two-point enhancement for

22  more than minimal planning, U.S.S.G. § 2F1.1(b)(2)(A), and a three-point

23  enhancement for a supervisory role, U.S.S.G. § 3B1.1(b), bring the offense subtotal

24  for Count 9 to 25.

25  _____

26  [9]  As reflected in the Plea Agreement, the government and Mr. Ketner's counsel

27  have agreed that the Sentencing Guidelines effective November 1, 1998 (the "1998 Guidelines") should govern this case.

28

1        Under the Sentencing Guidelines' grouping rules, the money laundering count

2   (Count 16 of the Indictment) is grouped with the wire fraud count, and a two-point

3   "grouping" upward adjustment applies, bringing the subtotal to 27.  U.S.S.G.

4   § 3D1.4(a).  A three-point downward adjustment for acceptance of responsibility

5   results in a Total Adjusted Offense Level of 24.  *See* Plea Agreement at 8-9.  The

6   government and Mr. Ketner have agreed that no other specific offense

7   characteristics, departures, or adjustments apply.  *Id.* at 9.

8        As noted above, the PSR prepared by the Probation Office departs

9   significantly from this analysis and proposes using a higher Total Offense Level.

10   Mr. Ketner vigorously disagrees with the PSR's proposed alternative calculations,

11   which are at odds with the government's factual conclusions incorporated in the

12   Plea Agreement and also with the important and well-established facts of this case.

13   Mr. Ketner's objections to the PSR and demonstration of the PSR's flawed analysis

14   are set forth more fully in his Objections to the PSR and the attachments thereto,

15   filed with this Court on April 22, 2007.  Mr. Ketner also will be filing a motion to

16   strike the myriad unreliable factual assertions contained in the PSR and the

17   Government's brief, which are derived almost entirely in conclusions extrapolated

18   from self-serving hearsay statements by co-defendants and co-conspirators.  Basing

19   a sentencing decision on such unreliable matter would violate Mr. Ketner's due

20   process right to a fair sentence based on a reliable factual record.  In the interest of

21   brevity and judicial economy Mr. Ketner will not repeat those detailed objections

22   here, but instead incorporates them by reference and requests that the Court review

23   and consider them before imposing sentence.

24        Mr. Ketner has no relevant criminal history placing him in Category I.  Thus,

25   the guideline calculation results in a recommended range of 51-63 months in

26   zone C.

27

28

SENTENCING MEMORANDUM OF DEFENDANT KEN KETNER

**B.      The PSR Ignores The Plea Agreement, Misconstrues The Facts, And Misapplies The Law.**

In the PSR, the Probation Department inaccurately calculates the advisory guideline range in that it misapplies the provisions of the November 1, 1998, edition of the Guidelines manual.  More specifically that the sentencing calculations set forth in the Plea Agreement are justified and appropriate.  The PSR incorrectly assesses key facts and applies guideline sections which are inapposite, including the following:

First, virtually all of the evidence on this uncharged conduct is in the form of statements from co-defendants, or others who themselves were or could have been liable to prosecution for loan fraud in this same scheme and others.  This type of evidence has been held to be too unreliable at sentencing even to carry the Government's burden of proof of a fact by a preponderance of the evidence.  *See, United States v. Huckins*, 53 F.3d 276, 279 (9th Cir. 1995).

In the present case the statements the Government and the PSR rely upon appear to be no more reliable than those held to be unreliable as a matter of law in *United States v. Huckins, supra*.  The statements at issue there:

"were not made under oath, nor at trial where the declarant could be cross-examined.  Rather, his statements were made in the context of plea negotiations with the government in which Miller may very well have been hoping to curry favor with law enforcement officials by implicating his accomplice.  *See Lee v. Illinois*, 476 U.S. 530, 546, 106 S.Ct. 2056, 2065, 90 L.Ed.2d 514 (1986) (reiterating 'the time honored teaching that a co-defendant's confession inculpating the accused is inherently unreliable.')."  *United States v. Huckins, supra*, 53 F.3d at p. 279.

1    Like the statements in *Huckins*, the statements in the FBI 302's relied upon by

2  the Probation Officer to increase the Guidelines score well above that agreed to by

3  the Government in the plea agreement, are not subject to cross-examination.  Nor

4  are Mr. Ketner or his counsel aware of any circumstances that make the hearsay by

5  these self-motivated potential co-defendants any more reliable than those statements

6  considered totally and inherently unreliable in the cited case.

7    In addition, Mr. Ketner notes that at the time *Huckins* was decided, any

8  hearsay of a co-conspirator that bears sufficient indicia of reliability could be

9  admitted over a confrontation objection, under *Lilly v. Virginia*, 527 U.S. 116, 124-

10  125 (1999), but *Lilly* has since been abrogated by the decision in *Crawford v.*

11  *Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L.Ed. 2d 177 (2004).  In *Crawford*,

12  the Court held that "[t]estimonial statements of witnesses absent from trial have

13  been admitted only where the declarant is unavailable and only where the defendant

14  has had a prior opportunity to cross-examine." *See also, Bockting v. Bayer*, 399

15  F.3d 1010 (2005) (applying *Crawford* retroactively).

16    **1.    Contrary to the Government's Stipulation, the PSR Improperly**

17    **Applies a Four-Level Increase Under 2F1.1(b)(7)(B) (Offense**

18    **Affecting Financial Institution And Defendant Individually**

19    **Received $1 Million)**

20    The PSR argues that Mr. Ketner derived more than $1 million in gross

21  receipts from an offense affecting a financial institution and therefore imposes a four

22  level enhancement under § 2F1.1(b)(7)(B).  PSR ¶ 64.  In reaching this conclusion,

23  the PSR relies on the receipt of $1.8 million into *MCR's account* ("Ketner received

24  at least $1.8 million into MCR's account from Johnson, funds Johnson acquired

25  from Household. In addition, Ketner received at least $266,215 in laundered funds

26  (half of the $526,430 deposited into the Heritage accounts.)"  PSR ¶ 64).

27    The government disagrees with this adjustment.  And this is for good reason.

28  The Guidelines forbid attributing *MCR* funds to Mr. Ketner for purposes of Section

1  2F1.1. "The defendant derived more than $1,000,000 in gross receipts from the

2  offense" means that the gross receipts "*to the defendant individually, rather than to*

3  *all participants*, exceeded $1,000,000." U.S.S.G. § 2F1.1(b)(7)(B), Appl. Note 18

4  (emphasis supplied). In other words, *only money Mr. Ketner actually received is*

5  *counted towards the $1 million.*

6          Case law similarly forbids applying this adjustment to an individual defendant

7  when the funds were received by a corporation rather than the individual defendant.

8  *See United States v. Colton*, 231 F.3d 890 (4th Cir. 2000); *United States v.*

9  *Castellano*, 349 F.3d 483 (7th Cir. 2003); *United States v. Bortnick*, 2006 WL

10  680544 (E.D. Pa. 2006); *cf. United States v. Millar*, 79 F.3d 338 (2d Cir. 1996)

11  (funds held by one individual co-defendant do not count against other individual co-

12  defendant).

13          In *Colton*, for example, the defendant and his partner used their corporate

14  entity to unlawfully obtain over $2 million. Thereafter the defendant and his partner

15  each received $300,000 from the corporation out of these funds, but the remainder

16  was used to satisfy the corporation's obligations along with corporate obligations

17  incurred by other entities run by the defendant and his partner. The district court

18  ruled that this adjustment did not apply because the defendant himself received only

19  $300,000. On appeal, the government argued this was error because § 2F1.1 defines

20  "gross receipts" as those received "directly or indirectly." Seizing on this

21  terminology, the government maintained that the defendant *indirectly* received half

22  of the $2 million. The Court of Appeals for the Fourth Circuit rejected this

23  argument and affirmed the lower court because there was no indirect receipt through

24  the corporation. *See Colton*, 231 F.3d at 910-12; *see also Castellano*, 349 F.3d at

25  486-87 (holding that founder and principal manager of corporation does not

26  individually receive money entering corporate coffers); *Bortnick*, 2006 WL 680544

27  at *3-4 (holding that president and part owner of corporations does not individually

28  receive money deposited into corporations' accounts).

1    The plain language of § 2F1.1 and Application Note 18, as well as the
2  relevant case law, mandate that the $1.8 million that *MCR* received into its account
3  does not factor into the calculation of Mr. Ketner's *individual* "gross receipts" under
4  § 2F1.1.  The government recognized this when it stipulated that this adjustment
5  does not apply here and the PSR should recognize this as well.  This adjustment
6  does not apply here.[10]

7    In addition, the PSR does not take into account the bank records which clearly
8  reflect that Mr. Ketner did not benefit from the $266,215 received from Johnson.  In
9  fact, $135,000 of that was returned to the MCR operating account and, therefore,
10  Mr. Ketner only benefited from $131,819.58 from the "sharing" arrangement with
11  Johnson.  (Exh. 2, Laffer Report, pp. 40-41; Laffer Exhibit 74.)

12  **2.    Contrary to the Government's Stipulation, the PSR Improperly**
13  **Applies a Four-Level Increase Under § 3B1.1(a)**
14  **(Organizer/Leader).**

15    After investigating this matter for several years, after interviewing witnesses
16  and taking testimony, the government concluded that Mr. Ketner deserves a three-
17  level upward adjustment for role in the offense.  The government also agreed that
18  Mr. Ketner *does not deserve* a four-level upward adjustment.

19    Though the PSR makes clear that its conclusions are not based on any
20  information other than that provided by the government, the PSR comes to a
21  conclusion the government disputes, namely that Mr. Ketner deserves a four-level
22  adjustment.  (PSR, ¶¶ 68-68.)  The PSR bases its conclusion on a rhetorical

---

24  [10]  In her May 14, 2007 "Second Addendum To The Presentence Report," the
   Probation Officer simply ignores the Application Notes and case law cited here – all
25  of which was set forth in Mr. Ketner's April 24, 2007 objections to the prior version
26  of the PSR.  Rather than addressing this compelling legal authority, the Probation
   Officer simply repeats her bare conclusions, which are unsupported by any legal
27  authority.

1    question, "if Ketner is not the leader, than who is[?]"  (PSR, ¶ 66.)  But not every

2    scheme has a single leader.  As discussed above, the underlying losses resulted from

3    the deceitful actions and supervision of several people and were simply not the end

4    result of the long term, preconceived scheme as envisioned by the PSR.

5        The PSR also considers the factors set out in the application notes regarding

6    role in the offense.  But these do not support the PSR's conclusion either.  For

7    example, while exercise of decision-making authority is a factor, it is clear that

8    others, such as Mr. Benicosa, had at least as much authority as Mr. Ketner when it

9    came to MCR's finances.  *Indeed, Mr. Ketner did not even sign any of MCR's*

10    *checks and he had no wire authority.*  Instead, Mr. Benicosa controlled these things.

11    Likewise, the nature of Mr. Ketner's participation in the commission of the offense

12    was not different from Mr. Bristol's, for example.  There is no evidence that

13    Mr. Ketner claimed or received a larger share of the proceeds than Mr. Bristol;

14    indeed, Mr. Bristol received more than Mr. Ketner.

15        In short, while the PSR lists a number of factors to be considered, it does not

16    actually determine whether any of these factors should apply here.  Instead, it

17    simply states that Mr. Ketner was in charge of MCR and was involved in the

18    offenses.  Of course, no one disputes that Mr. Ketner played a prominent role at

19    MCR.  But this is the wrong question.  The proper question is whether Mr. Ketner

20    was significantly *more* involved than the others and whether he "led" them in the

21    offense.  Even the PSR indicates that he did not, noting as it does that Mr. Ketner

22    "along with Bristol and Johnson" defrauded the warehouse lenders.  In fact, it was

23    Mr. Benicosa and Mr. Bristol – not Mr. Ketner – who engaged in most of the wide-

24    ranging misconduct that led to MCR's collapse.

25        In short, when the PSR gave Mr. Ketner a four-level adjustment, the PSR

26    assumed its own conclusion.  The government's agreement that this is wrong should

27    carry heavy weight here.  As the government stipulated, a proper understanding of

28    the facts reveals that Mr. Ketner should not receive this four-level adjustment.

1    **3.     The PSR's Calculation Of The Amount Of Loss Is Without**

2           **Sufficient Basis, Is Contrary To Government's Position, And Is**

3           **Wrong.**

4           The PSR's conclusion on loss (PSR, ¶¶ 35-39, 62; Letter to Judge Selna, p.1)

5    is significantly different from the government's.  Moreover, the PSR's conclusion is

6    not well-founded.  For example, the PSR states that the General Counsel of

7    Republic Bank "indicated to the SA that Ketner had a $15 million line of credit with

8    Republic Bank, approximately half of which had been recovered.  Republic Bank

9    then estimated an expected loss of several million dollars." PSR ¶ 36.  Apart from

10   the third-hand nature of this representation, what this means is entirely unclear: If

11   Republic recovered half of a $15 million credit line, why would the loss be only

12   "several million dollars?"  And why would the then AUSA indicate, contrary to the

13   stipulation he signed, that the loss was $1.5 million? *Id.* ¶ 37.

14          The point here is not to debate the precise number.  It is more fundamental

15   than that.  Whatever the number is, it needs to have some basis.  And none of the

16   numbers in the PSR has any basis that can be used to test its validity.  Indeed the

17   numbers provided don't even agree with each other.

18   **4.     Contrary to the Government's Stipulation, the PSR Improperly**

19          **Applies a Two-Level Increase Under § 3B1.3 (Abuse of Trust).**

20          The PSR argues that Mr. Ketner deserves a two level adjustment for abusing a

21   position of trust with the warehouse lenders.  PSR ¶ 68.  But this contradicts even

22   the government's understanding of events and, moreover, is inconsistent with the

23   Guidelines.

24          The PSR says that "it was [the] abuse of [Mr. Ketner's] position with the

25   warehouse lenders that allowed for the commission of the offense."  But whether

26   Mr. Ketner's position enabled him to commit the offense is the wrong inquiry under

27   § 3B1.3.  As the Application Notes to § 3B1.3 make clear, "position of trust" for

28   purposes of this adjustment does not mean a position that made the crime possible.

1  It does not mean access.  Instead, it means a position that entails a high level of

2  discretion on the part of the defendant.

3      Specifically, Application Note 1 states:

4      "Public or private trust" refers to a position of public or private trust

5      characterized by professional or managerial *discretion* (*i.e.*, substantial

6      discretionary judgment that is ordinarily given considerable deference).

7      Persons holding such positions ordinarily are subject to significantly

8      less supervision than employees whose responsibilities are primarily

9      non-discretionary in nature.  For this adjustment to apply, the position

10     of public or private trust must have contributed in some significant way

11     to facilitating the commission or concealment of the offense (*e.g.*, by

12     making the detection of the offense or the defendant's responsibility for

13     the offense more difficult).  This adjustment, for example, applies in

14     the case of an embezzlement of a client's funds by an attorney serving

15     as a guardian, a bank executive's fraudulent loan scheme, or the

16     criminal sexual abuse of a patient by a physician under the guise of an

17     examination.  This adjustment does not apply in the case of an

18     embezzlement or theft by an ordinary bank teller or hotel clerk because

19     such positions are not characterized by the above-described factors."

20     Even on its face, this makes clear that the government was right when it

21  concluded that abuse of trust does not apply.  Indeed, as alleged in the PSR itself,

22  the loan money at issue was supposed to have been distributed directly by Johnson

23  & Payne and not MCR.  If so, Mr. Ketner could not have had any position of trust in

24  regards to that money – if he improperly took control of the money, by definition he

25  did not enjoy a position of trust relative to the warehouse bank victims.

26     Moreover, even if Mr. Ketner did have authorization to distribute the funds

27  here, he would still not be in a position of trust for purposes of this adjustment.  As

28  the application notes make clear, discretion, not access, is the hallmark of abuse of

1  trust.  The misconduct alleged here is that mortgage money from one borrower was

2  used to pay another borrower's loan.  In other words, the whole point is that

3  Mr. Ketner *had no discretion*.  He was no different from a bank teller who has

4  access to money but no discretion about what to do with it.  And as the Application

5  Notes make clear, access does not equal a position of trust.  Instead, "discretion

6  must be entrusted to the defendant by the victim."  *United States v. Broderson*, 67

7  F.3d 452, 455-56 (2d Cir. 1995).  No such discretion was entrusted to MCR or Mr.

8  Ketner by the warehouse lenders.  Even the PSR recognizes that, pursuant to the

9  terms of their commercial transactions, the warehouse lenders' agreements which

10  were ignored, carefully restricted MCR's and Mr. Ketner's discretion: (1) they

11  permitted MCR to make loans on their behalf only if the loans met their specified

12  requirements; and (2) they required that a closing agent, not MCR, fund the loans.[11]

13  In other words, Mr. Ketner did take advantage of a "position of trust," but rather

14  acted openly and with the lenders' knowledge.

15       This conclusion is not undermined by the fact that MCR and Mr. Ketner

16  managed to redirect the warehouse lenders' funds to MCR despite the warehouse

17  lenders intentions:

18       That [the defendant's] illegal activities frustrated [the victims']

19       oversight by corrupting various checks on his performance does not

20       mean that he held a position that his victims intended to be immune

21       from oversight and control; indeed it appears that he held a position

22       with certain checks in place to confirm his compliance with the law and

23       the contract, but that his illegal actions undermined these checks.

24  *United States v. Thorn*, 317 F.3d 107, 121-22 (2d Cir. 2003).

25

26  [11]  As noted earlier, at least some bank employees were aware that MCR was

27  funding the loans.

28

1     Even according to the PSR, Mr. Ketner was never supposed to be and never

2 was in a position "immune from oversight and control" relative to the mortgage

3 money.  If so, as the government correctly concluded, the abuse of trust adjustment

4 does not apply.

5 IV

6 **CONCLUSION**

7     For all of the foregoing reasons, Mr. Ketner respectfully urges the Court to

8 apply the Guidelines analysis employed by Mr. Ketner in this Memorandum and by

9 the government in the Plea Agreement, and to take careful account of the additional

10 relevant facts discussed in this Memorandum, Mr. Ketner's Objections to the PSR,

11 and the attachments to those documents.

12     As noted, the government investigated the case for almost five years before

13 charging Mr. Ketner.  And between the charges and the plea, Mr. Ketner and his

14 lawyers met with the government many times to discuss (and debate) the facts and

15 the applicable laws.  After this intense process, the parties that knew the most about

16 the case, namely the government and Mr. Ketner, reached a very detailed plea

17 agreement.  While that agreement does not bind the Probation Office and certainly

18 cannot bind the Court, it should at least carry weight regarding the factors at issue

19 here.  If the government concluded, for example, that Mr. Ketner deserves a 3-level

20 adjustment for role in the offense, it is safe to assume that the government, after

21 much investigation, concluded that this fairly reflects what happened.  It is not just

22 Mr. Ketner who is asserting those positions.

23     The PSR's repeated assertion of unproven facts and its reliance on those facts

24 to significantly increase the sentence is very troubling.  As noted earlier, at some

25 point the increase becomes so significant that the defendant becomes entitled to

26 have it based on proper evidence, not just hearsay or speculation.  No such quality

27 evidence supporting the increase has been adduced in this case.  In short, Mr. Ketner

28 respectfully urges the Court to apply the Sentencing Guidelines calculations and

1  factors agreed upon by Mr. Ketner and the government.

2      This case has been a long journey for all involved.  In the course of it, Mr.

3  Ketner learned a lot about his responsibilities as a member of society and he also

4  learned a lot about himself.  Mr. Ketner recognizes that he must pay society a price

5  for his crimes and he also recognizes that his addictions and conditions cannot be

6  ignored.  He has actively sought help to deal with these issues so that he can try to

7  rebuild his life after this is over.  He has made great progress in that area and he,

8  along with his doctors, is optimistic about the future.

9      Mr. Ketner made terrible choices.  He admits this and he knows he must face

10 the consequences of his choices.  His guilty plea and his work with the doctors and

11 counselors discussed above are evidence of this and these are the first steps in his

12 effort to rebuild his life on a proper foundation.  In light of all of this, Mr. Ketner

13 respectfully requests that he be sentenced at the low end of the range agreed to by

14 the government in the Plea Agreement.[12]

15     Mr. Ketner respectfully suggests that the actual facts – as established by

16 reliable evidence – warrant a sentence of the low end of the Guideline range.

17 DATED: June 22, 2007            Terry W. Bird

18                                 Jason D. Kogan
                                    John M. McCoy III

19                                 BIRD, MARELLA, BOXER, WOLPERT,

20                                     NESSIM, DROOKS & LINCENBERG, P.C.

21

22                                 By:   /s/

23                                        Terry W. Bird
                                    Attorneys for Defendant Kenneth Ketner

24

25

26 [12]  When the Probation Officer wrote her last comments on the 7 year
   recommendation, she acknowledges that there should be a downward adjustment

27 based on relevant facts.

28